# WELCH & SMITH, P.C.
### LAWYERS
**6440 AVONDALE DRIVE**
**SUITE 206**
**OKLAHOMA CITY, OK 78116**
**TELEPHONE: (405) 286-0801**
**FACSIMILE: (405) 286-0301**
**E-MAIL: WS@WELCHSMITH.COM**

MORT G. WELCH
MWELCH@WELCHSMITH.COM

SHERRY L. SMITH
SSMITH@WELCHSMITH.COM

May 21, 2019

**Via E-Mail**
Jacob Rowe
Fulmer Sill

RE:     *Shackelford v. American Income Life Ins. Co.,* Case No. 18-CV-0456, United States
District Court for the Western District of Oklahoma

Dear Mr. Rowe:

This report is submitted pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), in my capacity as an expert witness for your client, Alice Shackelford. I will refer to her as the plaintiff or Mrs. Shackelford. I will refer to the defendant, American Income Life Insurance Company, as AILIC.

## I.   Education.

I received a Bachelor of Arts degree with Special Distinction from the University of Oklahoma in 1972. I received a Juris Doctorate degree from the University of Texas School of Law in 1975.

## II.   Experience And Qualifications.

### A.   History of Practice.

I have been continuously engaged in the practice of law, almost exclusively in civil law matters since 1975. I was employed in 1975 and 1976 by a general practice law firm, Johnson and Davis, in Harlingen, Texas. From 1976 to 1978, I was an associate with Cooper, Stewart, Elder and Abowitz, in Oklahoma City, a civil litigation firm which handled many cases on behalf of insurers and their insureds. In 1978 I was a founder of Abowitz and Welch, and was a shareholder in this law firm, later known as Abowitz, Welch and Rhodes, until 1995. In 1995, I was a sole practitioner. In 1996 I formed another law firm, Welch, Jones & Smith, P.C. with Laurie W. Jones and Sherry L. Smith. In 2000 this firm became Welch and Smith, P.C. Currently I am an officer, shareholder and employee of Welch & Smith, P.C.

I was a member of the State Bar of Texas from 1975 when first admitted to practice law. After moving to Oklahoma in 1976 I let my membership in the State Bar of Texas



EXHIBIT
1

May 21, 2019
Page 2

lapse. I have been a member of the Oklahoma Bar Association since 1976. I am admitted to practice in the United States District Courts for the Western and Northern Districts, the Tenth Circuit Court of Appeals, and the United States Supreme Court and formerly in the Eastern District of Oklahoma. I have also been admitted to practice *pro hac vice* in several state and federal trial and appellate courts in Arizona, Arkansas, California, Illinois, Iowa, Kansas, Missouri, New Jersey, New Mexico, Ohio, Pennsylvania and Texas.

I am a member of Insurance Section of the Oklahoma Bar Association. I am a former member of the International Association of Defense Counsel, the American Bar Association, and the Oklahoma Association of Defense Counsel. I have been selected for inclusion in *SuperLawyers* for insurance coverage for the last ten years for the State of Oklahoma.

### B. Insurance Practice.

Since 1976 my practice has consisted of civil litigation of all types, with special emphasis on insurance coverage claims of all sorts. Increasingly over time my practice has included advising insurers, insureds, lawyers and public adjusters on insurance coverage issues and claims. This advice has resulted in the preparation of an estimated thousand or more written opinions concerning a wide variety of issues arising as a result of claims made under insurance policies. I also have reviewed and approved preparation of numerous coverage opinions by other lawyers under my supervision.

Through my experience in insurance litigation and as an advisor to insurers, insureds, lawyers and public adjusters, I have addressed issues under the coverage parts of umbrella and excess liability insurance policies, workers compensation and employer liability policies, motor carrier policies, personal and business auto policies, homeowners and farmowners policies; individual and group life, health and accident policies and certificates; professional liability policies; directors and officers liability and corporate indemnification policies; commercial general liability and property coverage forms; and reinsurance contracts.

### C. Published Decisions.

Cases resulting in officially and unofficially published trial or appellate court opinions in which I was either trial or appellate counsel or both include the following: Lindsey v. Dayton-Hudson Corp., 592 F.2d 1118 (10th Cir. 1979), *cert. den'd.* 444 U.S. 856 (1979); Wilson and Co. v. Reed, 603 P.2d 1172 (Okla. Civ. App. 1979); Wilson Foods Corp. v. Noble, 613 P.2d 485 (Okla. Civ. App. 1980); Wilson Foods Corp. v. Porter, 612 P.2d 261 (Okla. 1980); Short v. Oklahoma Farmers Union, 619 P.2d 588 (Okla. 1980) (homeowners property coverage); Fleming v. Hall, 638 P.2d 1115 (Okla. 1981); Tax Investments Concepts Inc. v. McLaughlin, 670 P.2d 981 (Okla. 1982); Snethen v. Oklahoma State Union of the Farmers' Edu. and Coop. Union of Am., 664 P.2d 377 (Okla. 1983) (auto property coverage); Takagi v. Wilson Foods Corp., 662 P.2d 308 (Okla. 1983); Thiry v. Armstrong World Industries, Inc., 661 P.2d 515 (Okla. 1983); Beeman v. Manville Corp. Asbestos Disease Compensation Fund, 496 N.W.2d 247 (Iowa 1983); Bristol v. Fibreboard

May 21, 2019
Page 3

Corp., 789 F.2d 846 (10th Cir. 1986); Case v. Fibreboard Corp., 1987 OK 79, 743 P.2d 1062; Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982), *app. after remand*, 827 F.2d 667 (10th Cir. 1987); Huff v. Fibreboard Corp., 836 F.2d 473 (10th Cir. 1987); Livengood v. Thetford, 681 F.Supp. 695 (W.D. Okla. 1988); Cofer v. Morton, 784 P.2d 67 (Okla. 1989) (auto uninsured motorist coverage); Fisher v. Owens Corning Fiberglass Corp., 868 F.2d 1175 (10th Cir. 1989); Wever v. State ex rel. Dept. of Human Serv., 839 P.2d 672 (Okla. Civ. App. 1990); Horace Mann Ins. Co. v. Johnson, 953 F.2d 575 (10th Cir. 1991) (homeowners liability coverage); State Farm Mut. Ins. Co. v. Schwartz, 933 F.2d 848 (10th Cir. 1991) (amicus curiae – auto liability coverage); Sargent v. Central Nat'l Bank & Trust Co. of Enid, Oklahoma, 809 P.2d 1298 (Okla. 1991); Vilseck v. Fibreboard Corp., 861 S.W.2d 659 (Mo. App. 1993); Angelo v. Armstrong World Industries, 11 F.3d 957 (10th Cir. 1993); Timberlake Const. Co. v. U.S. Fid. & Guar. Co., 71 F.3d 335 (10th Cir. 1995) (builders risk policy); First Financial Ins. Co. v. Roach, 80 F.3d 426 (10th Cir. 1996) (cgl coverage); Trinity Univ. Ins. Co. v. Broussard, 932 F.Supp. 1307 (N.D. Okla. 1996) (cgl coverage); Akin v. Ashland Chem. Co., 156 F.3d 1030 (10th Cir. 1998) *cert. den'd* 526 U.S. 1112 (1994); Kerr-McGee Corp. v. Admiral Ins. Co., 905 P.2d 760 (Okla. 1995) (cgl coverage); Allstate Ins. Co. v. Fox, 139 F.3d 911 (Tab.), 1998 WL 77745 (10th Cir. 1998) (auto and homeowners liability coverage); Oklahoma Farmers Union Mut. Ins. Co. v. John Deere Ins. Co., 967 P.2d 479 (Okla. Civ. App. 1998) (auto dealer liability coverage); Grain Dealers Mut. Ins. Co. v. Farmers Alliance Mut. Ins. Co., 298 F.3d 1178 (10th Cir. 2002) (cgl and farmowners liability coverage); Gonzalez v. Dub Ross Co., Inc., 224 P.3d 1283, (Okla. Civ. App. 2009); Alea London Ltd. v. Canal Club, Inc., 231 P.3d 157 (Okla. Civ. App. 2009) (commercial general liability ["cgl"] coverage); Condray v. Unum Life Ins. Co. of Am., 2009 WL 1312515 (W.D. Okla. May 7, 2009) (accidental death policy); Poteau Ford Mercury, Inc. v. Zurich American Ins. Co., 2009 WL 9508739 (Okla. Civ. App. May 8, 2009) (employment practices liability and cgl coverages);   American Interstate Ins. Co. v. Wilson Paving & Excavating, Inc., 2009 WL 3427992 (N.D. Okla. Oct. 20, 2009) and 2010 WL 2624133 (N.D. Okla. June 25, 2010) (workers compensation and employers liability coverage); O'Rear v. American Gen. Assur. Co., 2010 WL 2594748 (W.D. Okla. June 23, 2010) (accidental death policy); American Farmers & Ranchers Mut. Ins. Co. v. Shelter Mut. Ins. Co., 267 P.3d 147 (Okla. Civ. App. 2011) (auto liability coverage); GuideOne Mutual Ins. Co. v. The Shore Ins. Agy., 259 P.3d 864 (Okla. Civ. App. 2011); Employers Ins. Co. of Wausau v. Midwest Towers, Inc., 2011 WL 5117610 (W.D. Okla. Oct. 25, 2011) (cgl coverage); Mulford v. Neal, 264 P.3d 1173 (Okla. 2011) (auto liability coverage); Republic Underwriters Ins. Co. v. Moore, 2010 WL 4365566 (N.D. Okla. 2010) *rev'd* 2012 WL 2948177 (10th Cir. 2012) (cgl and commercial umbrella liability coverages); Ray v. Oklahoma Heritage Home Care, Inc., 2013 WL 2368808 (W.D. Okla. May 29, 2013); Hanover American Ins. Co. v. Saul, 594 Fed.Appx. 526 (10th Cir. 2015) (businessowners' liability coverage); and MTI, Inc. v. Employers Ins. Co. of Wausau, 913 F.3d 1245 (10th Cir. 2019) (CGL coverage).

### D.   Non-Litigation Insurance Practice.

I have personally supervised hundreds of investigations of insurance claims, also I have personally conducted some such investigations when the expense was deemed warranted by a client.   I have trained adjusters and their supervisors concerning claims investigation

May 21, 2019
Page 4

techniques and procedures, the construction and interpretation of insurance policies, evaluation of claims, and standards for claims handling intended to comply with the covenant of good faith and fair dealing, and insurance case and statutory law. I have evaluated thousands of claim files for insurers and insureds (and their lawyers) to determine if the files include all information appropriate to make a determination concerning coverage, liability, and damages or losses, and whether the investigation and handling of the claim is consistent with the applicable law, the obligation of good faith and fair dealing, and insurance industry standards. In addition, I have qualified as an expert witness on a wide variety of coverages. Some of these cases are identified in Section III, *infra*.

I participated in drafting the anti-stacking provisions of auto uninsured motorist coverage subsequently upheld by the Oklahoma appellate courts in Withrow v. Pickard, 905 P.2d 800 (Okla. 1995); Breakfield v. Oklahoma Farmers Union Mut. Ins. Co., 910 P.2d 991 (Okla. 1995); and Kinder v. Oklahoma Farmers Union Mut. Ins. Co., 943 P.2d 617 (Okla. Civ. App. 1997). Since those decisions were rendered, the stacking of uninsured motorist coverage in policies subject to Oklahoma law has become minimal, and only in policies which have not been revised to include anti-stacking language.

I have drafted and revised many other types of clauses for use in various insurance policies, including auto, homeowners, farmowners, dwelling, commercial lines, insurance agent's professional liability, commercial general liability, commercial property, and umbrella and excess liability coverages. I have prepared drafts of entire business and personal auto policies.

I have presented client positions on insurance coverage issues to the Oklahoma Insurance Department and advised that department informally on insurance coverage issues. I participated in drafting proposed legislation relating to insurance in Oklahoma and Idaho, including amendment to the Oklahoma Declaratory Judgment Act, 12 O.S. §1651, to permit declaratory judgments concerning issues arising under liability insurance policies, effective November 1, 2004, to bring Oklahoma into line with the vast majority of state and federal law. I also participated in the revision of the motor vehicle insurance laws in Title 47 of the Oklahoma Statutes contained in Senate Bill 1161, which was passed by the first regular session of the 2009 Legislature.

**E. Teaching Experience.**

I have lectured and prepared seminar materials for continuing legal education programs sponsored by Oklahoma Bar Association (OBA), Oklahoma Association of Defense Counsel, Oklahoma Trial Lawyers Association, University of Oklahoma School of Law, Oklahoma City University School of Law, and The Conference on Consumer Finance Law. These presentations have been approved as continuing education programs for Oklahoma lawyers, Oklahoma, Texas and California adjusters, and Oklahoma insurance agents. Selected titles include: *Allocation of Fault-Identifying All Angles*, OBA CLE (Feb. 1989); *Identifying and Using Insurance Coverages Commercial Liability*, OBA CLE (Feb. 1990); *Documenting the Agreement,* OBA CLE (Dec. 1991 and Mar. 1995);

May 21, 2019
Page 5

*Replacement Cost Property Insurance Coverage Without Replacement: Coblentz v. Oklahoma Farm Bureau Mut. Ins. Co.;* The Conf. on Cons. Fin. Law (Dec. 1996) (discussing actual cash value and replacement cost coverage loss settlement terms in property coverages); *There are Many People Who Want Your Client's UM Money: Pitfalls in the Settlement of UM Claims,* OBA & Oklahoma Insurance Department approved CE (Oct. 2009); *Substantial Certainty Tort Claims By Injured Employees Against Their Employers: What Workers Compensation Professionals Should Know,* 11th Annual Spring Insurance Update Seminar (April, 2010, Oklahoma City/Dallas), an Oklahoma Insurance Department approved CE; and *Basic Elements of Auto Liability Coverage and Case Law Restrictions, What Must be Proved to Prevail on a UM Claim, The Interface Between Auto Liability and UM Coverages when the Claim's Value Potentially Exceeds the Liability Coverage Limit,* Last Minute Continuing Legal Education (Leflore County Bar Ass'n. Dec. 16, 2010). I was program planner and moderator for the OBA and Oklahoma Insurance Department approved CE seminar, *What The Other UM Seminars Didn't Tell you: How To Settle And (If All Else Fails) Try UM Cases* (Oct. 2009).

I also have served as an adjunct professor at the Oklahoma City University School of Law teaching civil procedure.

### III. Prior Testimony.

I have testified by deposition as an expert witness in the following insurance and similar cases:

Allen v. Lynn Hickey Dodge, No. CJ-96-6076, District Court of Oklahoma County, Oklahoma, on February 7, 2003 for the plaintiffs and their attorney, Ed Abel; Anders v. GEICO, No. CJ-2002-6387, District Court of Tulsa County, Oklahoma, on September 18 and September 19, 2003 for the defendant GEICO and its attorney, Jerry Pignato; Arrow Exterminators Inc. v. Mid-Continent Cas. Co., No. CJ-2000-1558, District Court of Tulsa County, Oklahoma, on June 3, 2004 for the defendant, Mid-Continent Casualty Co. and its attorney, Roger Butler; GuideOne Mut. Ins. Co. v. Smith, No. CIV-03-1087-F, United States District Court for the Western District of Oklahoma, on October 28, 2004 for the defendants and their attorney, Joe E. White, Jr.; Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co., No. CJ-04-7542-62, District Court of Oklahoma County, Oklahoma on November 16, 2005 for the defendant and its attorney, David Donchin; Horn v. GEICO, No. CIV-02-0058, United States District Court for the Western District of Oklahoma, on October 10, 2002 for the defendant GEICO and its attorney, Robert Allen; Hutchinson v. United Services Auto. Assoc., No. C-98-596, District Court of Pittsburgh County, Oklahoma for the defendant, Oklahoma Farmers Union Mutual Insurance Company and its attorney, W. G. "Gil" Steidley; Melton Truck Lines Inc. v. Indemnity Ins. Co. of North America, No. CV-263-JHP-SHA, Northern District of Oklahoma, on August 2, 2007 for the defendant and its attorney, Robert Rivera, Jr.; Ward v. Oklahoma Farmers Union Mut. Ins. Co., No. C-04-603, District Court of Pontotoc County, on September 8, 2005 for the defendant and its attorney, David Donchin; Cordova v. Oklahoma Farm Bureau Ins. Co., No. CJ-2008-1557, District Court of Oklahoma County on November 16, 2009 for plaintiff and her attorney Gregg W. Luther; Cearley v. Great American Ins. Co. of New York, No.

May 21, 2019
Page 6

CJ-2008-1202, District Court of Creek County on January 21, 2010 for plaintiff and his attorneys, W.G. "Gil" Steidley and Whitney Eschenheimer; Tate v. Allstate Ins. Co., Case No. 10-CV-104-R, United States District Court, Western District of Oklahoma on February 16, 2011, for the plaintiff and his attorney, Gregg W. Luther; Sherwood Construction Company, Inc. v. American Home Assurance Company, et al., Case No. 5:09-cv-1395-HE, United States District Court for the Western District of Oklahoma on April 13, 2011, for the defendants and their attorneys, Elizabeth E. Muckala and Linda M. Szuhy; David Gregory Miller v. Farmers Ins. Grp., et al., Case No. CIV-10-466-F, United States District Court for the Western District of Oklahoma, on July 8, 2011, for the plaintiff and his attorneys Logan Johnson and Brad Miller; Steven Hayes v. State Farm Fire & Casualty Co., Case No. 10-CV-680-HE, United States District Court for the Western District of Oklahoma, on September 13, 2011, for plaintiff Steven Hayes and his attorney Rachel Bussett; Janet McDonald v. American General Life Ins. Co., Case No. 12-CV-0012-D, United States District Court for the Western District of Oklahoma, on September 28, 2012, for plaintiff Janet McDonald and her attorney Patrick Ryan; SRM, Inc. v. Great American Ins. Co., Case No. 11-CV-1090-F, United States District Court for the Western District of Oklahoma, on January 23, 2014, for defendant Great American Insurance Company and its attorney, Roger N. Butler, Jr.; Elizabeth A. Roberts v. Safeco Ins. Co. of America, Case No. CJ-2012-1051, District Court of Oklahoma County, Oklahoma, on February 24, 2015, for plaintiff Elizabeth Roberts and her attorney, Simone Gosnell Fulmer; Rebecca Zeavin v. Evronia Ray and USAA Casualty Ins. Co., Case No. CJ-2011-7887, District Court of Oklahoma County, Oklahoma, on February 26, 2016, for plaintiff Rebecca Zeavin and her attorney, Simone Gosnell Fulmer; Wade Lavoy v. USAA and USAA General Indemnity Co., Case No. CJ-2014-131, District Court of Jackson County, Oklahoma, on April 9, 2016, for plaintiff Wade Lavoy and his attorney, Simone Gosnell Fulmer; Eric LaFollette et al. v. Liberty Mut. Fire Ins. Co., Case No. 14-CV-04147-NKL, United States District Court for Missouri, Central Division, on April 11, 2016, for plaintiffs Eric LaFollette and Camille LaFollette, and their attorney Derrick Morton; Rose Marie Carrier v. United Services Auto. Assoc. and USAA Casualty Ins. Co., Case No. CJ-2013-2547, District Court of Tulsa County, Oklahoma, on February 23, 2017, for plaintiff Rose Marie Carrier and her attorney, Simone Gosnell Fulmer; Dee Ann Harper v. United Services Auto. Assoc. and United Services Auto. Assoc. Casualty Insurance Co., Case No. CJ-2012-5890, District Court of Oklahoma County, Oklahoma, on February 23, 2017 for plaintiff Dee Ann Harper and her attorney, Simone Gosnell Fulmer; Rodney Stewart v. Brotherhood Mutual Insurance Company, Case No. 16-CV-00488, United States District Court for the Northern District of Oklahoma, on November 27, 2017, for plaintiff Rodney Stewart and his attorney Simone Fulmer; Reinaldo Lozano v. Golden Rule Insurance Company, Case No. CIV-15-1230-F, United States District Court for the Western District of Oklahoma, on November 30, 2017, for plaintiff Reinaldo Lozano and his attorney Simone Fulmer.

I have testified at trial as an expert witness in the following insurance cases:

Anders v. GEICO; Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co.; Tate v. Allstate Ins. Co.; David Gregory Miller v. Farmers Ins. Grp., et al. (hearing on class certification); Wade Lavoy v. USAA; Carrier v. USAA; and Nelson v. Granite State Ins.

May 21, 2019
Page 7

Co., Case No. CIV-08-1165-M, United States District Court for the Western District of Oklahoma, for the defendant and its attorney, Steve Holden.

In Gutkowski, Hutchinson, and Ward, my expert opinions were offered on behalf of the client I represented, and not as a retained expert.

I testified as an expert witness in legal malpractice cases by deposition for the defendants and their attorney, James K. Secrest II, in Wheat v. Richardson, No. CJ-2007-7248, District Court of Tulsa County, Oklahoma on October 13, 2009, and for the plaintiff and its attorney, Robert Killeen, in Gray Ins. Co. v. Heggy, No. 11-CV-733-C, United States District Court for the Western District of Oklahoma, on October 10, 2012.

## IV.  Compensation.

I am charging your firm $295.00 per hour for my services as an expert witness on behalf of your client in this case.

## V.  Documents Reviewed.

I have reviewed the following:

1. Documents filed in *Shackelford v. American Income Life Ins. Co.*, Case No. 18-CV-0456, United States District Court for the Western District of Oklahoma;

2. Responses of the parties to discovery requests (including documents and tape recordings) produced by the parties and documents identified as exhibits to depositions and in plaintiff's exhibit notebooks;

3. Accident Policy issued to Odell Shackelford, effective February 24, 1996;

4. Transcripts of depositions of Paul Johnson, Shaniqua Robles, Crystal Webb, Dawn Troxell, Joel Scarborough;

5. Insurance industry and governmental publications, actual and model insurance statutes and regulations, case law, and secondary insurance and legal resources;

**If I am furnished additional documents, deposition transcripts or other sources of information after the date of this report, I reserve the right to supplement this report.**

## VI. Exhibits.

I anticipate using one or more of the documents identified in Section V.

May 21, 2019
Page 8

## VII.   Opinions.

### A.   General Summary of My Opinions.

You requested me to evaluate the handling of Mrs. Shackelford's claim, as beneficiary of an accidental death policy issued to her husband, Odell Shackelford, by AILIC. Mr. Shackelford died in a one car accident on January 24, 2017. Mrs. Shackelford was paid the basic accident death coverage benefit, $20,000. She also made a claim under a double indemnity provision applicable if Mr. Shackelford's death resulted from an accident which occurs while Mrs. Shackelford was driving his car. AILIC denied the double indemnity claim on the basis of an exclusion for loss resulting from "the use of drugs."

I have evaluated the investigation and decision to deny the double indemnity claim in light of the facts furnished to me, basic nationally accepted standards applicable to the adjustment of insurance claims, and my experience as described in section II. In my opinion, AILIC's conduct was substantially below national standards, and this conduct directly caused AILIC to deny Mrs. Shackelford's claim without any basis when it should have been paid.[1]

### B.   National Standards For Adjustment of Insurance Claims.

I considered national standards which are generally applied in the insurance industry, regardless of the type of policy under which a claim is made and regardless of the status of the person making the claim, i.e. whether a first party or a third party claimant.[2] These standards are embodied in model legislation, claim handling insurance literature, and in some cases statutory or case law which incorporates specific industry standards. I have endeavored to identify relevant examples of this model legislation, literature and law in this report.

#### 1.   Insurer Knowledge of Applicable Law.

Claims personnel and in-house lawyers who advise the claims department and, through them, the insurers for whom they provide services, are held to, or deemed to have, knowledge of the law applicable to claim handling and interpretation of policies. A training publication by the Insurance Institute of America contains an apt statement: "[c]laims professionals should have expert knowledge of insurance policy coverages, the law and determination of damages".[3] "In the real world of insurance claims handling, claims personnel are usually trained in policy interpretation, and provided resources on

---

[1] I am aware that AILIC paid the double indemnity amount on May 9, 2018 after it was sued in this case on March 27, 2018. See Pf.'s Exhs. 2.13, AILIC 507-509, Dkt. No. 1, Exh. 3.

[2] A first party claimant refers to an insured or named beneficiary of a policy who makes the claim. A third party claimant is a person asserting a claim against an insured. A beneficiary of a life insurance policy is a first party claimant. See Roach v. Atlas Life Ins. Co., 769 P.2d 158, 161 (Okla. 1989).

[3] James K. Markham et al., *The Claims Environment*, at 12-14 (Ins. Instit. of Am. 1993).

May 21, 2019
Page 9

how to interpret and apply insurance policies to specific fact situations".[4]  In this case my opinions in part address the reasonableness of AILIC's conduct in light of established law. Industry standards require knowledge of applicable law and these standards apply to evaluate whether an insurer acted reasonably in a given set of circumstances.[5]  It is, therefore, necessary to identify the law which AILIC should have known and followed in evaluating whether to pay Mrs. Shackelford's claim.

## 2.  National Standards Identified In the Model Unfair Claims Settlement Practices Act and Model Regulations

In 1971 the National Association of Insurance Commissioners (NAIC) adopted amendments to its Model Unfair Trade Practice Act.  The amendments identified several existing claims practices which were declared unfair.  In 1990 NAIC adopted a free standing Model Unfair Claims Settlement Practices Act (Model Act) which continued to include the prohibited unfair claims practices added to the Model Unfair Trade Practices Act.[6]  The purpose of the Model Act "is to set forth standards for the investigation of claims arising under policies or certificates of insurance....".  Model Act Section 1.  The standards in the Model Act are based upon a consensus understanding of good claims handling practices.[7]  The Model Act or some variation on it, has been adopted in most states.[8]

One of NAIC's primary reasons for identifying consensus standards was "to protect both the insured and third-party claimants" from "unscrupulous, unethical or poorly trained adjusters who are looking for ways to deny a claim, as opposed to simply conducting the evaluation to accurately evaluate liability and damages."[9]  In other words, "[t]he purpose of these acts and regulations was to curtail precisely the conduct which necessitated the invocation of a tort remedy for certain breaches of insurance contracts."[10]

NAIC also adopted a Model Unfair Property/Casualty Claims Settlement Practices Regulation (Model Regulation) to implement the Model Act and the claim practices provisions of the Unfair Trade Practice Act.  See Model Regulation, NAIC 902-1 and PC-

---

[4] Charles Miller, *The Scope of Expert Testimony in Insurance Bad Faith Cases*, 15 CONN. INS. LAW JRL. 211, 217-18 (Fall 2008).
[5] This standard has been incorporated into case law.  *See e.g.,* Brown v. Patel, 157 P.3d 117, 122; Barnes v. Oklahoma Farm Bur. Ins. Co., 11 P.3d 162, 171; Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 800 (10th Cir. 1995) (applying Oklahoma law).
[6] NAIC Model Laws Requirements & Guidelines, NAIA 900-1.
[7] *See e.g.,* an article by a leading insurance industry lawyer, Douglas Howser, *The Unfair Claims Settlement Practices Act*, 15 THE FORUM 336 (1979); and *The Claims Environment* at 297 (Ins. Inst. Of Am. 1993).
[8] According to the NAIC, 54 states and territories have adopted the Model UCSPA or variations of it.  See NAIC ST-900-1.  The Oklahoma Unfair Claims Settlement Practices Act contains several provisions of the Model Act with some minor changes.  See 36 O.S. §§ 1250.1-1250.12.
[9] Michael T. Murdock, *Claims Operations – A Practical Guide* (Int'l Risk Mgmt. Instit., Inc. 2010) at 129 (herein referred to as *Claims Operations*).
[10] Steven Pitt et al., *The Claim Adjusters Automobile Liability Handbook*, § 6.1 (2015) ("Claim Adj. Handbook").

May 21, 2019
Page 10

902-1.  The stated purpose of the Model Regulation "is to set forth minimum standards for the investigation and disposition of property and casualty claims arising under contracts or certificates...".  Mod. Reg. §2, NAIC 902-1.  Parts of the Model Regulation was adopted by insurance commissioners in the majority of states, including Oklahoma.[11]

These consensus standards provide guidance for claims handling based upon the extensive experience of insurance regulators in the several states:  "The National Association of Insurance Commissioners (NAIC) created the Unfair Claims Settlement Practice Act to set forth standards for the investigation and disposition of claims arising under policies or certificates.[12]

One of the primary reasons for identifying consensus standards was, as an insurance industry publication put it, "to protect both the insured and third-party claimants" from "unscrupulous, unethical or poorly trained adjusters who are looking for ways to deny a claim, as opposed to simply conducting the evaluation to accurately evaluate liability and damages."[13]  In other words, "[t]he purpose of these acts and regulations was to curtail precisely the conduct which necessitated the invocation of a tort remedy for certain breaches of insurance contracts."[14]

Many insurers train their claims staff on the Model Act and Model Regulation as they exist in various versions in the states where the staff are handling claims.  In a book intended for use by claims professionals seeking the designation of Associate in Claims (AIC), the authors recommend that the reader "memorize the substance of the fourteen points" in the Model Act, referring to the practices identified in the Model Act as "unfair business practices".[15]

### 3.  Investigation Standards.

The insurance industry recognizes that an investigation must be fair and balanced, taking into account not only the insurer's interest in making a profit and thus minimizing payments on claims, but also taking into account the interest of the insured/claimant to be compensated for a loss under a policy for which he or she (or a third party) has paid a premium.   This means, at a minimum, that insurance companies must give equal consideration to the interests of insureds/claimants as they do to their own interests.[16]  An insurer cannot give equal consideration if it treats a first party claimant insured as an adversary.  As an industry publication put it, "[t]he adjustment process is not a contest in

---

[11] Claim Adj. Handbook § 6.16 (stating 29 states have adopted the Model Regulation in its entirety or parts of it).  The Oklahoma regulations are in OK ADM. CODE § 365: 15-3-1 et seq.

[12] 16 FC&S BULLETINS, *supra*. n.11 at Bcp-1.

[13] Michael T. Murdock, *Claims Operations – A Practical Guide* (Int'l Risk Mgmt. Instit., Inc. 2010) at 129 (herein referred to as *Claims Operations*).

[14] *Claims Adjusters Handbook, supra*, § 6.1.

[15] Willis Park Rokes, *Aggressive Good Faith and Successful Claims Handling*, at 87 (Ins. Instit. of Am. 1987) (herein "*Aggressive Good Faith*").

[16] See e.g., The Introduction to *Claims Handling Principles & Practices* (Am. Instit. For Charter Prop. Cas. Underw. 2006) §§ 2.37 & 5.3; *Claims Operations* 415.

May 21, 2019
Page 11

which either the company or the insured win and the other loses. This type of attitude creates an adversarial relationship from the beginning which is hard to overcome."[17] The law follows the industry standard: "[a]n insurer may not treat its own Insured in the manner in which an insurer may treat third-party claimants to whom no duty of good faith and fair dealing is owed."[18]

Another industry training publication shows just how important it is to comply with the investigation standard:

> Claims investigations are critical and represent the foundation of the evaluation and assessment of a claim. The key to a proper evaluation is to review all of the investigation and documentation material and then summarize the key elements of the claim in terms of liability and damages. The claim investigation serves as the basis for the coverage analysis and evaluation of the claim. **If the investigation is inadequate or incomplete, then the evaluation may be flawed or incorrect.**[19]

Most insurers have internal standards of investigation which they use to train their claims professionals. This is a best practice. The Model Act requires insurers to "adopt and implement reasonable standards for prompt investigation of claims arising under its insurance policies or insurance contracts.[20] The industry also recognizes that investigations must be timely and thorough, as "a duty to *timely* and *properly* investigate an insurance claim is intrinsic to an insurer's duty to *timely* pay a valid claim."[21] The Model Act also contains a number of sections intended to encourage "prompt investigation" and a "reasonable investigation".[22] Communications should be acknowledged with "reasonable promptness."[23] Insurers also should not "knowingly" misrepresent "relevant facts or policy provision" to "claimants and insureds."[24] The foregoing standards are intended to encourage insurers to **affirmatively** exercise the duty of good faith and fair dealing.[25]

It is standard practice in the insurance industry to identify claims for which additional assistance is needed from experts to address particular issues which arise in the course of

---

[17] *The Claims Environment* at 299.

[18] Newport v. USAA, 11 P.3d 190, 196 (Okla. 2000).

[19] *Claims Operations* at 115 (emp. add.). See also p. 155 and NAIC 900-1, Model Act § 4.F (claim denials should not be made "without conducting a reasonable investigation"). This standard has been incorporated into Oklahoma law: "[t]o determine the validity of the claim, the insurer must conduct an investigation reasonably appropriate under the circumstances." Buzzard v. Farmers Ins. Co., Inc., 824 P.2d 1105, 1109 (Okla. 1991).

[20] NAIC 900-1, § 4.C includes a "first party claimant" e.g. a beneficiary in a life insurance policy like Mrs. Shackelford. NAIC 902-1, Model Reg. §§ 3.C and 3.F.

[21] See e.g., *Claims Handling Principles & Practices* § 525 & *Claims Operations* at 109-110 and 119. Again, these standards are incorporated into Oklahoma law. *See e.g.*, Brown v. Patel, 157 P.3d 117, 122 (Okla. 2007).

[22] NAIC 900-1, Model Act §§ 4.C and 4.D

[23] *Id.* § 4.B.

[24] *Id.* § 4.A.

[25] *See e.g., Aggressive Good Faith* at 109.

May 21, 2019
Page 12

investigation or evaluation.[26] This standard is based on the practical observation that even experienced claims professionals will encounter issues on which a decision can only be made by consulting an expert, as the claims professional is not really qualified to address the issue. Where interpretation of a policy is an issue "[b]efore major claim decisions are made, claims representatives will want legal opinions on coverage....".[27] The opposite is also true. Reliance on the opinions of **unqualified or uninformed** professionals is not consistent with standards applicable to the claim investigation under discussion.

Proper claims investigation may require a claims representative to interview potential sources of information, including the person making the claim.[28] Thus, "statements are a necessary component of the investigation process."[29] Sometimes after a statement is taken a dispute arises as to exactly what questions were asked and what answers were given. To head off these disputes, statements should be recorded, as the recording will be the best evidence of what the claims professional did or did not ask and what the interviewee did or did not say.[30]

First party claimants have a legal and good faith obligation to reasonably cooperate with the insurer in processing the claim.[31] This obligation extends to providing authorizations to obtain information reasonably necessary to evaluate a claim. Insurers typically use these authorizations to obtain medical records, employment and school records, and tax returns. However, it is not good practice for a claims professional to shift the responsibilities to investigate the claim to a first party claimant.[32]

---

[26] See e.g., *Managing Bodily Injury Claims* (Am. Instit. For Charter Prop. Cas. Underw./Ins. Instit. Of Am. 2d ed. 2001) at 2-14; *The Claims Environment* at 20-22.

[27] *The Claims Environment* at 21.

[28] See e.g., *The Claims Environment* at 46 ("The basic purpose of a statement is to gather information in a logical and orderly fashion so that claims representatives can make decisions necessary for the disposition of claims.")

[29] *Claims Operations* at 118.

[30] See e.g., *The Claims Environment* at 46.

[31] FirstBank of Turly v. Fidelity & Deposit Ins. Co. of Md., 928 P.2d 298, 304 (Okla. 1996).

[32] Many courts have condemned this practice as well. *See e.g.,* Christie v. State Farm Mut. Auto. Ins. Co, 2015 WL 4755836 at *8 (E.D. Okla. Aug. 11, 2015) ("[D]espite having apparently valid medical authorizations in his possession, State Farm continually requested new medical authorizations be submitted, and continually requested Plaintiff's counsel provide a narrative report [of treating physician] instead of simply requesting it directly from [treating physician]; and failed to use medical authorizations State Farm had to obtain the uninsured motorist claimant's medical records); Hale v. Farmers Ins. Exch., 117 Cal.Rptr. 146, 153 (App. 1974) (insurer had "practice of making unauthorized and oppressive demands on the insured to himself furnish medical reports when the policy...required only that the insured execute the necessary consents so that the company could procure whatever medical reports it desired"); Kentucky Farm Bur. Mut. Ins. Co., v. Roberts, 603 S.W. 2d 498, 500 (Ky. App. 1980) ("insured party has the obligation to furnish any medical reports in his hands or subsequently coming into them, but...the duty to search out or to have reports prepared, as well as the duty to ascertain that the medical bills are the result of the injury, lies with the insurer"); and Fortune Ins. Co. v. Pacheco, 695 So.2d 394, 396 (Fla. App. 1999) (an insured "fulfills his obligation to furnish medical records upon signing a waiver of confidentiality that allows the insurer to procure the records directly from the provider").

May 21, 2019
Page 13

### 4.  Documentation Standard.

Proper claims handling requires adequate documentation.[33]  Hence, the adage "if it ain't there it don't exist"[34] applies in most cases.  The Model Regulations, for example, describe a standard of "[d]etailed documentation...in each claim file in order to permit reconstruction of the insurer's activities relative to each claim."[35]  The documentation should reflect a fair and balanced investigation, considering both the insurer's and the insured's interests.[36]  Specific acts of investigation performed should be described, the information obtained in the investigation should be identified, and the basis for evaluating a claim should be in the claim file.  This is because "[t]he claim file is the basic foundation on which all claims are resolved."[37]  "[A]ll claim activities documented in the claim file notes need to be clear so that any person reviewing the claim file will know the status of the investigation and the adjuster of the claim".[38]  This will enable the insurers to correctly advise claimants, management representatives and insurance regulators on the status of a claim.[39]

I see nothing about the industry-wide conversion to "paperless" claim files which reduces the need for proper documentation.  If anything, a person can document a claim quicker using an electronic system than she could when the claim file was a physical entity with lots of paper in it.  Of course, adjusters still see paper documents which generally are scanned into the electronic system.

### 5.  Internal Insurance Company Standards.

In addition to training, insurance companies should have internal standards for the handling of claims.  Companies which have no claims handling standards or inadequate standards risk harming the claims process:

> [l]ack of formal operational policies and procedures can have a detrimental effect on the claims organization....Policy and procedures guide the staff in addressing operational requirements, technical claims handling issues, development of a consistent approach to claims handling and establishment of a foundation to create ongoing goals and objectives.  Of the many type of internal company standards which should be formalized, the one probably most important in the context of a

---

[33] See e.g., *Claims Operations* at 123-124.
[34] Aggressive Good Faith at 128.
[35] NAIC 902-1, Model Regulations § 4.B.
[36] See e.g., *Claims Handling Principles & Practices* § 2.37.
[37] Barry Zalma, *Insurance Claims: A Comprehensive Guide*, Vol. 1 at 656 (The Nat'l Underw. Co. 2015).
[38] *Claims Operations* at 123.
[39] See e.g., *Aggressive Good Faith* at 115 ("Documentation can serve as excellent evidence to show that you handled a case with dispatch, providing timely and continual communication.")

May 21, 2019
Page 14

bad faith case is the so-called "claims manual" which "[d]etail[s] the processes and procedures in handling claims".[40]

### 6.  Training Standards.

Knowledge of the foregoing standards is conveyed to claims representatives, including managers, in their training.[41]  The insurance industry recognizes that adequate training is necessary to minimize the risk that claims which should be paid are paid, and claims which should not be paid are not paid.  Training is an ongoing responsibility.

Training should thoroughly address the elements of an adequate investigation, applicable law, interpretation of relevant policy provisions and the standards for good faith claims handling, including any specific statutory requirements for claims practices which are contained in applicable statutes, such as the Oklahoma Insurance Code.

In my experience, when an adjuster has received little or no training from her employer, there is a much greater risk that the adjuster lacks knowledge of applicable law, how policy language is intended to apply to a claim, what constitutes an adequate investigation and evaluation, and what communications with an insured/claimant, including communications denying a claim, should contain.  The result can be inadequate investigation and evaluation and thus both the denial of a claim that should have been paid, and the payment of a claim that should not have been paid.  Either way, lack of training does not serve the interest of the insurer or the insured/claimant.

### C.  Violation Of Standards.

### 1.  Basic Facts of Mrs. Shackelford's Claim.

The facts relevant to this claim are largely undisputed.  Mr. Shackelford is a military veteran who, along with Mrs. Shackelford, purchased an accident policy (referred to by AILIC as an A-71 policy) in 1996 from AILIC.  His wife, your client, is the named beneficiary.  Mr. Shackelford died on January 24, 2017.  In mid-afternoon he was driving a 2005 Chevrolet north bound on US Highway 62 in Comanche County when the vehicle crossed the center line dividing north and south bound lanes, entered the south bound lanes, and continued across the south bound lanes into a dirt embankment and rolled onto the passenger side.[42]

Under the heading "Unsafe/Unlawful Contributing Facts" of the investigating officer's report, he identified only one of the 99 factors, paragraph 88, which is "Other/Unk".[43]  He did not identify paragraph 80 "ALCOHOL – DUI/DWI" or paragraph 81 "DRUG – DUI".[44]  The officer also did not identify any unsafe or unlawful conduct of Mr.

---

[40] *Claims Operations* at 78.
[41] See e.g., *Claims Operations* at 1, 78-79.
[42] Official Oklahoma Traffic Collision Report, Plf.'s Exh. 2.2, AIL-000023.
[43] *Id.* AIL-000025.
[44] *Id.*

May 21, 2019
Page 15

Shackelford which was a factor contributing to cause Mr. Shackelford's vehicle to travel left of center off the roadway into the embankment.[45]   Two people are identified as witnesses in the report.[46]  The report does not include any description of the observations of the witnesses.

The officer's report was furnished to AILIC on February 20, 2017, 7 days after Mrs. Shackelford called AILIC about her husband's death.[47]  On February 20, 2017 AILIC also received a certificate of his death from Mrs. Shackelford.[48]  The report describes cause of death as blunt force trauma injuries.[49]  No other factors are identified as contributing to Mr. Shackelford's death.

AILIC requested records from Oklahoma Medical Examiner on March 28, 2017 (Ex. 2.4, AIL 000009) with the use of a medical authorization signed on March 9, 2017 by Mrs. Shackelford and received by AILIC on March 23, 2017 (Ex. 3.2, AIL 000015-16).  Mrs. Shackelford also signed a medical authorization furnished by her insurance agent on March 28, 2017 and faxed it to AILIC which received it on March 30, 2017 (Ex. 3.2, 2/23/17 ltr., AIL 000043; Ex. 3.3, AIL 000015-16).   The medical examiner's report and attached toxicology report were received by AILIC on April 25, 2017.  See fax cover sheet dated April 25, 2017 from Office of State Medical Examiner (Ex. 2.8, AIL 000035) and attached Report of Investigation By Medical Examiner (AIL 000033) and Report Of Lab Analysis (AIL 000032).  Even though AILIC received two signed authorizations, it sent another letter which informed Mrs. Shackelford that "[t]he medical records have been requested." (Ex. 3.5, AIL 000048).  The letter does not identify the medical records AILIC requested or to whom the request was made.  Since there is no evidence AILIC ever requested any of Mr. Shackelford's medical records from his provider, I assume "medical records" refers to the records of the medical examiner which were received two days after the date of the letter.

The medical examiner's report states Mr. Shackelford's body showed fractures to his cervical spine and ribs and bilateral pneumothorax.  The "Probable Cause of Death" is recorded as "Multiple Blunt Force Injuries", and "Manner of Death" as "Accident" (Ex. 2.2, AIL 000033).  The lab analysis report records testing Mr. Shackelford's blood for ethyl alcohol, benzodiazepines, amphetamine, methamphetamine, fentanyl, cocaine, opiates, PCP, barbituates.  The "RESULTS" of the blood test was that the blood was positive only for "DIAZEPAM and NORDIAZEPAM" (Ex. 2.2, AIL 000032).  I have not been furnished any evidence that the people who processed the double indemnity claim and made the decision to deny the claim knew what diazepam and nordiazepam are at the time they processed the claim.

After receiving the reports from the medical examiner, AILIC sent Mrs. Shackelford a letter dated May 2, 2017 requesting a "[c]opy of the prescription for Diazepam and

---

[45] *Id.*
[46] *Id.* at 000024.
[47] Exs., 2.4-9, 2.13, AIL 000519.
[48] Ex. 2.2, AIL 000007.
[49] *Id.*

May 21, 2019
Page 16

Nordiazepam prescribed to Odell Shackelford." Like the previous letter, this letter is from "Claims Department" (Ex. 3.6. AIL 000044). Discovery has revealed that claims examiner Shaniqua Robles was responsible for the letter. Ms. Robles was initially employed by AILIC on November 16, 2015 as a clerk in the claims department. (Ex. 17.3 – 17.7, AIL 000110, 104, 102, 098). The clerk position basically required opening mail and routing it to the proper location and organizing department paperwork. (Ex. 17.6, AIL 000197). Ms. Robles successfully bid for a claim examiner position effective April 28, 2016, approximately nine and one half months prior to the date Mr. Shackelford's death was reported to AILIC. (Ex. 10.8, AIL 000049, Ex. 10.12, AIL 000189, 181-185, 179, 177). Ms. Robles was hired by the claims manager, Crystal Webb. (Ex. 10, AIL 00018). Ms. Webb was hired as claims manager just a few months before promoting Robles. (Ex. 11.1 – 11.4, AIL 000229-30, 227, 226, 224). Ms. Robles and Ms. Webb quit their jobs after Mrs. Shackelford's claim was denied. (Ex. 11.5, AIL 000260).

AILIC also sent essentially duplicates of the May 2, 2017 letter, dated [MONTH] 23, 2017 and June 13, 2017 to Mrs. Shackelford, requesting prescriptions for diazepam and nordiazepam. (Ex. 3.6 – 3.7, AIL 000045-46)

Mrs. Shackelford sent a letter to AILIC by fax on June 13, 2017 which states in pertinent part:

> I am writing this letter to inform your company that Odell Shackelford has never taken a prescription drug named Nordiazepam and that there isn't a prescription or medicine bottle in my home for any Diazapams.

Ex. 3.8, AIL 000031.

Since nordiazepam is a metabolite of diazepam, Mr. Shackelford would never have had a prescription for it. Although the letter states "there isn't a prescription or medicine bottle in my home for any Diazepams", it does not say that Mr. Shackelford "has never taken a prescription drug named" diazepam, as the letter states with regard to nordiazepam. Prior to sending the June 13, 2017 letter, Mrs. Shackelford told employees of the Policy Owner Services (POS) department on the telephone that her husband did have a prescription for diazepam. She also informed POS in more than one call that Mr. Shackelford never was on nordiazepam. See e.g., June 7, 2017 call note by Kizzy Franco and June 11, 2017 note by Mary Elfrez. Ex. 4.12 – 4.14, transcripts of the telephone calls. In the June 7, 2017 call, Mrs. Shackelford told the POS employee that she knows her husband took diazepam, but not nordiazepam because she picked up their prescriptions but she had been able to find a prescription bottle. (Ex. 4.12 at 6.) The employee told Mrs. Shackelford that she would have to send a letter to the claims department stating what Mrs. Shackelford told the employee on June 7, 2017 about Mr. Shackelford never having taken nordiazepam and that her husband took diazepam, but she could not find a prescription bottle for it. (*Id.* at 5-7.) When Mrs. Shackelford asked "Ya'll didn't request the doctor for it"? (referring to the diazepam prescription), the POS employee informed her "No", AILIC had not requested the prescription from Mr. Shackelford's doctor. (*Id.* 6-7). There is no evidence I was

May 21, 2019
Page 17

furnished that AILIC requested Mrs. Shackelford to identify Mr. Shackelford's doctors and pharmacies or that any requests were made to a doctor or pharmacy for the prescription.

On June 18, 2017 Ms. Robles sent the Shackelford claim file to her manager, Webb, for review. According to deposition testimony of Robles and Webb, they agreed Mrs. Shackelford's claim should be denied because Mrs. Shackelford had not furnished evidence that Mr. Shackelford took diazepam pursuant to a prescription. However, I have not been furnished any documentation for the reasoning of Robles and Webb to deny the claim on the basis of exclusion 6.

Ms. Webb then sent some information about the claim (but not the claim file) to the office of AILIC's general counsel, Joel Scarborough, to determine if the decision Ms. Webb and Ms. Robles had made to deny the claim was appropriate. (Ex. 2.11, AIL 000030). Initially the request asked "does Legal agree due to exclusion #7, sickness, illness, disease or mental illness. No prescription for drugs." *Id.* Mrs. Webb subsequently noticed that the wrong exclusion had been referenced initially: "Sorry it should have been exclusion #6 – use of drugs, narcotics, or hallucinogens since they were not prescribed to the insured." *Id.*, AIL 000029 note dated June 27, 2017.

The request from the claims department was assigned to assistant general counsel, Paul Johnson. Mr. Johnson was hired in March 2017, after Mrs. Shackelford initiated her claim. He had graduated from law school in May 2016. He was admitted to the State Bar of Texas where AILIC is located on November 4, 2016. (Ex. 12.1 – 12.4, AIL 000303-315 & Ex. 12.7 (no Bates number on my copy)).

Mr. Johnson requested the accident report and also requested, "if we have any medical records saying whether this person was prescribed this drug or not." (6-27-17 P. Johnson entry on Ex. 2.11, AIL 000029). The police report was furnished on June 28, 2017 but, since the claims department did not have any of Mr. Shackelford's medical records, none were furnished to Mr. Johnson. It is unclear to me from the documents I reviewed whether the medical examiner's report and lab results were furnished to Mr. Johnson but his deposition clarified that he was furnished these documents.

On June 28, 2017 Mr. Johnson stated: "Legal advises claims continue with the denial of the accidental death policy under exclusion #6." (Ex. 2.12, AIL 000021). I have not been furnished any documentation which explains Mr. Johnson's reasoning for this decision. The claims department then sent a letter dated June 29, 2017 to Mrs. Shackelford informing her that the double indemnity claim was denied:

This policy provides benefits for accidental death and dismemberment only. There is an exclusion on this policy and no benefits are payable if the insured's death was as a result of the following:

(6) Use of drugs, narcotics, or hallucinogens

(Ex. 3.9, AIL 000047).

May 21, 2019
Page 18

The letter does not describe the factual basis for the decision to apply exclusion 6 or which particular substance was supposedly used by Mr. Shackelford. Nor does the letter mention the lack of a prescription for diazepam as a basis for denying the claim, even though the supposed absence of the prescription is noted by the claims department and general counsel's office as somehow significant.

### 2. Violations Of The Investigation And Documentation Standards.

AILIC's investigation consisted of obtaining the accident report, death certificate, medical examiner's report and laboratory test results. The claims examiner, Robles, never talked to Mrs. Shackelford, much less took a recorded statement from her. Had Ms. Robles done so, she would have found out that Mr. Shackelford was a veteran of military service, retiring as a sergeant in the U.S. Army. Thus he was eligible for care in military facilities. She would have found out that Mr. Shackelford received medical treatment at the Reynolds Army Community Hospital at Ft. Sill in Lawton, Oklahoma, a short drive from the Shackelford's home in Apache.

Had Robles obtained this information she then should have ordered the records from Reynolds with the medical authorization provided by Mrs. Shackelford. The Reynolds records show Mr. Shackelford had a prescription for diazepam, 5mg tablet, which was refilled on several occasions. See Shackelford 0034-0060, Reynolds Army Community Hosp. records. According to the testimony of claims examiner Robles and her manager, Webb, Mrs. Shackelford's claim would not have been denied had AILIC been furnished a prescription for diazepam. Thus, AILIC violated basic requirements of the Investigation Standard by failing to interview the claimant and obtain and review Mr. Shackelford's medical records, and this violation resulted in a wrongful denial of Mrs. Shackelford's claims.

However, AILIC had confirmation from Mrs. Shackelford that her husband had a prescription for and took diazepam. Mrs. Shackelford informed two different POS employees of the fact of the prescription and use of diazepam. This information was not provided by POS to the claims department generally or to the assigned claim examiner, Robles. This failure violated the Documentation Standard. This violation led Robles and Webb to conclude Mr. Shackelford did not have a prescription for diazepam and thus to their decision to deny the claim.

AILIC did not interview the witnesses identified on the police report. The witnesses may have observed the Shackelford vehicle before it crashed, and whether any conditions existed on the highway which might explain why the vehicle went left of center. This failure was a violation of the Investigation Standard. This information potentially was relevant to a determination of whether Mr. Shackelford's death resulted from the use of drugs, as required by exclusion 6 in Mr. Shackelford's accident policy to apply.

As will be discussed *infra.*, subsection 3, the "resulting from" phrase in the **EXCLUSIONS** section of the A71 policy form requires a causal connection between Mr.

May 21, 2019
Page 19

Shackelford's death and "use of drugs" in exclusion 6. No one who handled the Shackelford claim – claims examiner, claims manager, and in-house counsel – seems to have realized the exclusion requires proof the insured's death was caused by the "use of drugs." Therefore, they never sought to obtain any evidence which would help to determine whether the causation element of exclusion 6 applied. This failure was a violation of the Investigation Standard which directly resulted from the lack of knowledge about the effect of the "resulting from" phrase in the **EXCLUSIONS** section of the A71.

Likewise, AILIC did not interview the investigating officer to find out if he had additional information obtained in his investigation and not disclosed in his report.[50] Because of the requirement in exclusion 6 that Mr. Shackelford's death result from his use of drugs, such information was potentially relevant to evaluate the causation issue.

There is no evidence AILIC tried to obtain photographs taken at the scene of the accident by another officer. The accident report notes such photos were taken. The photos may have shown the roadway where Mr. Shackelford drove and the position of the vehicle when it came to rest, and any evidence that Mr. Shackelford took any kind of evasive action (such as braking or swerving sharply). Together with the statements, the photos may have shed light on the circumstances of the accident and thus what caused it to happen. This failure too was a violation of the Investigation Standard.

AILIC did not retain a consultant who perhaps could have reliably evaluated whether the amount of diazepam in Mr. Shackelford's blood just before his vehicle crossed the center line could explain why the vehicle went left of center and off the road (assuming the witnesses identified on the accident report did not observe any oncoming vehicles or other reasons why the vehicle crossed the center line). This too violated the Investigation Standard.

### 3. Violations Of The Knowledge OF Law Standard.

Perhaps the most troubling standards' violations committed by AILIC concerns the lack of knowledge of law applicable to Mrs. Shackelford's claim in the claims and general counsel departments of AILIC.

The double indemnity provision of the policy states:

**AUTOMOBILE ACCIDENT BENEFIT**

If an injury to an Insured Person results from an accident which occurs while that person was either driving or riding within a passenger automobile not operated as a common carrier, the benefits payable under the Accidental Death and Dismemberment Benefit will be doubled.

---

[50] Officers who investigate motor vehicle accidents, in my experience, sometimes do have information about accidents and the persons involved in the accidents not disclosed in their official reports.

May 21, 2019
Page 20

(Ex. 1.1, AIL 000075).

The AILIC witnesses recognized that Mr. Shackelford was an Insured Person and that his injury, i.e. death, satisfied the policy definition of **INJURY** which states: "**INJURY** means accidental bodily injury which directly and independently of sickness and other causes, results in loss covered by this Policy." (Ex. 1.1, AIL 000074).

The word "accident" is not defined in the A71 policy. Therefore, "accident" is afforded its ordinary definition in insurance policies. *See e.g., Cranfill v. Aetna Life Ins. Co.*, 49 P.3d 703 (Okla. 2002). Oklahoma courts applying this standard define "accident" and "accidental" when used in insurance policies as unintended and unexpected from the insured's perspective. In Cranfill the Supreme Court held that, under accident policy the death of intoxicated insured when he was driving pickup which ran off right side of road, then travelled back across road to left side of road where vehicle hit a sign post, went airborne and then collided with the ground was caused by accident.[51] This reasoning was applied in Brimer v. Life Ins. Co. of N. Am., 2011 WL 650329 at *4 (N.D. Okla. Feb. 11, 2011). The federal court held under Oklahoma law that the death of the insured following his voluntary consumption of prescribed codeine, diazepam, carisoprodol, and hydrocodone, the result of which was a fatal drug toxicity, was accidental, and his death was caused by accident. The accident policy in Brimer stated that the insurer would "'pay benefits for loss from bodily injuries: a. caused by accident... and b. which, directly and from no other causes, result in a covered loss.'" *Id.* ¶1.

Blunt force trauma is the only evidenced cause of Mr. Shackelford's death. His body suffered fatal injuries from the trauma which, in turn, occurred because Mr. Shackelford's vehicle went left of center off U.S. 62, into an embankment. AILIC never obtained any information to show that Mr. Shackelford's death resulted from some other cause. AILIC was therefore required to presume Mr. Shackelford's death was caused by an accidental motor vehicle accident. *See e.g., Prudential Life Ins. Co. of Am. v. Tidwell*, 21 P.2d 28 (Okla. 1933) (Syl. 2: "Where, in an action on an [accident] insurance policy from death by accidental means, the cause of death is known to have been an injury received in an automobile collision,... it will be presumed, in the absence of evidence to the contrary, that the collision was accidental."[52] Moreover, as the Supreme Court in Cranfill said, even grossly negligent conduct of an insured does not make the result expected or intended. 49 P.3d at 709.

Neither the claims examiner handling Mrs. Shackelford's claim (Robles), nor her claim manager (Webb) understood exclusion 6. The phrase "resulting from" as used in the exclusion "No benefit will be paid for expenses for loss resulting from" followed by 8 instances in which coverage is excluded, required AILIC to prove[53] that the "use of drugs"

---

[51] 49 P.3d at 706-710.
[52] The "syllabus" of a case was formerly the law of the case, but Oklahoma appellate courts no longer put syllabi in their opinions.
[53] The insurer has the burden to prove an exclusion of coverage applies. *See e.g., Kansas City Life Ins. Co. v. Nipper*, 51 P.2d 741 (Okla. 1935) (Syl. 1).

May 21, 2019
Page 21

in exclusion 6 caused the loss, i.e. death of Mr. Shackelford.  This is because the basic dictionary definition of "result" is "'[t]o occur or exist as a consequence of a particular cause'", quoted in Southwester Glass Co., 552 S.W.2d 328.  The court applied this definition to a "result of" drugs or alcohol exclusion to require the insurer to prove that intoxication was the proximate cause of the insured's injuries.  Other courts have construed "resulted" or "resulting from" an excluded risk to require insurer to prove death of the insured was caused by the excluded risk.[54]

Consequently, AILIC could not correctly deny Mrs. Shackelford's claim merely because her husband's post-death femoral blood had some amount of a drug, diazepam, in it.  The effect of the drug may or may not have contributed to cause the motor vehicle accident, but to discharge AILIC's burden to prove Mr. Shackelford's death resulted from his use of diazepam, AILIC had to prove that diazepam use more likely than not directly caused Mr. Shackelford's death.  As discussed in the previous subsection, AILIC did not take any action to obtain any information which might have discharged its burden.

According to the testimony of AILIC's general counsel, he had instructed the claims department at some unspecified time in the past that exclusion 6 would be applied only if a drug was a direct, not an indirect, cause of injury or death. AILIC has not produced any evidence that Scarborough's opinion was reduced to writing or email and then communicated to claims personnel and other lawyers in the general counsel's office.  The decision to deny the claim under exclusion 6 indicates the claim examiner, her manager and assistant general counsel did not know of this opinion.  They decided the claim should be denied on the ground use of diazepam was an indirect cause of Mr. Shackelford's death.  The direct cause was indisputably the blunt force trauma to Mr. Shackelford's body when the vehicle he was driving struck a dirt embankment.  The failure to communicate Scarborough's coverage position to the people who are involved in handling and reviewing claims is a significant violation of the Documentation Standard.  This violation directly caused the claim examiner Robles, her manager, Webb, and assistant general counsel Johnson (the people who were involved in the decision to deny Mrs. Shackelford's claim), to apply an interpretation of "resulting from" as applied to exclusion 6 in contravention of the general counsel's previously stated coverage opinion.

The decision to deny the claim ultimately seems to have turned on whether Mr. Shackelford had a prescription for diazepam.  However, exclusion 6 does **not** contain an exception if the use is of a drug prescribed by a physician.  Consequently, the existence or

---

[54] See e.g., Mason v. Life & Cas. Ins. Co. of Tenn., 41 So.2d 155 (Fla. 1949) (exclusion in accident policy for "'loss or injury **resulting from** intoxication'" of insured not direct cause of insured's death when she was walking in road and struck by moving vehicle); Mayo v. Minnesota Life Ins. Co., 2012 WL 12865015 (W.D. Okla. 2012) (where ERISA plan contained exclusion for "accidental death... where the insured's death... results from or is caused directly or indirectly by... alcohol... voluntarily... ingested...'", J. Friot rejected argument that post-death toxicology showing high level of alcohol, and the general effects of consumption of that amount of alcohol, discharged insurer's burden to prove ingestion of alcohol was an indirect cause of the insured's death in motor vehicle accident); and Blue Cross & Blue Shield of Fla., Inc. v. Steck, 778 So.2d 374 (Fla. App. 2001) app. dism'd. 818 So.2d 465 (Fla. 2002) (applying Mason).

May 21, 2019
Page 22

not of a prescription for diazepam was irrelevant to the determination of whether exclusion 6 applied. In any event, as discussed in the previous subsection, AILIC did not obtain readily available evidence that Mr. Shackelford had a prescription for diazepam.

Fundamentally, Mrs. Shackelford's claim was denied because the people who evaluated whether the exclusion applied did not know that the exclusion only applied if the use of diazepam was the direct, proximate cause of Mr. Shackelford's death. They did not know this because they did not recognize that undefined words in an insurance policy are construed according to the ordinary meaning of the words, and thus did not apply the "resulting from" phrase in the **EXCLUSION** section of the A71 form according to its ordinary meaning or even according to the interpretation of the causation requirement previously stated by AILIC's general counsel which led directly to the denial of Ms. Shackelford's claim. This is an egregious violation of the "knowledge of law" standard.

AILIC also violated the "Knowledge Of Law" standard because it ignored the word "expenses" in the Exclusion section of the A71 form. The exclusion section states that "[n]o benefit will be paid **for expenses incurred** for loss resulting from" 8 excluded risks (emp. add.). A basic principle of insurance policy interpretation is to accord every word in the disputed part of the policy to have meaning. *E.g.* Cranfill v. Aetna, *supra.*, 49 P.3d at 706 ("we construe the policy to give reasonable effect to all of its provisions"). This principle, along with the requirement to afford ordinary meaning to undefined words in a policy (which is contract) is embodied in the statutory law of Oklahoma. See Tit. 15 Okla. Stats. Ann. § 157 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practical, each clause helping to interpret the others"); *Id.* § 160 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given them by usage, in which case the latter must be followed"), and Tit. 36 Okla. Stats. Ann. § 3621, a part of the Insurance Code ("Every insurance policy shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any rider, endorsement or application attached to and made a part of the policy").

Evidence of AILIC's usage in the interpretation of exclusion 6 to ignore the phrase "for expenses incurred" is not relevant because there is no evidence that Mr. and Mrs. Shackelford had knowledge of this interpretation. *See e.g.*, Bower-Venus Grain Co. v. Norman Mill & Grain Co., 207 P. 297 (Okla. 1922) (Syllabus – one of the requirements for admission of evidence of custom and usage to explain the meaning of a contract is that "the **parties** had knowledge of the existence of the custom or usage..") (emp. add.)

The use of the phrase "for expenses incurred for loss" in the **EXCLUSIONS** section has no application to Mrs. Shackelford's claim under the **AUTOMOBILE ACCIDENT BENEFIT** because **no expenses** were incurred for Ms. Shackelford's "loss", the death of her husband. Her claim was to receive the double indemnity benefit of $40,000 provided by the **AUTOMOBILE ACCIDENT BENEFIT**. "Expenses" cannot mean the double indemnity benefit because the **EXCLUSIONS** section says no benefit, such as the double indemnity benefit, will be paid "for expenses". Construing "expenses" as equivalent to

May 21, 2019
Page 23

"benefit" would require a person reading the policy to disregard the SCHEDULE OF POLICY which describes the benefits which are provided by the policy, including "AUTOMOBILE ACCIDENT Amount.... $40,000". (AIL 000073). The PRINCIPAL SUM AMOUNT payable under the ACCIDENT DEATH AND DISMEMBERMENT BENEFIT is $20,000. This amount also has no relation to any expenses that may have been incurred by Mrs. Shackelford as a consequence of Mr. Shackelford's death ("loss"). Review of the other benefits provided in the policy indicates the benefits are amounts which have no relation to expenses incurred for hospitalization or emergency care, or other treatment of injuries caused by accident.

AILIC did not attempt to determine the meaning of "expenses incurred for loss" in the course of processing Mrs. Shackelford's claim, a major violation of basic principles of contract interpretation and thus a violation of the Knowledge Of Law Standard. I did not find any evidence that claims personnel or the general counsel's office even recognized the problem which the phrase creates when evaluating whether exclusion 6 applies to Mrs. Shackelford's claim.

Another egregious violation of the "knowledge of law" exclusion is the failure to recognize that exclusion 6 is not enforceable because it is broader than the "use of narcotics" exclusion authorized in accident policies by the Oklahoma Insurance Code, OKLA. STATS. ANN. Tit. 36 § 4405. This section requires that accident policies "shall contain the provisions specified in this subsection", or the policy may contain different provisions "which are in each instance not less favorable in any respect to the insured or the beneficiary." Section 4406(B) of the Insurance Code invalidates any accident policy provision which "is in conflict with this article" and declares that "the rights, duties and obligations of the insurer to the insured beneficiary shall be governed by the provisions of this article. The "article" referred to is Article 44 of the Insurance Code which includes section 4405 and its mandatory policy language. Article 44 "shall apply to all insurance companies... issuing policies of insurance against loss or expense from sickness or from bodily injury or death by accident." Article 44 applies to AILIC because it is an insurance company which issued a policy of insurance against loss from bodily injury or death to Mr. Shackelford.

Paragraph A.10 of section 4405 states that the policy shall contain "[a] provision as follows: NARCOTICS: The insurer shall not be liable for any loss sustained or contracted in consequence of the insured's being under the influence of any narcotic administered on the advice of a physician.

Section 4405 appears to have been based upon the Uniform Individual Accident And Sickness Policy Provision Law drafted by NAIC, although the narcotics exclusion in section 4405(A)(10) is narrower than in the model law. Section A(a)(a) the Model Accident Policy Law requires "a provision that the insurer is not liable for any loss sustained or contracted in consequence of the insured's being intoxicated or under the influence of any narcotic unless administered on the advice of a physician." The Oklahoma legislature omitted the intoxication component of the exclusion.

May 21, 2019
Page 24

Several other states have adopted all or parts of the Model Accident Policy Law, including versions of the intoxication and narcotics exclusion, and several courts have construed and applied the exclusion because policy exclusions were less favorable to the insured or beneficiary than the statutory exclusion. Even though a state's insurance regulator generally is required to approve policy forms, this approval does not mean a policy provision which makes the accident coverage less favorable than required by statute is enforceable. *See e.g.,* Holloway v. J.C. Penney Life Ins. Co., 190 F.3d 838, 843-44 (7th Cir. 1999) (although a non-statutory intoxication/narcotics exclusion had been approved by the Illinois Director of Insurance, the exclusion was much broader than the statutory exclusion, thus the exclusion as written was less favorable than the statutory exclusion, rendering the broader policy exclusion unenforceable, as "[t]he Director [of Insurance] was not authorized to approve policies that were less favorable to the insured than the mandatory provisions in sections 357.15 through 357.25")[55]; and Ghiorso v. American Gen. Life Ins. Co., 715 Fed. Appx. 714 (9th Cir. 2018) (under Montana version of the model law, the policy definition of "accidental injury" which excluded all injury caused by any "medicine" was less favorable than allowed by the Montana intoxication/narcotics exclusion, identical to the Illinois statutory exclusion applied in Holloway.)

These cases are consistent with Oklahoma which repeatedly has held that policy provisions which conflict with mandatory statutory language are unenforceable and are not made enforceable because the Insurance Commissioner approved policy language not allowed by the legislature in the statutes. *See e.g.,* Young v. Mid-Continent Cas. Co., 743 P.2d 1084 (Okla. 1987) (exclusion in auto liability coverage unenforceable as not authorized by compulsory auto insurance law, OKLA STATS ANN tit. 47 § 7-600 1922); Barnett v. Merchant's Life Ins. Co., 208 P, 271, 273 (Okla. 1922), followed in Chambers v. Walker, 653 P.2d 931 (Okla. 1982) (Insurance Commissioner's approval of exclusions which conflict with Oklahoma statutes does not make exclusions valid, as commissioner has no authority to approve policy form which violates statute).

These courts construe "in consequence of" to require that the use of intoxicants or narcotics must have been the proximate cause of a loss. *See e.g.,* Olson v. American Bankers Ins. Co., 35 Cal.Rptr.2d 897, 903-04 (Cal. App. 1995) (Cal. Statute); Ciberey v. L-3 Comm. Corp. Master Life & Accid. Death & Dismem. Ins. Plans, 2013 WL 2481539 at *11 (S.D. Cal. June 10, 2013). This construction of "in consequence of" is consistent with the courts' construction of the same language in an identical non-statutory intoxication/narcotics exclusion. *See,* Cummings v. Pacific Std. Life, *supra.,* at 1078, discussed in connection with the meaning of "resulting from" in the **EXCLUSIONS** section of the A71 form.

Other courts have construed the phrase "unless administered on the advice of a physician" in a statutory narcotics exclusion to mean the exclusion does not apply if the narcotics taken by the insured was prescribed for the insured. Hummel v. Continental Cas. Ins. Co., 254 Fed.Supp.2d 1183, 1189-90 (D. Nev. 2003) ("the Court finds the reasonable and appropriate construction of the term 'administered on the advice of' to include

---

[55] The full statutory citation is 215 ILC § 7 357.15 through § 357.25.

May 21, 2019
Page 25

[insured's] situation where her physician gave her a prescription of Oxycodone to relieve her migraines"); Smith v. Stonebridge Life Ins. Co., 582 Fed.Supp.2d 1209, 1222-23 (N.D. Cal. 2008) (rejecting insurer argument "that the exception 'on the advice of a physician' to the California statutory exclusion involving "controlled substances" does *not* require that the [insured] have taken her prescription oxycodone in the exact dosage prescribed by her doctor"); Davis v. Peoples Benefit Life Ins. Co., 47 So.3d 1033, 1037 (La. App. 2010) *writ. den'd* 518 So.3d 16 (La. 2010) ("The Louisiana statutory language of 'under the influence of narcotics unless administered on the advice of a physician' is reasonably interpreted as merely requiring that "the narcotic substance... has been prescribed by a physician rather than requiring that the dosage not exceed a therapeutic or prescribed dosage of that substance").

No evidence was furnished to me indicating that the claims personnel or the in-house lawyer even knew about the Oklahoma Insurance Code's mandatory language for accident policies, much less treating exclusion 6 as replaced by the statutory narcotics exclusion. The general counsel appears to have learned of the Oklahoma Insurance Code provisions only after this case was filed. This lack of knowledge is a violation of the Knowledge of Law Standard, particularly as several states have substantially similar mandatory accident coverage provisions in their statutes.

Clearly, exclusion 6 renders Mr. Shackelford's policy "less favorable" to his beneficiary. The undefined word "drug" in the exclusion is broader than "narcotic" in the statutory exclusion. The dictionary definition of "drug" includes "a substance used as a medication." *Merriam-Webster's Online Dict.*, quoted in Cummings v. Minnesota Life Ins. Co., 711 Fed.Supp.2d 1287, 1294 (N.D. Okla. 2010) where the court held that non-prescribed hydrocodone was a "drug" within the accidental death coverage exclusion for death which "results from or is caused directly or indirectly by ... (8) drugs....".

In contrast the ordinary definition of "narcotic" as used in an accident policy is "drugs considered to be illegal" and thus the exclusion has been held not to apply to "a drug, which although technically falling within one of these categories of excluded substances, is legally prescribed and unfortunately becomes a source of addiction to the insured". Doe v. General American Life Ins. Co., 815 F.Supp. 1281, 1285 (E.D. Mo. 1993) (holding nonprescribed cocaine was a "narcotic" within exclusion). Likewise, in Crose v. Humana Ins. Co., 823 F.3d 344 (5th Cir. 2016) the court, applying Texas law, applied an ordinary, nontechnical definition of "narcotics" as a "'drug affecting mood or behavior which is sold for non-medical purposes, **esp.** one which is prohibited or under strict legal control but which tends nevertheless to be extensively used illegally'", and holding ecstasy was a "narcotic" within an exclusion for "'Loss due to being intoxicated or under the influence of any narcotic unless administered on the advice of a health care practitioner.'"

Crose rejected the reasoning of Ney v. Liberty Life Ins. Co., 743 S.E.2d 827 (S.C. 2013) where a statutory definition of "narcotics" was applied to the undefined word "narcotic" in the accident coverage, holding non-prescribed methamphetamine is not "narcotics". 823 F.2d at 349 ¶1. In Crose the court applied the Texas rule that the meaning of undefined words in an insurance contract is given its ordinary construction of

May 21, 2019
Page 26

undefined words in a statute is consistent with the Texas rule applied in <u>Crose</u> and the Oklahoma rule embodied in OKLA. STATS. ANN. Tit. 15 § 160.  See OKLA. STATS. ANN. Tit. 25 § 1 ("Words used in any statute are to be understood in their ordinary sense, except when a contrary intention plainly appears, and except also that the words hereinafter explained are to be understood as thus explained"); <u>Curtis v. Board of Ed. Sayre Public Schools</u>, 914 P.2d 656, 659 (Okla. 1995).[56]

Finally, exclusion 6 is also less favorable to a beneficiary because it does not include any exceptions whereas the statutory exclusion excepts narcotics prescribed by a physician. However, as discussed *supra.*, AILIC construed exclusion 6 as if an exception for a drug prescribed to the insured was a part of the exclusion, but failed to conduct a minimally adequate investigation to determine if Mr. Shackelford had a prescription.  In any event, the statutory narcotics exclusion clearly does not apply to Mrs. Shackelford's claim because in fact Mr. Shackelford had a prescription for diazepam.  AILIC's inadequate investigation would have caused it to deny that Mr. Shackelford had a diazepam prescription if AILIC had knowledge of the Oklahoma statutory narcotics exclusion. Therefore, had AILIC recognized that it could not apply exclusion 6 because it is less favorable to a beneficiary in using the word "drugs" than is the mandatory statutory exclusion, AILIC still would have violated the Investigation Standard.  The failure to adequately investigate whether Mr. Shackelford had a prescription for diazepam would have led AILIC to the same erroneous denial of coverage based upon the lack of prescription for diazepam.

### 4.  Violation Of The Standard For Internal Claims Handling And Training.

Based on my review of the depositions of present and former representatives of AILIC[57], it is clear that AILIC did not have any written or electronic claims handling standards to show claims examiners and their managers the process by which to investigate, document, and evaluate claims, in particular claims under the AUTOMOBILE ACCIDENT BENEFIT and the **EXCLUSIONS** section of the A71 policy form.  Nor did AILIC have any written or electronic or otherwise established standards for the training of persons working in the claims and general counsel's departments.  The absence of these important documents are violations of the national standards which require formal claims handling standards and training.

---

[56] Diazepam is classified as Schedule IV controlled dangerous substance in OKLA STATS ANN tit 63 § 2-101 through § 2-608.  However, nothing in OKLA STATS ANN tit 36 § 4405(A)(10) indicates the word "narcotics" refers to drugs classified as Schedule IV drugs in the Controlled Dangerous Substances Act.  C.f. <u>First Financial Ins. Co. v. Roach</u>, 80 F.3d 426 (10th Cir. 1996) (rejecting argument under Oklahoma law that statutory definition of 3.2% beer in the Oklahoma Alcoholic Beverage Act as a "nonintoxicating beverage", in OKLA STATS ANN tit 37 § 163.2(a) should apply to an exclusion in liability insurance policy for sale or serving alcoholic beverages, and holding 3.2% beer is an alcoholic beverage in the ordinary sense of the phrase).

[57] I say "representatives" because these people were in some instances employed by other related companies.

May 21, 2019
Page 27

The conduct of the claim examiner assigned to Mrs. Shackelford's claim, her manager and the assistant general counsel demonstrate the compelling need for training and claim handling standards. None of the three persons were trained on how to read the **EXCLUSIONS** section of the A71 form policy, thus they did not realize that the presence of a drug in an insured's post-death blood, combined with a lack of some explanation for why Mr. Shackelford's vehicle crossed the centerline and continued off the road into an embankment, did not satisfy AILIC's burden to prove exclusion 6 applied. Had they been properly trained they would have realized that "resulting from" in the **EXCLUSIONS** means there must be a direct causal connection between Mr. Shackelford's use of diazepam and his death, and that they did not have such evidence.

These same people were not informed by management that the Oklahoma Insurance Code contains a mandatory narcotics exclusion which invalidates exclusion 6. In fact, management representatives had no knowledge of the mandatory statutory narcotics exclusion even though such exclusions are required by insurance statutes in several states.

These people believed exclusion 6 did not apply if the insured had a prescription for the drug he used. The source of this belief remains unclear even after several witnesses have been asked about the source. The words of exclusion 6 do not create an exception for the use of prescription drugs. Perhaps implying a prescription drug exception seemed fairer (as the legislature seems to have decided by including an exception in the statutory narcotics exclusion for narcotics used on the advice of a doctor), but this approach is troublesome.

It violates the most fundamental principles of contract constructions and creates a real risk of inconsistent application of exclusion 6 (assuming it is enforceable in some state which does not statutorily require a narcotics exclusion with an exception for use on the advice of a doctor). Depending on word of mouth to communicate an interpretation of a policy which is not based upon the actual language of the policy is fraught with the risk of inconsistent application of exclusion 6. Proper documented training standards, when consistently applied, help to reduce if not limit this risk.

It is particularly disturbing to me as a lawyer that a fellow lawyer who studied contracts in law school did not have sufficient knowledge to recognize that the "resulting from" language in the **EXCLUSIONS** section of the A71 policy form creates a causation requirement and that no exception for prescribed drugs exists in exclusion 6. Mr. Johnson was practically a rookie lawyer when he was asked to evaluate whether the claims department's view that Mrs. Shackelford's claim should be denied was correct. If AILIC was going to put Mr. Johnson in this position, then at the very least his manager, Mr. Scarborough, should have discussed the basis for the denial with Mr. Johnson. That is what senior lawyers do to protect their client and teach the younger person.

The failure to create internal claims handling standards created similar problems to those resulting from the lack of training standards. Claim examiners were not informed on the need to affirmatively investigate claims and what the investigation should include.

May 21, 2019
Page 28

This failure led to the erroneous conclusion that Mr. Shackelford did not have a prescription for diazepam. Examiners must be allowed to call insureds, beneficiaries, and witnesses when necessary, as was the case for Mrs. Shackelford's claim. Likewise, proper claims handling standards must address the confusion and lack of internal communication which exists by having every call about the status of a claim addressed by POS rather than by claims examiners. Mrs. Shackelford told POS employees her husband had a diazepam prescription but that she had not found it. Without having access to this information, examiner Robles and her manager Webb misinterpreted Mrs. Shackelford's letter about her search for a prescription bottle.

A final note about general counsel Scarborough's testimony about his previous interpretation of the causation requirement created by the "resulting from" language of the **EXCLUSIONS** section of the A71 policy. As I read his testimony he formed the opinion that exclusion 6 only applies when, for example, use of drugs are the "direct" cause of injury to or death of an insured. The direct cause of Mr. Shackelford's death was blunt force trauma to his body. Therefore, according to Scarborough and a high ranking claim management representative, Troxell, the denial of the claim was a mistake.

Yes, it was a mistake. But the reason why the mistake was allowed to occur was the failure to properly train claims personnel on the general counsel's interpretation. No documentation of the existence of the coverage interpretation or its communication to the day-to-day handlers of claims has been provided to me. This is yet another example of a violation of the Training and Documentation Standards.

Very truly yours,

*Mort G. Welch*

Mort G. Welch

MGW:vm