# CAVANAGH

Steven Plitt
Phone: (602) 322-4047
Facsimile: (602) 322-4103

splitt@cavanaghlaw.com
www.cavanaghlaw.com

July 1, 2019

Candace Lisle, Esq.
Phillips Murrah
101 N. Robinson
Oklahoma City, OK  73102

## EXPERT OPINION LETTER

Re:     *Alice Shackelford v. American Income Life Insurance Company*
        USDC, Western District of Oklahoma, Case No. 18-CV-456-HE

Dear Ms. Lisle:

I have reviewed the materials you have provided to me and have set forth herein my observations based upon my review of those materials. I reserve the right to alter or change any of my opinions based upon new or additional information that may be received since this report was issued.

## I.       QUALIFICATIONS

I have attached to this report a copy of my CV (**Exhibit 1**). I have been a licensed attorney within the state of Arizona since 1982. I have my LL.M. in Insurance Law. I focus my practice in the field of insurance law. A large part of my practice has in the past involved working with claims representatives in order to allow claims to be processed consistent with the insurance policy's implied covenant of good faith and fair dealing. I have directly managed with claim representatives insurance claim files which are under investigation, in real time, or are being processed toward resolution.

I am currently an adjunct professor of law teaching insurance law at the University of Arizona's James E. Rogers College of Law. I previously taught the insurance law curriculum at Arizona State University's Sandra Day O'Connor College of Law. Insurance company regulation is part of my teaching curriculum including insurance bad faith. In my treatise on insurance law, *Arizona Liability Insurance Law,* I have devoted a chapter to insurance bad faith. I am a contributing senior editor of the *Arizona Tort Law Handbook* where I co-authored the chapter on bad faith. In my national treatises, *The Claim Adjuster's Automobile Liability Handbook* and my two-volume treatise entitled *Practical Tools for Handling Insurance Cases,* I devote chapters to bad faith and Unfair Claims Practices. I am an active speaker regarding the law of bad faith and I have been a frequent lecturer within the insurance industry where I have instructed claims departments of insurance companies on how to properly manage claims in order to be consistent

**EXHIBIT 1**

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 2

with regulatory requirements as well as compliance with the implied covenant of good faith and fair dealing which is a part of every insurance policy.

I am the current senior author of COUCH ON INSURANCE 3D. My team and I are revising, editing and re-writing the treatise. The COUCH treatise comprises 24 substantive volumes of text on insurance law and is one of the nation's leading treatises on insurance law. The COUCH treatise has been cited as an authoritative national treatise on insurance law by courts and lawyers throughout the United States. I am on the editorial board for the Insurance Litigation Reporter where I am a Senior Contributing Editor. The Insurance Litigation Reporter is a national reporter publication of significant insurance law cases that have been decided nationwide.

I have been cited by the Supreme Courts in 33 states, the Intermediate Appellate Courts in 23 states, 11 of the Federal Circuit Courts of Appeal, 59 Federal District Courts, the Federal Court of Claims and 4 Federal Bankruptcy Courts. I have also been cited in 95 scholarly articles and the Code of Federal Regulations.

Although I cannot give a precise number within my 36 years of practice experience, I have reviewed thousands of claim files. During my practice career, I would estimate that I have reviewed and analyzed thousands of claim files from more than a hundred different insurance companies.

Over my practice career I have acquired a significant amount of practical knowledge and experience regarding industry standard, custom and practice, generalized claim handling practices within the industry, specific claim handling practices regarding different types of claim categories, claim management and oversight, and other related insurance claims activities and protocols. During my direct representation of insurance companies, as well as part of my consulting retentions, I have reviewed the claim manuals and guidelines, claim bulletins and general corporate claim documentation from many insurance companies. As an attorney, I would regularly speak directly with claim adjusters, supervisors and claim management/legal representatives regarding the processing of claims, in real time. On a regular basis, over the course of 36 years of practice, I have been in direct communication with claim professionals at all levels within the insurance company and industry during which specific claims and claim conduct were discussed and analyzed. I have also reviewed hundreds of depositions and sworn declarations of insurance claims adjusters, claim supervisors, claim legal attorneys and other claim management professionals regarding the handling of specific claims, claims handling generally and claim and underwriting operations.

As a national commentator on insurance law issues, I have reviewed thousands of published and unpublished bad faith cases which have contained within the court opinions the recitation of insurance company practices regarding the handling of specific claims as well as general claims handling practices. I have extensively studied and analyzed the NAIC Unfair Claims Settlement Practices Act and its various adopted iterations throughout the United States. I have also extensively reviewed and analyzed the state-specific regulations which often accompany a state's adoption of its variation of the Unfair Claims Settlement Practices Act.

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 3

In my practice I have reviewed hundreds of expert reports from other claim handling consultants who have expressed within their reports their understandings and beliefs regarding industry standard, custom and practice. I have also reviewed hundreds of depositions from other claim handling consultants where they have testified regarding the claim handling practices of insurance companies that are specific to a particular claim as well as their overall opinions regarding industry standard, custom and practice.

I have participated in many insurance company "roundtable" discussions which are part of the overall claim adjustment and evaluation process. These "roundtable" committees are populated by claims representatives, supervisors and other claim management personnel where the handling of claims are discussed in real time as the claims in question are being actively processed. When I have attended a "roundtable" discussion, my role has been to provide guidance and advice on claim evaluation, claim handling conduct, issues and problems, and I have provided independent advice as well as proposed solutions regarding claim impediments that may have arisen in the claim environment on specific claims. In this specific role, or when I am acting as coverage counsel for insurance company clients, I am directly engaged within the processing of active claims in real time and, therefore, I am part of the claim adjustment process.

In my capacity as an attorney directly representing insurance companies, I have oftentimes been called upon to provide informal advice and guidance regarding the claim handling of a specific claim as well as claim handling practices and procedures. The foregoing activities, over a span of 34 years of practice, have provided me with a working practical knowledge and experience that informs me as to industry standard, custom and practice regarding claim handling practices and the operation of claim departments, in real time. Finally, I have adjusted claims for insurance companies.

This practical knowledge and experience informs me as to industry custom, standard and practice. I have participated in roundtable discussions, claim handling, and bad faith risk avoidance activities as part of my national insurance law practice.

I have been involved with the drafting of insurance policies generally, and endorsements specifically, and I have worked closely with insurance company product development committees and corporate counsel regarding the evaluation of existing policy language and possible amendments.

I have analyzed coverage issues in all 50 states; I have been retained as an expert witness in cases venued in Arizona; California; Colorado; Florida; Georgia; Hawaii; Idaho; Indiana; Kansas; Kentucky; Louisiana; Maryland; Michigan; Minnesota; Mississippi; Missouri; Nebraska; Nevada; New Jersey; New Mexico; New York; North Carolina; North Dakota; Ohio; Oklahoma; Pennsylvania; South Carolina; South Dakota; Tennessee; Texas; Utah; Washington; West Virginia; Wisconsin and Wyoming.

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 4


My hourly rate structure is $575/hour for research, case analysis, review, report, and travel; $675/hour for depositions, hearings and trial testimony; and $725/hour for depositions or preserving trial testimony by video.

## II.   **DOCUMENTS PROVIDED FOR REVIEW**

### **Pleadings & Discovery**
1.   Petition (3/27/18)
2.   Answer to Petition (5/16/18)
3.   Joint Status Report and Discovery Plan (6/25/18)
4.   Witnesses Likely to have Discoverable Information (7/5/18)
5.   Discovery - AIL Responses to 1st Discovery Requests (9/14/18)
6.   Discovery - AIL Supplemental Responses to First Interrogatories (9/20/18)
7.   Response to Third Set of Discovery (12/28/18)
8.   Discovery - AIL Responses to 2nd Discovery Requests (10/29/18)
9.   Discovery - AIL Supplemental Responses to First Interrogatories (10/29/18)
10.   ECF 020 - Revised Scheduling Order (11/13/18)
11.   Plaintiff's Responses to Discovery Requests (2/11/19)
12.   Defendant's Supplemental Response to Plaintiff's First Set of Discovery
13.   Discovery -- AIL Responses to Plaintiff's 4th Set of Discovery (Executed)
14.   Plaintiff's Final Witness and Exhibit List
15.   Revised Scheduling Order

### **Claim File**
1.   AIL 000001-85, 490-528

### **Depositions**
1.   Paul Johnson (12/4/18)
2.   Shaniqua Robles [with Exhibits] (4-12-19)
3.   Dawn Troxell (4/25/19)
4.   Crystal Webb (4/11/19)
5.   Joel Scarborough (4/25/19)
6.   Amanda Lindsey (5/15/19)

### **Documents**
1.   Crystal Webb Personnel File AIL000213-AIL000298 (undated)
2.   Paul Johnson Personnel File AIL000299-AIL000390 (undated)
3.   Paul Johnson Post Employment & Medical Information AIL000391-AIL000398 (undated)
4.   Rosario Martinez Disciplinary Report AIL000489 (10/23/18)
5.   Rosario Martinez Personnel File AIL000399-AIL000488 (undated)
6.   Shaniqua Robles Personnel File AIL000086-AIL000212 (undated)
7.   AIL's Initial Disclosures (7/6/18)
8.   AIL Accident Policy

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 5

    9.     Interest Payment Correspondence
   10.    Letter from Jacob Rowe to John Russell re: initial disclosures

**Transcripts of Calls**
1.    4.01 - Transcripts of calls
2.    4.02 - Mary Alice Elfrez Audio Transcription AIL 53
3.    4.03 - Jessica Yanez Audio Transcription AIL 61
4.    4.04 - Jessica Yanez Audio Transcription AIL 54
5.    4.05 - LaChambria Medlock Audio Transcription AIL 62
6.    4.06 - Janell Barnes Audio Transcription AIL 63
7.    4.07 - Khrysten Martinez Audio Transcription AIL 60
8.    4.08 - Antonelle Brown Audio Transcription AIL 64
9.    4.09 - Monica Sandoval Audio Transcription AIL 65
10.   4.10 - Becky Chatman Audio Transcription AIL 67
11.   4.11 - Casey Jordan Audio Transcription AIL 68
12.   4.12 - Kizzy Franco Audio Transcription AIL 55
13.   4.13 - Mary Elfrez Audio Transcription 56
14.   4.14 - Rosario Martinez Audio Transcription 57
15.   4.15 - Rosario Martinez Audio Transcription 58
16.   4.16 - Rosario Martinez Audio Transcription 66
17.   4.17 - Mary Elfrez Audio Transcription 59
18.   Phone call between (agent) and Sham (customer service)
19.   Phone call between Chanel (agent ) and Shevi Thompson (customer service)
20.   Phone call between Shackelford and Rosario (customer service)
21.   Phone call between Shackelford and Ve (customer service)
22.   Phone Call between Shavi and Yolanda
23.   Phone call between Shavi (agent) and Teresa (customer service)
24.   Phone call between Shavi and Jessica (customer service)
25.   Phone call between Shavi and Natalie (customer service)
26.   Phone call between Shavi and Rosario (customer service)
27.   Phone call between Shavi and Whitney (customer service)

## III.   **PRIOR TESTIMONY**

In the past four years, I have testified as follows: (See **Exhibit 2**)

## IV.   **OVERVIEW OF CLAIM**[1]

The date of loss (death) in this matter was January 24, 2017. On February 14, 2017 the death of decedent Odell Shackelford was called in to American Income Life Insurance Company (AIL). See also February 14, 2017 (519). A letter was sent to the insured beneficiary on February

---

[1]   The American Income Life Insurance Company Claims File prefix "AIL 00000#" is being shortened to "#" only from this point forward in the Report.

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 6

16, 2017 (41). On February 23, 2017 (3) the AIL claims department acknowledged receipt of the claim and processed the payment of benefits on the whole life policy (27) Additional information was requested from the beneficiary, Alice Shackelford. AIL sought a completed authorization for release of medical records that was HIPAA compliant and the autopsy/toxicology report. On February 24, 2017 (53) a call was made to AIL by Mrs. Shackelford, following up on where the death benefit check was. On March 2, 2017 Mrs. Shackelford called AIL, inquiring about a refund of premium on the policy. See March 2, 2017 (61). At that time, she inquired as to the status of the death benefit payment and was informed that the accidental death payment claim had just been received and that it typically would take seven to ten business days to review the information once it is received; and further that the whole life claim had been processed, and it could take seven to ten business days to audit the check and then seven to ten business days to receive the check.

On March 9, 2017 (62) Mrs. Shackelford called AIL, inquiring as to why a change of beneficiary form was required and why medical records and an autopsy report were required to process the accidental death benefits. The AIL representative advised that the beneficiary form was required because for Alice's policy, her primary beneficiary was now deceased, and needed to have a new beneficiary identified for her policy. Regarding the toxicology and autopsy reports, they were needed to rule out foul play and to establish that the decedent had died from an auto accident and that he was not intoxicated at the time of the accident (62-63). The caller (presumably Mrs. Shackelford) advised that there was "no autopsy." Additionally, the caller advised that an accident report was mailed to AIL with the death certificate. When the caller asked why a signed release for medical records was necessary, it was explained that the records from a primary care physician were typically requested for accident claims or the last attending physician if it was a hospitalization. The caller was advised that the release for information needed to be signed and returned. The $4000 check which had been sent to Mrs. Shackelford was for the whole life policy. However, the $40,000 benefit under the accidental death policy for automobile accidents would take longer because information needed to be gathered. The caller was advised that it could take between three to six months, but it should not take that long because the policy was over two years old. The caller was advised that once the records were received, the claim would then be processed quickly. A claim note was entered into the system regarding the phone call. On March 9, 2017 (50) Janell Barnes sent an email to Claims that no autopsy was done and that AIL would be receiving a copy of the accident report by mail soon. On March 10, 2017 (50) a Claims Dept. representative responded to Ms. Barnes via email that AIL had received the death certificate and the accident report. She reported, however, that AIL still needed the HIPAA authorization. Once the authorization was received, medical records would be requested in order to complete the claim evaluation. On March 23, 2017 (64, 65) Mrs. Shackelford called, following up on the status of the issuance of accidental death benefits. At that time, AIL confirmed its receipt of a HIPAA authorization to obtain the records. Mrs. Shackelford was advised that the company was working on a death benefit claim.

AIL requested Mr. Shackelford's autopsy and toxicology report from the Medical Examiner on March 28, 2017 (9). On March 28, 2017 Mrs. Shackelford and the insurance agent

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 7

called AIL regarding the status of the claim. At that time it was reported that the HIPAA authorization had been received but had not yet been processed by the claims department.

On April 6, 2017 (67) Mrs. Shackelford called AIL inquiring as to the status of the $40,000 accidental death benefits. She was advised that the claims department was still waiting upon the receipt of medical records. On April 12, 2017 (67) Mrs. Shackelford called AIL inquiring as to the status of the claim and was advised that the claim was still under review. The claim department was still waiting on the receipt of medical records. Agent Shevy Thompson called AIL on April 17, 2017 inquiring as to the status of the claim and was advised by Janell Barnes that AIL was waiting upon the receipt of medical records (534). Ms. Barnes sent a follow-up email to Claims on April 17, 2017 inquiring about the medical records (51). The Claims Department responded on April 18, 2017 with an email confirming that AIL was waiting on receipt of the toxicology report and nothing was needed from the beneficiary (51). On April 18, 2017 (48) correspondence was sent to Mrs. Shackelford, by Shaniqua Robles, Claims Examiner, updating her on the status of the claim in that the medical records had been requested and would be reviewed immediately upon receipt. The agent called AIL on April 25, 2017 following up on the claim. The agent was advised that the autopsy and toxicology reports were being sought and that AIL would request the information again after 35 days if it was not received. . AIL received the toxicology report for Mr. Shackelford on April 25, 2017 (35). On April 28, 2017, Claims Manager Crystal Webb directed Claims Examiner Shaniqua Robles to request a prescription for Diazepam/Nordiazepam from the beneficiary (12).

On May 2, 2017 (44) the claims department wrote to Mrs. Shackelford requesting a copy of the decedent's prescription for Diazepam and Nordiazepam. This request was followed up on with correspondence again on May 22, 2017 (45). On June 6, 2017 (68) Mrs. Shackelford called AIL, indicating that she had received the claim department letter regarding her deceased husband's medications, she stated that he had never taken one of the medications. Because the claims department was closed, she was advised she would need to call the following day. In fact, Mrs. Shackelford did call on June 7, 2017 (54, 55). Mrs. Shackelford spoke to a customer service representative, indicating that her husband had not been prescribed Nordiazepam. Mrs. Shackelford seemed to indicate that he was, however, on Diazepam. The customer service representative advised Mrs. Shackelford that Ms. Shackelford should send in a prescription for the medication that Mrs. Shackelford was aware of and that for the other medication she was not aware of, she should write a letter saying that Mrs. Shackelford was not aware that her decedent husband was taking that medication. It was explained to her that she could get a copy of the prescription from the doctor or take the label off the bottle for the medication that he was taking. Mrs. Shackelford indicated that she looked for the bottle of the medication he was taking but apparently he was out of that medication and that's why she could not find a bottle. She denied again that he was taking Nordiazepam. The customer service rep indicated that the only way that medication would have even been identified by the claim department was because it must have been referenced in a medical record. On June 11, 2017 (56, 57) Mrs. Shackelford called AIL to follow up on the claim status. The customer service rep advised Mrs. Shackelford that AIL was

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 8

still awaiting receipt of a letter from her regarding the prescription medications. This included a communication that the decedent was not taking the Nordiazepam as a medication.

On June 13, 2017 (31) Mrs. Shackelford wrote to AIL stating the following: "I am writing this letter to inform your company that Odell Shackelford has never taken a prescription drug named Nordiazepam and that there isn't a prescription or medicine bottle in my home for any Diazepams." On the same date, crossing in the mail, the AIL claims department wrote to Mrs. Shackelford, following up on its request for the prescription for the Diazepam and Nordiazepam.

On June 16, 2017 (58) Mrs. Shackelford called to follow up on a fax that she sent to AIL on June 13, 2017. The customer service representative advised that a fax had been received and that claims had started working on the claim as of the previous day.

On June 22, 2017 (59) Mrs. Shackelford called in about the status of the accident death benefit claim. The customer service representative informed her that the claim had been routed to management and the legal department had the claim and was reviewing it. It appeared there was an escalation of the claim which meant that it was probably also sent over to underwriting. Because of this, the processing of the claim could potentially take a month.

On June 29, 2017 (47) AIL corresponded with Mrs. Shackelford, explaining that the policy contained an exclusion when the decedent's death was as a result of the "[u]se of drugs, narcotics, or hallucinogens." The claim for benefits was denied, with an invitation to Mrs. Shackelford to submit additional information for consideration.

On May 9, 2018 a decision was made by AIL to pay the accidental death benefit. See May 9, 2018 (see 504-514). The check was sent to attorney Simon Fulmer for the full accidental death benefit. See May 9, 2018 (504).

## V.   DEPOSITIONS

### 1.   Deposition of Paul Johnson (December 4, 2018)

Mr. Paul Johnson was an Assistant General Counsel for AIL (pp. 6:8-7:21). Mr. Johnson obtained his license to practice law in the State of Texas in November of 2016 (pp. 29:11-30:1). He was employed by Torchmark in March 2017 as an Assistant General Counsel. *Id.* He maintains that position today. *Id.* Generally, as an Assistant General Counsel he does not have access to the Claims Management System (pp. 10:13-19). He does not generally get into the claim notes because they are not something that Legal reviews. Therefore, he does not recall whether there were any claim notes within the Shackelford file (pp. 11:2-20).

When the Claims Department has questions, they will post questions or concerns for the Legal Department in the Legal drive (pp. 14:15-15:10). That is how Mr. Johnson would access files in what is called the Legal Review. *Id.* At the time of the Shackelford claim Mr. Johnson was

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 9

the only employee responsible for reviewing the files in the Legal Review folder (pp. 15:18-24). When a question is presented in Legal Review, there will be an individual folder for each question (pp. 16:10-25). There are subfolders under that which contain different documents pertinent to the question, as well as a document that contains the question itself. *Id.*

Mr. Johnson's response to the Claims Department's question is documented on the cover sheet (pp. 19:21-20:13). There is a separate section that is titled Legal Advice or Legal's Response. *Id.*

It is Mr. Johnson's role to review and provide legal advice to the Claims Department based on policy language or the applicable laws (pp. 25:7-26:1). When he is reviewing a claim, he reviews the law, the legal statutes, and the case law. *Id.* He does not conduct a factual investigation. *Id.* With respect to the Shackelford claim, he did not recall doing any legal research. *Id.*

Mr. Johnson was only asked to address whether Exclusion 6 or 7 of the A71 Accidental Death Benefit policy applied to the Shackelford claim (pp. 74:21-75:4). He concluded that there was an appropriate denial based on the decedent's use of drugs. *Id.*

When Mr. Johnson receives a claim for review, he will review a cover sheet and specific documents provided to him (pp. 78:25-79:18). He does not have access to the claim file. *Id.* When Mr. Johnson got the referral on the Shackelford matter, he questioned whether the Claims Department provided him with the correct exclusion (pp. 80:15-81:3). Claims did not provide any indication of sickness, illness, disease, or mental illness in the provided documents. *Id.* When he inquired, he learned that the exclusion should have been Exclusion Number 6 (Drug Use). Because of this, he asked for the accident report a second time, because he no longer had the copy of the accident report in his file at that point (pp. 83:14-84:9). What he was looking for were the facts on how the accident occurred (pp. 85:8-86:24). He wanted to know if there was any indication of what may have caused the accident. *Id.* In reaching his conclusion that Exclusion Number 6 applied, there are a couple of documents that led Mr. Johnson to believe that the death was attributable to drugs (pp. 86:25-88:11). First, the police report indicated that it was a single vehicle accident and it occurred in the middle of the day. *Id.* There was no indication in the report that there was any outside event that caused the accident. *Id.* Mr. Johnson acknowledged that there was nothing in the traffic collision report indicating that the accident was caused by drug use (pp. 88:12-16). He reviewed records from the medical examiner establishing the cause of death for Mr. Shackelford, including a copy of the toxicology report (pp. 89:6-91:1). The probable cause of death was listed as multiple blunt force injuries in the autopsy report (pp. 91:2-92:3). It was also listed that the manner of death was accidental. *Id.* That was not sufficient proof for AIL to pay on an accidental death claim. *Id.*

As the Assistant General Counsel conducting a claim review, Mr. Johnson reviews the policy language to see what the exclusion that the Claims Department referenced was. Claims had indicated that a possible exclusion involved Exclusion Number 6, the drug exclusion (pp. 92:4-93:6). Exclusion number 6 states that "[n]o benefit will be paid for expenses incurred for loss resulting from…(6)  Use of drugs, narcotics, or hallucinogens". *Id.* With that information, Mr.

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 10

Johnson wanted to know what drugs, narcotics, or hallucinogens the Claims Department believed were at issue and how they believed it affected the death. *Id.* The lab analysis of Mr. Shackelford's blood showed he was positive for Diazepam and Nordiazepam (pp. 93:7-20).

Mr. Johnson believed that Diazepam was a muscle relaxer and he conducted brief research into the medication. *Id.* From that research it was Mr. Johnson's understanding that Diazepam could have issues with pain, consciousness, and/or the ability to properly handle heavy machinery (pp. 94:8-20). He had looked up the information on the drug in 2017. *Id.* It was also Mr. Johnson's understanding that a common name for Diazepam was Valium (pp. 94:21-95:1). He did not conduct any research on the process by which Diazepam metabolizes in the human body. *Id.* Mr. Johnson did briefly research Nordiazepam. He noted that it was related to Diazepam, but he did not understand the connection (pp. 95:2-13). He did not think the connection between Diazepam and Nordiazepam was important in handling the claim because whether the two were related did not change the fact that they were present in the decedent's system at the time of death. *Id.* It was an important factor to Mr. Johnson that the Diazepam and Nordiazepam were present in Mr. Shackelford's blood (pp. 95:14-24). Other important factors for the analysis were whether the cause of the loss was from the use of drugs, narcotics, or hallucinogens; which would be the drug Diazepam and/or Nordiazepam (pp. 95:14-24).

The mere fact that Mr. Shackelford was on Diazepam was not enough to demonstrate the application of the exclusion. However, the use of the drug in conjunction with the police report showing no outside factors as a cause of the collision, together with decedent Shackelford having Diazepam and Nordiazepam made it reasonable to proceed with the denial under Exclusion Number 6 (pp. 95:25-96:15). Mr. Johnson's view was that there was enough information at that point to state that the accident was not covered under the policy due to Exclusion Number 6 (pp. 96:16-24). Mr. Johnson asked for any medical records showing that the insured was prescribed those drugs (pp. 97:1-4). At that point, had Mrs. Shackelford produced a valid prescription for the drugs, Mr. Johnson may have advised Claims to have one of their medical directors conduct a review of the claim (pp. 97:12-98:4). He also may have asked for additional medical records to see how long decedent Shackelford had been using the drugs and in what capacity. *Id.*

Mr. Johnson was unsure what the levels of the drug in decedent Shackelford's blood were that would have been of importance (pp. 100:1-12). Under the facts presented, he concluded that Exclusion Number 6 was enough to exclude coverage. *Id.* When he approved the denial, he believed that it was more than likely that the drugs caused the crash or appeared to have caused it (pp. 101:10-18).

Had a prescription for Diazepam been provided to him, he would have likely advised the Claims Department to have Medical conduct a review on the levels of the drug in decedent Shackelford's system at the time of his death in order to get a better understanding of the medication (pp. 105:1-18). He would have advised the Claims Department to conduct additional investigation of the drugs and any other indication of decedent Shackelford's use of either drug. *Id.*

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 11

On June 28, 2017 his recommendation to the Claims Department was to deny the claim under the accident death policy under Exclusion Number 6 (pp. 117:5-22). At that point he had reviewed the death certificate, the accident report, the toxicology report, and the statement from Mrs. Shackelford informing AIL that there was no prescription for the medication. *Id.* From the Shackelford letter advising that the decedent had never taken a prescription drug named Nordiazepam and that there wasn't a prescription or medicine bottle in the home for any Diazepam, Mr. Johnson concluded that it appeared that the drugs were used recreationally and that it looked as though the cause of the accident was the use of the drugs (pp. 119:11-120:16).

Mr. Johnson was shown Exhibit 6, which was a medication profile for decedent Shackelford. He was shown a document indicating that decedent Shackelford was prescribed Diazepam about a month before his death (Exhibit 6, pp. 126:15-128:2). Had he been provided with Exhibit 6 before giving his legal review, he may have advised Claims to get a medical director review. However, at the time he was asked to do his review, he was given a document that said the prescription did not exist. *Id.*

After the lawsuit was filed, Mr. Johnson had a discussion with Mr. Scarborough, who was the company's General Counsel (pp. 140:22-141:7). Mr. Johnson discussed exclusion 6 and how he believed it applied to the Shackelford claim with Mr. Scarborough when the suit was filed (pp. 142:4-17). This was in response to Mr. Scarborough asking what happened in the claim to give him an overview and to discuss the reasoning behind Mr. Johnson's advice to rely upon exclusion 6. *Id.* They both discussed the policy language. *Id.* Mr. Scarborough stated that while the language appeared to apply to the facts, that was not how AIL historically treated the exclusion. *Id.* At that point, Mr. Scarborough instructed Mr. Johnson that AIL historically applied (and should continue to apply) exclusion 6 regarding overdoses and situations where the death is the direct biological cause of the use of the drugs at the time, i.e., cardiac arrest (pp. 142:23-143:20). Mr. Johnson was instructed to look at the death certificate, autopsy, and/or toxicology report for a drug overdose or direct biological cause of death to apply the exclusion (pp. 143:23-144:4).

Although the language of exclusion 6 did not specify whether the drug had to have been a non-prescribed medication, Mr. Johnson requested that the company learn if a prescription existed because he was trying to get more context (pp. 186:15-187:5). In response to the inquiry, Mrs. Shackelford sent a fax indicating that decedent never had a prescription for Nordiazepam (pp. 191:9-192:9). Mrs. Shackelford also stated that she did not have a prescription or a medicine bottle for Diazepam in her home. *Id.* Mr. Johnson did not believe she was withholding information. He does not believe that the communication implied that a prescription existed. *Id.*

## 2.    Deposition of Shaniqua Robles (April 12, 2019)

Normally, Ms. Shaniqua Robles would get managerial approval to deny an A71 claim (pp. 23:19-24:12). She would get advice or recommendations from her manager before the denial. *Id.* She did not have authority to deny a claim. *Id.* She always spoke with her manager before denying

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 12

a claim. *Id.* Her first manager was Jessica Harper, and then Crystal Webb was her second manager (pp. 24:24-26:4). Ms. Robles reported to Ms. Webb and any communications that Ms. Robles got came through Ms. Webb (pp. 26:5-22). Ms. Robles recommended the denial of the Shackelford claim based on the drug use exclusion because decedent Shackelford had Diazepam and Nordiazepam in his system and she was not provided with a valid prescription for those medications (pp. 41:17-43:4).When she received a toxicology report, the first thing she would look for is whether there were any drugs in the decedent's system based upon the policy exclusion. When she saw Diazepam, she knew it was a sedative from her prior experience (pp. 43:5-44:8). The drug makes you sleepy. *Id.* She then noticed that decedent Shackelford's accident was a one-car accident on a clear day and therefore she believed that she needed to find out what was the cause of the accident to make sure the claim could be paid. *Id.* When she saw Diazepam was in his system and he was driving with no other car around from what she could see on the police report, she wanted to get the prescription and make sure that it was his prescription. If it was decedent's prescription, they would pay the claim. *Id.* She specifically asked Mrs. Shackelford if the decedent was taking the drugs pursuant to a physician's orders. *Id.* According to Ms. Robles, exclusion 6 required benefits to be denied in the event that the loss resulted from the use of drugs (pp. 44:24-45:14). The Shackelford claim was denied because no prescription was provided for Diazepam. AIL would have paid the claim if it had a valid prescription for Diazepam. *Id.* Ms. Robles did not know how long Diazepam stayed in the human body system after it was consumed or how it metabolizes (pp. 46:10-47:7). She didn't know how long the sedating effects lasted. *Id.* AIL did not provide her any training on those issues. *Id.* She was trained to deny claims for the drug use exclusion where the beneficiary couldn't provide a valid prescription. *Id.* The operative question to her as a claims examiner in denying a claim for drug use was whether or not the use was proven by prescription use (pp. 47:8-48:12).

With a separate A71 policy, an accident death policy, if the insured has an A71 policy and an accident is involved in the death, then they would look to see what type of accident was involved (pp. 51:8-55:7). If the accident was a car accident, they would request a copy of the police report. *Id.* They look at the police report to see if any drugs were involved. *Id.* They would also look over the police report to see how the accident happened. In the Shackelford situation, it was a one car accident and it wasn't clear how he wrecked, so a toxicology report was required. *Id.* If there a whole life policy, then it is paid because it doesn't matter whether it is an accident or a natural cause (pp. 55:23-57:25). Whether it was an accidental death is relevant to an A71 policy or a whole life policy with an accidental death benefit.

Police reports often will indicate whether drugs are involved in the accident or will give circumstances regarding the car accident. If there is no clear yes or no or unknown on the police report as to whether drugs were involved, AIL will request a toxicology report if one exists (pp. 55:23-57:25). They request an autopsy and toxicology report in all accidents generally (pp. 58:1-59:7). They do this by getting a HIPAA authorization from the beneficiary or insured's representative (pp. 58:1-59:7).

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 13

On February 23, 2017 Ms. Robles sent to Mrs. Shackelford a letter requesting a HIPAA release so that she could secure the autopsy and toxicology reports (pp. 78:7-79:6). Ms. Robles was attempting to rule out drugs as part of the claim issues. *Id.* Ms. Robles received back from Mrs. Shackelford the HIPAA authorization on March 23, 2017 (pp. 79:7-23). She then presented a medical records request to the medical examiner. She received from the medical examiner a response on April 25, 2017 (pp. 82:19-85:8). The probable cause of death was multiple blunt force trauma caused by accident. At that time she understood that Diazepam was a sedative and it would have made Mr. Shackelford sleepy. *Id.* She then continued her investigation by requesting the prescription. *Id.* She sent a letter to Mrs. Shackelford requesting a prescription for Diazepam and Nordiazepam. *Id.* Ms. Robles followed up with Mrs. Shackelford on May 22, 2017, requesting a copy of the prescription (pp. 94:12-95:3).

Ms. Robles sent several correspondence to Mrs. Shackelford requesting evidence of a prescription for the Diazepam. While she was sending these follow-up letters she was not aware that Mrs. Shackelford was calling Customer Service because that information was not relayed to her (pp. 160:9-24). Then Ms. Robles received Mrs. Shackelford's letter, informing AIL that Mr. Shackelford had never taken a prescription drug named Nordiazepam and there wasn't a prescription bottle in her home for any Diazepam. This letter was received on June 13, 2017 (pp. 160:25-162:2). After reading Mrs. Shackelford's letter, Ms. Robles firmly believed that there was no prescription for Diazepam or Nordiazepam and she would have talked to her manager about the situation. *Id.* They sent it to Claims Legal to see if it would be denied for exclusion 6 at that point. *Id.* Both she and Ms. Webb concluded from the Shackelford letter that there was no prescription (pp. 163:23-166:3). The drug exclusion factored into why they believed the claim might be subject to denial. *Id.* It was a single car accident with no other factors explaining the accident itself. *Id.* It was Ms. Robles and Ms. Webb's impression that they could not pay the claim because there was no prescription. *Id.* Ms. Robles knew that Diazepam was a sedative and that could have caused decedent Shackelford to go off the road. *Id.* Because there was no prescription, both agreed that the claim needed to be sent to Legal to see what Legal recommended. *Id.* They then received word from Mr. Johnson indicating that Claims could go ahead and deny the claim under Exclusion Number 6 (pp. 167:21-168:25). A denial letter was then issued (pp. 169:1-15). Paul Johnson was the final decision maker on the Shackelford claim (pp. 185:16-25). Once the claim was sent to Legal, Mr. Johnson's recommendation would have been the final decision. *Id.*

### 3.    Deposition of Crystal Webb (April 11, 2019)

Crystal Webb was hired by AIL as a claims manager in January 2016 where she supervised claim examiners. (pp. 9:2-11:1). She is no longer employed by AIL. (pp. 4:23-8:18). Regarding the Shackelford claim, she does not recall anything specific about the claim. *Id.* She has no recollection of the specific details of the Shackelford claim (pp. 27:23-28:3). When the exclusion for loss resulting from the use of drugs, narcotics, or hallucinogens was involved, Legal would be the department telling Claims if the claim would be denied (pp. 28:4-21). When an auto accident claim came in, AIL would obtain a copy of the autopsy/toxicology and/or police report (pp. 72:24-73:24). They would review the autopsy and toxicology reports to determine if the decedent

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 14

had anything in their system that would have potentially caused or attributed to the accident. *Id.* The examiner reviews that. If they don't have those documents, they will obtain them with a HIPAA release. *Id.* Once those documents had been secured, the examiner would bring it to Ms. Webb. *Id.* She did not recall whether an autopsy/toxicology report was required for all A71 policy claims involving car crashes (pp. 73:25-75:7). In the Shackelford case, the lab analysis from the medical examiner's office showed positive test reports for Diazepam and Nordiazepam (pp. 79:13-81:3). From prior experience, any time you have a name with a preceding "nor" it means that the drug is generally a derivative of or what is produced by the body (pp. 81:4-81:21.)

She knows that Mrs. Shackelford was asked to produce a prescription for Nordiazepam (pp. 81:13-82:21). From her review of the file Ms. Robles asked Mrs. Shackelford for a Nordiazepam prescription on at least three different occasions (pp. 82:22-84:6). She was not aware if the FDA had approved Nordiazepam in the U.S. (pp. 81:13-82:21). She did not believe that was within the adjuster's realm of understanding and that's why they referred the Shackelford claim to Legal in order to get guidance. *Id.* Examiners are not involved in the medical side. *Id.*

She was aware that AIL had a doctor on staff (pp. 84:7-18). They could send claims to him. She would send claims to the staff doctor on the advice of Legal. *Id.* Regarding whether the use of Diazepam and Nordiazepam would be grounds for denial of the Shackelford claim was a question she would defer to Mr. Johnson in Claim Legal or Mr. Scarborough (pp. 88:23-89:24). It was up to Legal to advise as to what level of Diazepam was sufficient to support denial of the claim and if it was necessary to have it reviewed by a medical doctor (pp. 90:11-92:1).

She was not aware that Mrs. Shackelford, on any occasion, called Customer Service to disclose to them that her husband had a prescription for Diazepam (pp. 92:13-93:6). Ms. Webb was not aware that Mrs. Shackelford had asked a customer service representative if they could get the prescription for her (pp. 93:7-21). If she was aware that a customer service representative had been asked by the insured to assist, she would have taken additional steps for review and evaluation. *Id.* If she had known that, AIL would have obtained the prescription for Mr. Shackelford (pp. 92:13-93:6). If a prescription was provided, she would have recommended to Ms. Robles to pay the claim. For Ms. Webb, the determining factor was whether a prescription existed. *Id.*

Ms. Webb interpreted Mrs. Shackelford's June 13 fax as indicating that Mr. Shackelford did not have a prescription for the drugs in his system, which warranted a denial based on the drug exclusion (pp. 108:20-112:15). Her takeaway from the facts was that Mrs. Shackelford had made contact with the doctors and they were telling her they didn't have a prescription for the drugs. *Id.* She would have had that takeaway interpretation from the fax regardless of whether she had access to the phone call logs where Mrs. Shackelford asked AIL to gather the prescription for her. *Id.* Ms. Webb's role at the company was to facilitate legal reviews prior to a decision on claim denial (pp. 134:22-135:19). The claim examiners did not have direct access to the Legal Department. *Id.* An examiner would send a claim to her first if it was potentially subject to denial. *Id.* Ms. Webb would look at the claim and, if appropriate, would send it to Legal with her recommendation. *Id.* Thus, three people would have looked at the claim before denial. *Id.*

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 15

    4.    **Deposition of Joel Scarborough (April 25, 2019)**

Joel Scarborough is General Counsel for American Income Life Insurance Company
(pp. 5:4-23). His job responsibilities as Senior Vice President and General Counsel are that he is
responsible for the legal work that his department does for various subsidiaries (pp. 5:24-6:14).
His department gives legal advice to each of the insurance subsidiaries. *Id.* He is presented as a
corporate representative for AIL in the designated categories (pp. 7:3-9:20).

He was asked if the insurance company's duty of good faith and fair dealing was a non-
delegable duty (pp. 14:20-15:20). His response was that there are circumstances where a third
party might perform an aspect of investigation or handling for the company, but it is ultimately the
company's responsibility. *Id.*

Historically, AIL interpreted Exclusion Number 6 very narrowly, benefitting the
beneficiaries (pp. 28:6-29:13). For purposes of Exclusion 6, the ingestion of the drugs had to be
the direct physiological cause of the death under AIL's application of the exclusion. *Id.*
Ms. Robles, Ms. Webb, and Mr. Johnson read the exclusion in a broader context. *Id.* While he can
see the reasonableness of their broader interpretation, and can see the logic in how they applied it
to the facts of the Shackelford claim, that application was not consistent with how AIL historically
applied the exclusion. *Id.*

He was familiar with Oklahoma's narcotic exclusion statute, which required that a loss
could only be excluded if the narcotic was not prescribed (pp. 29:14-30:8). Narrowly interpreted,
AIL would apply the exclusion only if the insured died as a direct physiologic result of the
ingestion of drugs, non-prescribed narcotics, or hallucinogens. *Id.* If someone had a prescription
for the drug, the exclusion would not apply (pp. 31:11-33:5). AIL's narrow interpretation of the
exclusion came about in 2001 when he made a recommendation that the exclusion should only be
applied when drugs were the direct physiologic cause of death (pp. 33:13-34:13). Since 2001, that
has been the historic application by AIL. *Id.* As a practical matter, it is rare to get A71 death claims,
and Exclusion Number 6 does not frequently come up in those claims. *Id.*

It is the AIL procedure that when a claims examiner has a question on a denial or needs
input on an issue for a claim by an assistant general counsel, the examiner escalates that question
or issue to the examiner's manager (pp. 37:1-40:10). The manager then decides whether to request
assistance from Legal. *Id.* When the claim was escalated, the question being presented and
supporting documentation would be scanned so that it was available to Mr. Johnson for review
(pp. 37:1-40:10). Mr. Johnson would then answer the question and send it to the claims manager,
who would then communicate the answer to the claims examiner. *Id.* That was the process in place
at the time of the Shackelford claim. *Id.* Mr. Johnson did not have direct access to the D notes nor
documents in the claims file that were accessible to the claims personnel (pp. 40:11-42:1).

The process for a Claims Legal review has now changed. *Id.* Mr. Johnson no longer
provides the legal claim review. *Id.* Claims Legal reviews have been transitioned to two attorneys

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 16

working at Globe Life in Oklahoma City. *Id.* Mr. Scarborough wanted to centralize the claim review process (pp. 42:2-43:7).

Via a shared folder, Mr. Johnson would communicate with Claims, advising that he needed access to additional documents (pp. 46:23-48:3). Now, the lawyers doing claim legal reviews have access to the same resources that the claims examiners have (pp. 48:4-50:22).

It is his understanding that Ms. Webb and Ms. Robles did not have access to some phone calls that Mrs. Shackelford made (pp. 50:23-53:4). Prior to his deposition Mr. Scarborough listened to all of the 32 phone calls. *Id.* It was troublesome to him that there were communication breakdowns between Customer Service and Claims. *Id.* As an example, if Mrs. Shackelford had notified Claims that her husband had a prescription for Diazepam, claims personnel would have arrived at a decision to pay the claim, not for the right reason, but because they would have eventually gotten to the right answer. *Id.* The right reason would have been because the death occurred as the result of a car accident without more. *Id.*

In looking at the accident and toxicology reports, Mr. Scarborough testified that he could understand the logic and reasonableness used by the claims examiners and by Mr. Johnson in reaching their denial position (pp. 53:5-20). That decision, however, was not consistent with how AIL applied Exclusion 6 in the past. *Id.*

After the lawsuit was filed in this case, Mr. Scarborough looked at the facts of the claim and the claim file (pp. 53:21-54:14). At that time he made a determination that the right thing to do was to pay the claim because it was consistent with AIL's prior practice in applying the exclusion. *Id.*

If Ms. Robles applied the narrower interpretation of Exclusion 6, Mr. Scarborough believes it is likely that the Shackelford claim would have been paid (pp. 74:14-75:10). Ms. Robles' other actions, in terms of looking for a prescription for Diazepam, flowed from that mistake. *Id.* If Ms. Robles had used the narrower interpretation of the exclusion, then she wouldn't have needed the prescription. *Id.* He did not see any other mistakes that Ms. Robles made. *Id.* He acknowledged that Ms. Robles' testimony was that if she had received the prescription, she would have authorized payment of the claim. *Id.* The question that Ms. Robles needed to answer was whether Mr. Shackelford's death resulted from the use of drugs (pp. 75:25-76:17). In Ms. Robles' broader interpretation of the exclusion, she was looking at Mr. Shackelford's death as an indirect result of drugs, so from Ms. Robles' perspective, the question would have been whether Diazepam was indirectly involved in Mr. Shackelford's death. *Id.* Given the historical application of Exclusion 6 utilized by AIL, Ms. Robles should not have asked about the Diazepam (pp. 101:14-24). What Ms. Robles should have considered was whether decedent Shackelford died in a car wreck, and she should have never gotten to the question of Diazepam. *Id.* Ms. Robles should have paid the claim because of the death by car wreck. *Id.*

Mr. Scarborough reviewed Mr. Johnson's deposition (pp. 86:16-88:8). He noted that Mr. Johnson testified that had he known there was a prescription, then Mr. Johnson would have

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 17

gone further in the investigation to determine whether the prescribed drug had some influence over the cause of the crash. *Id.* Mr. Johnson testified that he might have advised Claims to reach out to a medical director. *Id.* Mr. Scarborough recalled that Mr. Johnson might have wanted the medical director to render advice about decedent Shackelford's state of being at the time of the crash regarding the ingestion of Diazepam. *Id.* The level of Diazepam in decedent Shackelford's system would have been a factor in whether drugs played a role in the crash. *Id.*

Mr. Scarborough acknowledged that AIL made mistakes in handling the Shackelford claim (pp. 54:15-56:3). First, starting with the Policy Owner Services employees (POS), there was a communication breakdown between POS and Claims. *Id.* The mistakes made by the POS employees was that the Customer Services Department did not communicate with the Claims Department that Mrs. Shackelford had told Customer Service that there was a prescription for Diazepam. *Id.* Also, in listening to the calls, there was a lot of confusion from the Customer Service standpoint, not necessarily related to the handling of the claim. *Id.* The first seven calls were about changing the beneficiary to Mrs. Shackelford on the A71 policy because decedent Odell Shackelford had passed away. He could understand how Mrs. Shackelford was frustrated by those calls. If that wasn't a mistake, it was certainly sloppy. *Id.* Besides not clearly communicating the existence of a prescription and the sloppiness of the calls, there was a call where the customer service representative told Mrs. Shackelford that she couldn't talk to the claims people or Legal, which was not true, because Claims and Legal can call beneficiaries (pp. 56:4-25). Mr. Scarborough has engaged in plenty of calls with beneficiaries, claimants, and insureds. *Id.*

In listening to the confusion among the POS employees, he wouldn't say that the employees were confused about the fundamental nature of the job when taking calls from beneficiaries like Mrs. Shackelford (pp. 57:9-58:3). There were a few calls, as he mentioned that were troubling. However, there weren't consistent mistakes made on most of the calls or that the customer service representatives fundamentally didn't know what they were doing (pp. 57:9-58:13).

Regarding Ms. Webb's involvement, her mistake was in handling the claim without applying AIL's narrower interpretation of Exclusion 6 that had been applied in the past (pp. 105:16-106:12). Mr. Scarborough understood the logic of Ms. Webb's handling. *Id.* However, she should have applied the more narrow interpretation and paid the claim. *Id.* Ms. Webb's focus on the presence of a prescription would not have come into play if she had applied the narrow interpretation of Exclusion 6. *Id.* Regarding Mr. Johnson, he made a mistake in the claim by giving the wrong advice (pp. 106:13-108:1). Mr. Johnson should have said the need to interpret this exclusion to mean the denial of claims would only occur if the insured died as the direct physiologic result of taking a drug. *Id.* He believes that Mr. Johnson should also have advised Claims to seek the advice of a medical director. *Id.* Mr. Scarborough was not sure if the medical director's advice would have been meaningful, but the medical director's advice could have been sought. *Id.* Mr. Johnson could also have reviewed the claim file and come to the same conclusion that he came to. *Id.* Regarding whether Ms. Troxell made a mistake, he could not comment because he did not work in the Claims Department and didn't train the claims examiners or managers

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 18

(pp. 108:2-15). He agreed that both Ms. Robles and Ms. Webb did not appear to know about the narrow interpretation of the exclusion, but Mr. Scarborough was not prepared to say that Ms. Troxell did not train the employees. *Id.*

The company has changed its practices because of what occurred in this matter. One of the changes was the implementation of a concierge program (pp. 66:8-67:22). Under that program, a dedicated POS employee would be assigned to a specific beneficiary. *Id.* That person would not be a claims adjuster, but someone to walk the claimant through the process. *Id.* The concierge program is designed to prevent someone calling in and being transferred and having to explain their claim to a new person each time they called. *Id.* In addition to the changes explained in Ms. Troxell's deposition, the company has also implemented what Mr. Scarborough calls a 360-degree review process which involves not just Customer Service, but also Claims (pp. 67:23-71:21). This involves an informal committee comprised of Mr. Scarborough, the head of HR, the head of Regulatory Compliance, and is chaired by the Chief Administrative Officer for AIL. Dawn Troxell and Shane Spriggins are invitees. *Id.* They are not just looking at what happened with the Shackelford claim, but in making other improvements to customer service/claims processes. *Id.* They have talked about improvements in Ms. Troxell's group, Human Resources, and whether they have enough personnel. *Id.* The concern was not that Ms. Troxell's group was understaffed, but instead whether the staffing was appropriate. *Id.* They have discussed the possibility of adding a correspondence clerk. *Id.*

During his deposition, Mr. Scarborough was asked about Oklahoma statute 36 O.S. 4405 which indicates that an accidental death policy cannot include an exclusion for narcotic use if the narcotics were being used pursuant to a valid prescription given by a medical professional (pp 98:2-99:6). He noted that the statute stands for the proposition that an accident insurance policy can contain a provision excluding the payment of benefits for narcotic use and that the exclusion cannot be any more narrowly tailed than the statute set forth (pp. 99:20-101:2). Under the statute, if a prescription did not exist, then the insurer could utilize a narcotics exclusion if the use of the drug was the cause of the loss. *Id.*

When the lawsuit was received, Mr. Scarborough reviewed it. He then asked the question, "Is there a way to get this paid?" (pp. 93:9-94:24). The claim was paid as a result of his advice to pay it. *Id.* He looked at the Shackelford claim file and the fact that the benefits were due based on a narrow interpretation of Exclusion 6 that had been historically applied. *Id.* Therefore, he advised Claims to pay the Shackelford claim. He felt the benefits were owed under the terms of the policy given the historic interpretation of Exclusion 6 that AIL utilized. *Id.*

5.      **Deposition of Dawn Troxell (April 25, 2019)**

Dawn Troxell is the Senior Vice President of policy benefits for Globe Life and Accident Insurance Co. performing job responsibilities for American Income Life Insurance Co. (pp. 4:24-6:17). She oversees Claims, as well as other departments (pp. 6:18-8:9). She is ultimately responsible for the design and implementation of the AIL claims handling processes (pp. 8:10-9:4).

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 19

She appeared at her deposition as the designated corporate representative for AIL in the categories identified (pp. 9:5-15:13).

Regarding the Shackelford claim, she testified that the only applicable exclusion was the drug, narcotic, and hallucinogen exclusion (pp. 39:15-42:6). Regarding the denial decision, she testified that there was a logical conclusion drawn that the drugs could have been a factor in decedent Shackelford's accident (pp. 42:7-46:9). She did not recall seeing any investigation about the amount of drugs in Mr. Shackelford's system. However, drugs were the only possibility that they could find to explain why the crash occurred. *Id.* The police report did not indicate that there were other vehicles involved in the accident. *Id.* The toxicology report indicated Diazepam was in decedent Shackelford's system. *Id.* There was no documentation that another driver ran decedent Shackelford off the road. *Id.*

From her review of the claim file, Ms. Robles was assigned to work on the Shackelford claim and on February 23 she sent a letter to Mrs. Shackelford requesting additional information (pp. 48:17-50:25). It was standard practice at AIL with any type of accident claim to request a toxicology report. *Id.* The A71 policy is an accident policy and covered a broad spectrum of accidents. *Id.* Because of this, police reports were requested in all accident claims involving a vehicle crash. *Id.* If they could acquire it from the beneficiary, AIL requests an autopsy and toxicology report. *Id.* The death certificate combined with the police report allowed AIL to determine that decedent Shackelford was involved in an auto accident which resulted in an injury that caused death (pp. 51:1-53:1). The only question left to be answered was whether there was an exclusion that would prohibit payment of benefits. *Id.* AIL conducted an investigation to gather evidence to determine if the drug exclusion applied. *Id.* Because decedent Shackelford was the driver of the single vehicle involved in the accident, AIL will automatically request the autopsy and toxicology reports if available, and also request the submission of a HIPAA authorization. *Id.* This would not be the procedure if the decedent was a passenger. In the latter situation, they would not request a toxicology report. *Id.* From her review of the file, Ms. Robles requested the autopsy and toxicology report on March 28, 2017 (pp. 54:4-56:12).

The medical examiner's report was received on April 25, 2017 (pp. 546:13-60:16). The ME report indicated that the probable cause of death was multiple blunt forth injury which was common for individuals who die as the result of injuries from a car crash. *Id.* Thus, the manner of death was accidental. *Id.* Looking at the laboratory analysis, it indicated that at the time of death decedent Shackelford had Diazepam and Nordiazepam in his system. *Id.* Based on that finding, Ms. Robles consulted with her manager, Crystal Webb, to determine if they should ask for a prescription to see if those drugs were prescribed to decedent Shackelford. Ms. Webb advised Ms. Robles to request a prescription because that was AIL's common practice to try and understand all of the facts of the accident and whether the drugs were a contributing cause. *Id.* According to Ms. Troxell, she believes both Ms. Webb and Ms. Robles understood that they were making the decision on the claim (pp. 157:14-161:10). Involving the Legal Department was a final control point to see if Legal agreed that Claims was applying the laws correctly in that state. *Id.* Ms. Robles was the first checkpoint and she was responsible for gathering information,

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 20

investigating, and making claims decisions on the Shackelford claim. *Id.* She then took her decision for denial to Ms. Webb for her opinion and if Ms. Webb agreed with Ms. Robles' decision for denial, the next step would be to get input from Legal. *Id.*

Ms. Troxell agreed that there were several calls made by Mrs. Shackelford asking to speak to somebody in Claims and that she asked to speak to somebody in Legal at least once when Mrs. Shackelford came to realize that the claim file had been moved to a legal review (pp. 105:6-109:25). If the insured wanted to speak with somebody from Claims, the customer service representative could send an email to Claims and ask that they call the insured or they could let their customer services manager know that somebody needed to speak with someone in Claims. *Id.* At that point, the customer service manager would then contact the claims manager who would determine whether the question could be answered by customer service or whether a claims examiner should make a call back to the caller. *Id.* Ms. Troxell acknowledged that in practice there were very little transfer of calls from Customer Service to Claims. *Id.* Sometimes a call did require the examiner to get involved and make a call back. *Id.* The customer service employees were responsible for the direct communication with the insured and beneficiaries since they were trained to do that task. *Id.* They were also trained to take detailed notes of their interactions with insureds and to include those notes in the D note entries that they made. *Id.* After reviewing the D notes from the calls with Mrs. Shackelford, she acknowledged there were no notes of Mrs. Shackelford's requests to speak to somebody in Claims. *Id.* Ms. Troxell also recalled seeing at least one email to Claims that Mrs. Shackelford had called which resulted in a letter from Ms. Robles. *Id.* The email from Janelle Barnes to the Claims Department was Exhibit 2.5 to her deposition (pp. 110:1-111:3). Reviewing the email, Ms. Troxell acknowledged that it did not tell Claims that Mrs. Shackelford wanted to talk to somebody from Claims. *Id.* Claims did respond to the email request with an update on where the claim stood. *Id.* A second email (Exhibit 2.7) from Ms. Barnes to the Claims Department and Claims' response to the email was discussed (pp. 111:4-113:1). The second email did not tell Claims that Mrs. Shackelford wanted to speak with somebody from Claims. Mrs. Shackelford spoke to over ten employees in Customer Service and only Ms. Barnes emailed Claims regarding the discussions. *Id.* Based upon Ms. Troxell's review she agreed that there were a couple of instances where the notes from Customer Service could have been much better and there should have been better communications with the Claims Department. *Id.* That is one mistake that AIL made in the handling of the claim. *Id.* Having said that, Ms. Troxell noted that while Janelle Barnes was the only one who documented communication from Customer Services to Claims, that did not rule out the possibility that another customer service employee contacted the Claims Department to ask questions regarding the claim (pp. 116:20-120:8). The Barnes contact was the only one documented. *Id.* She believed that individuals from Customer Service did contact Claims based on some of the phone calls. *Id.* She recalls from the transcriptions that Mrs. Shackelford would be put on a brief hold so that the

Customer Service representative could either talk to a supervisor or make a call to Claims. *Id.* The customer service employee then got back on the call with Mrs. Shackelford with additional information. *Id.*

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 21

In Ms. Troxell's opinion, the Shackelford claim should have been paid before AIL received the laboratory analysis from the medical examiner's office (pp. 60:17-65:21). The claim should have been paid when AIL determined that Shackelford died as the result of a car accident, shortly after February 20th when the death certificate and police report were provided. *Id.* The way Ms. Robles, Ms. Webb, and Mr. Johnson applied the drug exclusion was not consistent with how AIL had historically applied the exclusion. The way AIL applied the drug exclusion in the past required the cause of death to be the direct physiological result of the drug, such as a drug overdose as an example. *Id.* That is not what occurred with decedent Shackelford. The claim team made a mistake by not applying the exclusion as had been historically done by AIL. *Id.* She testified that the team was applying the exclusion more broadly when AIL had historically applied the exclusion very narrowly. *Id.* From past practice, in order to be consistent with how the company had traditionally applied the drug exclusion, the Shackelford claim should have been paid after the receipt of the death certificate and police report. *Id.* It was only from the information requested from the ME that the team found out about the Diazepam. *Id.* It was a common practice to request an autopsy and toxicology report for any sort of accident claim.

Since the filing of the Shackelford lawsuit, the claims staff has been retrained on how they should apply the drug exclusion (pp. 65:23-66:16). The claims staff has been instructed that if a person died in an auto accident and there was proof of that, then the claim should be paid, and Claims would not ask for toxicology reports or copies of prescriptions.

The exclusion issue which confronted the claim team does not occur very often. According to Ms. Troxell, AIL has not denied an A71 policy death claim in the state of Oklahoma for the last seven years, so is not a frequent occurrence (pp. 60:17-65:22). In the past seven years, AIL has only had 17 A71 death claims in Oklahoma and all of those claims were paid, including the Shackelford claim (pp. 134:8-136:5). The company has rarely applied an exclusion in any state under an A71 policy. *Id.* Ms. Troxell ran the numbers because she was curious and she found out that AIL had only denied approximately 18 or 19 A71 policy claims and the majority of those were based on the suicide exclusion. *Id.*

Notwithstanding the fact that the claim examiners were looking at the drug exclusion more broadly than AIL had historically applied it, Ms. Troxell understood why they were doing what they did (pp. 129:24-134:7). The claims examiners wanted to figure out if the use of drugs was a possible cause of the accident. *Id.* There was a dispute with the claim because the examiners didn't know what caused the accident. *Id.* It was a single car accident on a day with no adverse weather conditions and it didn't appear that there were any other vehicles around or involved. *Id.* The team had a legitimate dispute as to whether it was a payable claim or not. *Id.* Although decedent Shackelford did not die specifically because of the use of drugs, it was possible that the drugs were a contributing factor to why the accident occurred. *Id.* The accident report showed that on the day of the accident the weather was clear and there was no rain or ice involved (pp. 165:17-166:22). There were no road obstructions and the accident did not occur in a construction zone. *Id.* It was a single car accident. *Id.* It was noted there was no phantom vehicle or anything in the roadway to cause the Shackelford vehicle to swerve off the roadway (pp. 166:23-170:13). No car hit the

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 22

Shackelford vehicle and there was no obvious cause of the accident indicated in the police report. *Id.*

Since the lawsuit has been filed, AIL has added layers of individuals that are reviewing claims (pp. 91:1-93:14). The same review process is used but now there are more individuals involved in the process. *Id.* The previous layers of review were the examiner, the examiner's manager, and assistant general counsel. *Id.* Now there are additional employees in that process since they've gone to a more collaborative approach with Underwriting, as well as Legal. *Id.* Additionally, Ms. Troxell and Joel Scarborough attend meetings and do basic claim reviews for all claims where there are questions, not just A71 policies. *Id.* Now Underwriting is involved in a meeting with Claims and Legal together, reviewing all the documentation at the same time. *Id.*

. Regarding Customer Service, there is now a heightened awareness because there is a resolution team. Pp. 123:13 – 124:16) Customer Service received additional training of when they should escalate something to the resolution team. The random audits look for calls that are longer than average to see what took so long and that the customers' issue(s) was resolved. *Id.* The audits also look to see if they are using the resolution team the way they need to. The audit does not include 100% of all calls. That would not be realistic. *Id.* The auditors can see what screens the customer service employees accessed (pp. 127:20-129:23). It is not a real-time review, but it does capture what they were seeing at the time. *Id.* The auditors see a recorded version of the computer screen that the customer service employee was looking at during the call. *Id.*

6.    **Deposition of Amanda Lindsey (May 15, 2019)**

She didn't have any role in handling Ms. Shackelford's claim when it was pending at AIL because she was on maternity leave (pp. 87:21-88:13). She started at AIL in 2015. She was on maternity leave during the Shackelford claim. She wasn't involved in any of the claims decisions. Her involvement was when the complaint was made and she authorized payment. The only thing she knows about this claim is from reading the file after the fact (102:25-104:21).

When Amanda Lindsey was hired by AIL, she understood her primary job responsibility was to make sure claims turnaround time was low. Her performance was based in part on how quickly claims were turned around (pp. 23:15-14:13). While working at AIL, she had available to her training regarding the Unfair Claims Settlement Practices Act through training modules (pp. 30:12-32:10). The training modules were sent to her annually and were in the form of tests that had to be passed. *Id.* The managers and examiners on her team took the Unfair Claims Settlement Practices Act module. *Id.* Additionally, one of the training modules included training on the duty of good faith and fair dealing. It was also on the computer (pp. 91:25-93:18). Regarding claim handling standards, Ms. Lindsey testified that there were no claim handling standards produced by AIL but that the employees passed around documents and written down handling procedures to each other, they just weren't formal (pp. 50:11-51:22).

Other than the policy language itself, there were no other set claims handling processes (pp. 44:20-46:15). How to interpret the policy language would fluctuate depending on which

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 23

examiner was handling the claim. *Id.* She made repeated requests to AIL to allow her to memorialize specific guidance on how to handle the problems. Her understanding of why they were rejected is that they would create a standard that they might not be able to meet over time. *Id.*

For A71 policy claims, the examiners were required to determine if the policy was active, was it payable,  was it contestable, take the actions needed, and get the documentation and make a decision on the claim (pp. 46:16-47:2). The claim manager was required to make sure that claims were getting handled in a timely fashion and audited properly, depending on the amount, if it went to them, and to make sure that they had all the information needed to make a claims decision. That was part of the auditing process (pp. 47:3-10). There were claims escalation specialists who would help obtain documentation (pp. 47:11-48:17). The claims escalation specialist would reach out to the insured or beneficiary and try to get the information they needed to process the claim. The claims escalation specialist was there to try to reduce the amount of the claims that were pending. *Id.*

In her tenure at AIL there was a standardized procedure for the investigation of A71 claims that could possibly be excluded under Exclusion No. 6 (pp. 60:1-61:15).  When she first started, they would order autopsy/toxicology reports if the death was due to an accident in order to rule out the exclusion. *Id.* For the first half of her tenure with the company, they would request in every instance a police report and an autopsy/toxicology report. *Id.* The examiners were looking for the use of drugs, narcotics, or hallucinogens or whatever exclusions were listed. *Id.* Different states had different languages used. They were looking at the policy language to see if any of the exclusions applied. *Id.* Although she could not answer how Exclusion 6 was applied for claims made from Oklahoma, everyone adhered to the policy language (pp. 61:16-62:9). The exclusions were applied based on what was in the toxicology/autopsy report. *Id.* If they didn't know what a drug was, they Googled it. *Id.* If they had a question on something they could reach out to their medical director and ask if a certain exclusion would apply, and after receiving that information, if they determined the claim was going to be denied, they would then send it to Legal (pp. 62:10-18).

She was shown the toxicology report on decedent Shackelford. She acknowledged that the report showed that decedent Shackelford had Diazepam and Nordiazepam in his system at the time of his death (pp. 67:1-68:1). When an examiner would see those type of drugs in the decedent's system, they would then bring the issue to their manager. *Id.* The manager would normally do a Google search if there were any questions regarding the drug. If she had a question, she would reach out to the medical director, and if she thought an exclusion applied, then she would present it to Legal with why she thought that the claim should be denied. *Id.*

According to the testimony of Ms. Lindsey, the Shackelford claim would have been denied in 2017 because of the presence of drugs in decedent Shackelford's system. That is how she was trained to handle a claim like the Shackelford claim (pp. 69:17-70:7).

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 24

According to Ms. Lindsey, the process for a beneficiary to speak to an examiner usually involved the POS employee going through a POS manager and the POS manager to communicate with the claims manager and the claims manager to then communicate with the examiner handling the claim (pp. 75:14-76:13). It wasn't set in stone, but that was her understanding. *Id.* It was unusual for her examiners to have direct contact with an insured or beneficiary unless they had a question, but it wasn't standard practice. *Id.* She acknowledged that part of the POS employee's job was to insulate examiners from beneficiary contact so that claims examiners could turn claims faster. *Id.* In her experience that process could have created some problems for the beneficiary, but it was a low percentage and most policyholders would probably rather have had their claims paid quickly (pp. 76:14-77:15). It was her practice with her employees that if they had a situation where a beneficiary wanted to speak to a claims examiner and there were multiple notes in the case and clearly the beneficiary or policyholder needed some further explanation that maybe the POS employees had not provided, then her examiner should pick up the phone and call them (pp. 76:14-77:15). Sometimes there was a lack of detail in the notes made by POS employees, and sometimes it was really detailed. There was no consistency. *Id.*

The standard method for handling Exclusion 6 in an A71 policy changed (pp. 88:14-90:3). If they had proof that someone died as a result of a car accident, they paid the accident portion of the benefit. That's how it changed. They didn't look at the exclusion. The only way that exclusion could ever be applied as far as she could see, was if they had documentation that someone died as a result of drug use and then crashed the car, but she hasn't seen that. *Id.*

## VI.    SUMMARY OF OPINIONS

In rendering my opinions below, it is not my intent to offer legal opinions. Questions of law are to be decided by the trial court and not experts. However, in assessing the insurance company's conduct, questions can arise regarding whether the insurance company's interpretation and belief regarding the governing law was reasonable under the circumstances. In the latter type of situation, the focus is not on what the law is, in fact, but on how the insurance company perceived the law to be. With that focus in mind, the interpretation of the law becomes part of the factual context in which the insurance company's conduct is assessed. In that context, the question is not what the law is that governs a particular case, but what the insurance company interpreted the law to be and how that interpretation informed the insurance company's decisions and conduct regarding the claim.

### 1.    AIL's method for processing A71 policy accident death benefit claims was reasonable, although there were execution errors during the processing of the Shackelford claim.

The processing of accidental death benefit claims is significantly different than most first-party and third-party claim submissions. With typical first and third-party claim submissions there normally is a longer investigation phase regarding the acceptance and valuation of the claim, which requires significant ongoing communication between the assigned claim adjuster and the insured and/or claimant. With most first-party and third-party claim presentations, significant

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 25

investigation must take place regarding the loss event (in the first-party context) or the liability event (in the third-party context) that is not present to the same degree when dealing with accidental death benefits. The first question to be resolved in the accidental death benefit context was whether the death occurred from natural causes or some form of external cause.[2] In the Shackelford case a covered person died. The second question to be resolved was whether the death was accidental, as opposed to natural or intended (suicide). If the answers to those two questions are in the affirmative, benefits are owed unless an exclusion applied. The next question to be resolved was whether an automobile was involved in the death. (Was the decedent either "driving or riding within a passenger automobile not operated as a common carrier" at the time of death or injury resulting in death (within 90 days)). If an automobile death was involved, the benefits under the policy for accidental death ($20,000 in the Shackelford policy) are doubled ($40,000 in the Shackelford policy). The foregoing questions can typically be resolved quickly with limited proof and information, allowing A71 type claims to be processed on a confirmation basis, unlike normal claim investigations which can involve more complex fact patterns and differentiated valuations depending upon the development of facts as the claim is processed.

The AIL claim processing structure for A71 policy claims at the time of the Shackelford claim disposition primarily involved two departments. The Customer Service Department, which was manned by policy owner services employees (POS) and a separate Claims Department, manned by claim examiners and supervisors. Occasionally, if a denial was being considered, the process would also involve the Legal Department. All information regarding a particular claim was routed to the Claim Department. The claim examiner would make a preliminary determination as to whether the claim should be accepted for benefits or denied. When the claim examiner's decision was to accept the claim for benefits, and the benefit payment would be over the claim examiner's authority limit, it would be routed to the claim examiner's supervisor, who would sign off on the acceptance of benefits determination. Every examiner, supervisor, manager, etc. has an authority limit. If the benefit payment would be above the individual's authority limit, then the claim would go to the individual who had the appropriate approval authority. If a claim examiner was going to recommend a denial of benefits, the claim disposition was escalated to the supervisor, who would then make a decision to accept the claim examiner's recommendation for denying benefits, or the supervisor could overrule the claim examiner's recommendation that benefits be denied. Where the supervisor overruled the denial recommendation, the benefits would then be paid. If, however, the supervisor concurred with the claim examiner's recommendation for denial, then the Legal Department would become involved. The claim presentation would be reviewed by an assistant general counsel, who would then report back to the Claim Department his recommendation. As a practical matter, if the assistant general counsel recommended that the claim be accepted for benefits, then it was accepted for benefits. If the assistant general counsel concurred in the denial of benefit decision, then the denial would stand. Thus, where the claim

---

[2]     The A71 policy is an accidental death and dismemberment benefit policy and therefore includes dismemberment benefits in addition to a death benefit.

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 26

examiner preliminarily recommended the denial of a claim, there would be two additional separate reviews of the claim to determine deniability (claim supervisor and assistant general counsel).

Regarding communication with beneficiaries, the system was designed to have the primary source of contact the POS's or what were commonly called customer service representatives. The customer service representatives were the primary contact for beneficiaries and others regarding a particular claim. Their role was to answer questions of beneficiaries and to receive information from beneficiaries. This personal contact with beneficiaries and their representatives was separated from the Claim Department with the design that claims examiners would be able to focus their attention on the substance of the information presented with each claim to make expeditious claim determinations, which by practice overwhelmingly resulted in acceptances of benefits. It is much like a secretary who puts her phone on DND while trying to process paperwork on her desk with the intended purpose of circling back to any voice messages that have been left on her phone. Customer service representatives were available to answer a multitude of questions that beneficiaries and their representatives would have regarding the claim process. Under AIL's system, the customer service representatives were to alert the Claims Department regarding any significant and substantive communications from the beneficiary and/or beneficiary's representatives. Much like the secretary who puts her phone on DND, a claim examiner was appointed daily to review and follow up on communications from the POS Department, while other claim examiners worked on the disposition of claims. Utilizing a system that maximizes the attention of claims examiners on the substance of the claim disposition in order to increase the speed of those dispositions was a reasonable goal of the system as designed.

As designed, customer service representatives were to facilitate communications between policy beneficiaries and their representatives with Claims. This was accomplished first by relaying questions or information from the beneficiary to the claim examiners electronically for consideration and possible response. If, during the real time communication with the customer service representative, a beneficiary or representative wanted to speak with the claim examiner or someone else from Claims, the customer service representative would escalate the request to the customer service representative's manager. At that point, the customer service manager could become involved with the call, or would make a decision regarding how the customer service representative was to respond. The customer service manager could reach out to the manager of the Claim Department to address the issue further. As designed, the system allowed for there to be indirect communication (if not direct communication on a case-by-case basis) with the Claims Department. Given the non-complex nature of the claims being processed, this system was reasonable to achieve expeditious resolution of A71 policy claims. As testified to by Ms. Dawn Troxell, in seven years there were 17 A71 death claims in Oklahoma and all of them were paid. Overall, there were only 18 or 19 A71 policy claims that were denied throughout the portfolio of policies outside of Oklahoma, and the majority of those denied claims were based on the policy's suicide exclusion. See Troxell Dep., 4/25/19, pp. 134:8-136:5.

An example of how the communication between beneficiary-customer service representative-claim examiner occurred is exemplified by Ms. Janell Barnes messaging to the

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 27

claims examiner during the Shackelford claim processing, which were then responded to by Ms. Robles as the claim examiner. Additionally, a customer service representative might put the caller on hold and obtain the requested information from claims during the call. That also occurred regarding the Shackelford matter. *See* AIL 63 (3/9/16 call between Janell Barnes and Mrs. Shackelford).

Unfortunately, not all customer service representatives who interfaced with Mrs. Shackelford and the insurance agent properly reported substantive communications with Mrs. Shackelford and her representatives to the Claim Department as they should have done. This was human error and did not comply with the system as designed. As an example, the customer service representatives' failure to communicate to the Claims Department that Mrs. Shackelford had indicated her deceased husband had a prescription for his Diazepam altered the trajectory of the claim disposition. Had Ms. Robles been aware of that fact (including Ms. Webb and Mr. Johnson) there would have been further follow-up to secure proof of the prescription and an internal medical consultation might have happened. What the claim file does reflect is that Ms. Robles was looking for a reason to not apply the drug exclusion (see EXCLUSIONS (6)) when she communicated on several occasions with Mrs. Shackelford following up on Ms. Robles' request for a copy of the prescription. If Mrs. Shackelford produced the prescription, Ms. Robles and Ms. Webb testified they would have paid the claim.

The system employed by AIL for its A71 policy death benefit claims was appropriate given the minimal information that was necessary to complete the claim investigation. Questions to be asked regarding the predicate for the claim were simple. Was there a death and was the death an accident? If so, did an exclusion apply? The value of the predicate loss was predetermined by the policy. Minimal information was necessary from the claimant or beneficiary to establish the predicate for coverage. Servicing insured claimants and beneficiaries can take a substantial amount of time away from the actual, minimal required investigation that the claims examiner must perform in order to verify coverage for payment. This, in turn, would slow the claim approval process.

Based upon the foregoing, it is my opinion that AIL reasonably designed a claim processing system for A71 claims. However, as discussed herein and acknowledged by both Ms. Troxell and Mr. Joel Scarborough, there were execution problems at the customer service representative stage of the process. Mistakes and less than expected conduct can occur with all processing systems, irrespective of how perfectly targeted and designed they are.

**2.      Oklahoma's statutory narcotic exclusion does not govern non-narcotic drug exclusionary language.  Nevertheless, assuming Oklahoma's narcotic exclusion statutory language applies to AIL's non-narcotic drug exclusionary language, the record demonstrates that AIL's conduct conformed with the narcotic exclusion statutory language.**

By statute, Oklahoma permits accident policies to contain a narcotics exclusion (*see* 36 Okl. St. §4405(B)(10). The statute requires specific wording for the policy, unless alternative

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 28

wording is approved for the exclusion by the insurance commissioner. The language of a narcotics exclusion must be stated as follows:

> The insurer shall not be liable for any loss sustained or contracted in consequence of the insured's being under the influence of any narcotics, unless administered on the advice of a physician.

The statutory narcotic exclusion does not require there to be any specific quantity of the drug in decedent's system before the exclusion can apply. The statutory scope of the narcotic exclusion allows for direct and indirect causes of death from non-prescribed use of a narcotic. Thus, where death is sustained or contracted in consequence of the insured's being under the influence of a narcotic, the statutory exclusion language would apply if the narcotic was non-prescribed. The language would permit application of the exclusion to situations where a driver of a vehicle runs the vehicle off the road and dies in a single vehicle crash as a result of being under the influence of a non-prescribed narcotic.

The A71 policy exclusionary language in question here provides as follows:

> No benefit will be paid for expenses incurred for loss resulting from:
> * * *
> (6) Use of drugs, narcotics, or hallucinogens;

*See* p. 5, A71 policy (AIL-75). The parties agree that Diazepam was a "drug" but not a "narcotic." As such, the required narcotic exclusion statutory language regarding administration of the narcotic drug on the advice of a physician is not technically required for non-narcotic "drugs." However, Ms. Robles and Ms. Webb's implementation of the AIL drug exclusion for purposes of processing the Shackelford claim was consistent with the narcotic drug statutory requirement. On several occasions, Ms. Robles requested proof of a prescription for the Diazepam in her attempts to find coverage for the claim.

     **3.    Ms. Robles, Ms. Webb, and Mr. Johnson concluded that the Shackelford accidental death benefit claim was not covered, based upon a reasonable review of the claim facts and the policy language.**

Ms. Robles, Ms. Webb, and Mr. Johnson reviewed the medical examiner's autopsy report, the toxicology report, and the police accident report. The known facts regarding decedent Shackelford's accident indicated that the accident was a single vehicle accident in which the Shackelford vehicle left the roadway and crashed without explanation. There were no obstructions in the roadway. No other vehicles were involved in the accident event. The weather was clear and there was an absence of any type of adverse weather condition which could have contributed to the accident. Decedent Shackelford had Diazepam in his system according to the toxicology report at the time of the accident. From these facts, it was reasonable for Ms. Robles, Ms. Webb, and Mr. Johnson to conclude that the likely explanation for the Shackelford vehicle leaving the roadway was the physiologic effects of the Diazepam in decedent Shackelford's system. A reasonable application of those facts to the drug exclusion in the A71 policy was that there was no

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 29

coverage for decedent Shackelford's accidental death. However, Ms. Robles and Ms. Webb's ultimate conclusion of no coverage also took into consideration whether decedent Shackelford had a prescription for the Diazepam. Ms. Robles' several requests to Mrs. Shackelford, asking for a copy of the prescription (*see* May 2, 2017 (44), May 22, 2017 (45), and June 13, 2017(46)), was consistent with Oklahoma's statutory (36 Okl. St. §4405(B)(10)) requirement that a "narcotic" drug exclusion is only applicable if the drug in question was not administered by a physician

The AIL Claim Department was not made aware by the Customer Service Department that Mrs. Shackelford had reported to the customer service representative that the Diazepam had been prescribed by a doctor. If those communications had been relayed to Ms. Robles, she would have followed up on securing a copy of the prescription.

Ms. Robles, Ms. Webb, and Mr. Johnson read Mrs. Shackelford's June 13, 2017 (31, 932) letter as indicating that decedent Shackelford did not have a prescription for the Diazepam ("There isn't a prescription or medicine bottle in my home for any Diazepams"). It would be reasonable for a claim examiner and attorney to believe that the securing of a copy of a prescription is a fairly easy thing to acquire because the beneficiary would likely know the decedent's doctors and/or local pharmacy. Because Ms. Robles, Ms. Webb, and Mr. Johnson were not aware that Mrs. Shackelford expressed a need for assistance in securing the requested prescription, that her failure to provide the prescription as requested by Ms. Robles in her correspondence on three separate occasions was the functional equivalent of the beneficiary acknowledging that there was no prescription for the Diazepam.

Based upon the foregoing, it is my opinion that it was reasonable for Ms. Robles, Ms. Webb, and Mr. Johnson to come to the conclusion that, based upon the known facts and the express wording of the A71 policy exclusion for drugs, that there was no coverage for the Shackelford claim. Additionally, the testimony is uncontroverted that Claims believed that the drug exclusion would not be applicable if proof of a doctor's prescription for the Diazepam was provided.

   **4.    Ms. Robles, Ms. Webb, and Mr. Johnson mistakenly failed to apply AIL's historic interpretation of the drug exclusion, resulting in the Shackelford claim denial.**

In 2001, AIL adopted an internal narrow interpretation of its drug exclusion in the A71 policy, requiring that the drug in question directly result in the death of the decedent for the drug exclusion to be applied. In essence, the decedent had to die from a drug overdose or an adverse drug reaction. This historic internal interpretation did not apply the drug exclusion for indirect causation. Thus, if the decedent drove his vehicle off the roadway and crashed because he was under the influence of a drug, that would not be considered to be a qualifying direct causal link between the drug use and the death for application of the exclusion. In that regard, AIL's historic practice in applying its drug exclusion only to direct causation deaths was narrower than what Oklahoma statute permitted for narcotic exclusions, and thus more favorable to the insured. Oklahoma's statute regarding narcotic exclusions allows insurance companies to exclude indirect causation, as well as direct causation.

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 30

If Ms. Robles, Ms. Webb, and Mr. Johnson had applied AIL's historic internal interpretation of the drug exclusion to the facts presented with the Shackelford claim, the result should have been that Ms. Robles accepted the Shackelford claim for benefit payment upon receipt of the police accident report without requiring any type of proof that the Diazepam had been prescribed by a doctor.

When the Shackelford lawsuit was filed and served upon AIL, the Shackelford matter came to the attention of AIL's general counsel, Joel Scarborough. Mr. Scarborough immediately realized that an error in interpretive application had occurred, which had resulted in the Shackelford claim denial. Mr. Scarborough was aware of the historic internal narrow interpretive practice of AIL regarding the drug use exclusion because he was central to its adoption in 2001. Upon learning that the drug exclusion had been applied in a manner inconsistent with AIL's historic internal narrow interpretive practice, he gave instruction to reopen the claim to have it paid.

There is some confusion in the testimony as to whether Ms. Robles, Ms. Webb, and Mr. Johnson received training on AIL's historic internal narrow interpretive practice regarding the application of the drug use exclusion. There is no uniform practice within the industry regarding the scope of training given to claim adjusters regarding the application of policy exclusions to specific claim facts. This is especially true with exclusions that rarely are seen in the claim environment. According to the testimony in this case, the drug use exclusion rarely came up in the A71 policy context involving automobile accidents. Given this infrequency, it is unclear whether some discussion regarding the drug use exclusion took place, but was not remembered by Ms. Robles, Ms. Webb, and Mr. Johnson. Ms. Troxell and Mr. Scarborough testified that some degree of training on the historic application of the exclusion was given at some point. Either way, it is not regular and routine practice within the insurance industry to instruct claim adjusters on all of the policy exclusions contained within insurance policies they may be called upon to adjust, especially if the claim presentations which might be subject to the exclusion are infrequent or rare in occurrence.

There is no indication in the record that Ms. Robles, Ms. Webb, and Mr. Johnson's failure to follow the historic interpretive precedent used by AIL for application of the drug use exclusion was intended to purposefully and wrongfully deny the Shackelford claim. The record establishes that the opposite occurred. Under another historic interpretive application of the drug use exclusion which limited the exclusion only to those situations where a doctor had not prescribed the drug in question, Ms. Robles tried on several occasions to get a prescription from Mrs. Shackelford so as to pay the claim. It was only after the attempts of Ms. Robles did not produce a prescription for the Diazepam that the claim was denied.

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 31

     5.    **Ms. Robles, Ms. Webb, and Mr. Johnson failed to utilize the historic internal narrow interpretive precedent of AIL in applying the drug exclusion to the Shackelford claim. This oversight was unintentional and was not done in bad faith.**

     As indicated above, Oklahoma statutory law permits the use of narcotic exclusions. Oklahoma law permits narcotic exclusions to apply to both direct and indirect causation situations. AIL's drug exclusion, similar to Oklahoma's permissible "narcotic" exclusion, applies to causation irrespective of being direct or indirect. Absent the voluntary and narrower historic interpretive precedent of AIL regarding its policy A71 drug use exclusion, the interpretation of the policy exclusion wording, together with the facts presented, was reasonably interpreted to apply to the Shackelford claim. That is to say that Ms. Robles, Ms. Webb, and Mr. Johnson made a reasonable and legitimate decision not to pay the Shackelford claim based upon the known facts demonstrating indirect causation and the policy language. Therefore, their decision to deny the claim did not constitute a breach of the policy's implied duty of good faith and fair dealing. AIL's internal historical interpretive practice of narrowly construing the drug exclusion to apply only in direct causation situations does not, in my opinion, warrant a different conclusion. Any argument that a company's voluntary internal procedures legally expands the company's duties under Oklahoma law is inherently flawed. Insurance companies do not act unreasonably merely because they failed to follow internal policies or procedures without more being shown. This is so, generally, because a party cannot, by adoption of private rules, fix the standard of that party's duty to others as a matter of law. The customs and practices of an individual party, as distinguished from a general custom and practice within an industry, is not helpful in the determination of what constitutes reasonable care. Additionally, an insurance company's internal practices do not establish contractual duties.

     On the record before me, there is no indication that Ms. Robles, Ms. Webb, and/or Mr. Johnson knew about (or were currently aware of) AIL's internal historic interpretive precedent regarding the narrow interpretation of the drug exclusion when evaluating the Shackelford claim submission. (However, Ms. Troxell and Mr. Scarborough testified that training was provided on the subject). Certainly, the record demonstrates that Ms. Robles contacted Mrs. Shackelford on at least three occasions trying to find a prescription for the Diazepam so that the claim could be accepted for payment.

     6.    **The acknowledged mistakes made by AIL in processing the Shackelford claim do not represent a breach of the covenant of good faith and fair dealing.**

     By correspondence dated June 29, 2017 (47) AIL advised Mrs. Shackelford that it was denying her claim for benefits with the caveat that the company would reconsider its denial based upon any additional information Mrs. Shackelford provided. Thereafter, Mrs. Shackelford filed the pending lawsuit on March 27, 2018. The Shackelford lawsuit and claim came to the attention of AIL's General Counsel, Joel Scarborough, on or about May 9, 2018. When Mr. Scarborough reviewed the Petition, he investigated the Shackelford claim and came to understand that Mr. Johnson had provided advice to the Claim Department that was not consistent with AIL's long-standing internal historical interpretive practice which required a narrower reading of the

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 32

drug exclusion to only apply to direct causation accidental deaths. Mr. Scarborough then initiated a rush request for payment of benefits under the A71 policy to Mrs. Shackelford. *See* May 9, 2018 (508). The benefit check was immediately overnighted to Mrs. Shackelford's attorney. *See* May 9, 2018 (515, 510). Thus, the record shows that when Mr. Scarborough discovered the mistake in application of the exclusion based upon AIL's internal historic interpretive practice, the company expeditiously corrected the error.

Both Mr. Scarborough (General Counsel) and Ms. Troxell (Senior VP of Claims), have acknowledged in their testimony that mistakes were made by AIL in processing the Shackelford accidental death benefit claim. These mistakes occurred in two principle areas. First, the customer service representatives who spoke with Mrs. Shackelford and her representatives did not communicate to the Claims Department that Mrs. Shackelford needed assistance in acquiring Odell's prescription for the Diazepam and that she believed there was a prescription for the Diazepam. Because that information was not communicated to the Claims Department, Ms. Robles did not reach out to Mrs. Shackelford to provide assistance in acquiring the prescription. The second area in which mistakes were made involved Ms. Robles, Ms. Webb, and Mr. Johnson mistakenly not applying AIL's narrower interpretive practice regarding of the drug exclusion. Applying the historic interpretive practice which would have resulted in an earlier claim payment upon presentation of the death certificate and police report (without the need for a prescription). At the time that the claim denial decision was made, the record indicates that Ms. Robles, Ms. Webb, and Mr. Johnson were currently unaware of the historical interpretation of AIL's drug exclusion.

Ms. Troxell's and Mr. Scarborough's admissions that mistakes were made regarding the processing and denial of the Shackelford accidental death benefit claim does not, in and of itself, establish a breach of the covenant of good faith and fair dealing or bad faith. *See, Errahmouni v. Progressive N. Insurance Co.*, No. CIV-12-1380-HE, 2013 WL 6410985 at *4 (W.D. Okla. 12/9/13) (unpublished decision). There was nothing in the mistakes that were made regarding the customer service representatives, claim examiner, supervisor, and assistant general counsel that suggested anything more than simple mistakes were occurring. *See also, Bailey v. Farmers Insurance Co.*, 2006 Ok. Civ. App. 85 ¶¶18-19, 137 P.3d 1260, 1264-1265 (Insurers may make mistakes and legitimate business decisions without breaching duty of good faith.) What the record demonstrates is that when Claims did receive communications from the customer service representative on two occasions, Claims was responsive to the communication (*see, e.g.,* April 17, 2017 (51) which was responded to by Claims on April 18, 2017 (51); *see also* March 9, 2017 (50) which was responded to by Claims on March 10, 2017 (50)). Presumably, had more communication been conveyed to the Claim Department, there would have been more robust Claim response.

When Ms. Robles and Ms. Webb considered the drug use exclusion in the A71 policy, they construed the exclusion consistent with Oklahoma law, dealing with "narcotic" exclusions, which permitted direct and indirect causation and the exclusion would not apply if the Diazepam had been prescribed by a doctor. Ms. Robles reasonably followed up with Mrs. Shackelford to require

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 33

proof of a prescription so that she could reach a favorable coverage determination resulting in payment under the policy. Unfortunately, the mistakes made by the Customer Service Department in failing to fully communicate with the Claims Department resulted in Ms. Robles not knowing that Mrs. Shackelford had indicated that there was a prescription for the Diazepam but that she did not know how to acquire it. It was reasonable for Ms. Webb to concur in Ms. Robles' preliminary coverage assessment and to then refer the claim to Mr. Johnson in the Legal Department for a final assessment. Mr. Johnson also construed the exclusion as allowing for indirect causation, and because he understood based on the documentation he reviewed that there was no prescription for the Diazepam, he recommended the claim denial. The denial analysis used by Ms. Robles, Ms. Webb, and Mr. Johnson to apply to indirect causation was not inconsistent with Oklahoma law, the facts, and the A71 policy exclusionary language. The mistake came from not utilizing AIL's internal voluntary interpretive approach to the drug use exclusion which was narrower than the law required. It is understandable why they were unaware of the internal voluntary narrower interpretation used by AIL because drug use auto accident claims were very rare and did not come up very often.

Central to the inquiry of bad faith is whether Ms. Robles, Ms. Webb, and Mr. Johnson had a good faith belief that there was a justifiable reason to deny the Shackelford accidental death benefit claim. As indicated herein, there was. When the mistake was discovered in their not applying the voluntary internal interpretation of the exclusion used by AIL, the claim denial was expeditiously reversed.

**7.      Generally, AIL's processing of the Shackelford accidental death benefit claim complied with industry standard and practice, except for the mistakes identified herein.**

**8.      AIL's processing of the Shackelford accidental death benefit claim complied with the implied covenant of good faith and fair dealing. The mistakes that were made did not rise to the level of breaches of the implied covenant of good faith.**

## VII.   SUMMARY OF REBUTTAL OPINIONS

I have been provided with the expert report authored by attorney Mort G. Welch dated May 21, 2019. I do hereby reaffirm the affirmative opinions set forth above in Section IV after having reviewed Mr. Welch's report.

With respect to Mr. Welch's report, the first eight pages of the report are biographical. From pages 8 through 14 he presents a boilerplate discussion of what he believes are national claim handling standards. Within that boilerplate discussion, Mr. Welch makes no attempt to particularize the type of claim involved in the Shackelford matter and how general standards of claim handling would not apply to the processing of an A71 policy claim. As indicated in my affirmative opinions above, A71 accident death benefit claims are straightforward, and are typically processed through to payment with very little investigation needing to take place. Because of this, the AIL claim processing procedure is designed to speed claims through to a payment decision, which is different than most standard claim operations involving first party and

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 34

third party property and casualty claims. Additionally, throughout Mr. Welch's report he offers legal opinions, as well as legal analysis. The offering of legal opinions and legal analysis is improper and goes beyond the proper scope of expert testimony. I will not address Mr. Welch's legal arguments, where he assumes the role of legal advocate in this rebuttal, nor will I address his improper legal analysis.

        **1.**     **Mr. Welch opines that AIL violated applicable standards regarding investigation and documentation of claims. I disagree.**

       First, Mr. Welch opines that national industry standards exist in the form of, or at least have been derived from, the Model Unfair Claims Settlement Practices Act and/or the Oklahoma Unfair Claims Settlement Practices Act, which has been adopted and codified at 36 Ok. Stat. § 1250.1-1250.12  The Model Act does not create a private cause of action. The Oklahoma Supreme Court and the Oklahoma Court of Civil Appeals have both made clear that the Oklahoma Unfair Claims Settlement Practices Act does not create a private cause of action, nor is it proper to use the Oklahoma Unfair Claims Settlement Practices Act as a guide for a jury to determine bad faith. *See Walker v. Choteau Lime Co.*, 1993 OK 35; ¶ 7, 849 P.2d 1085, 1087; *Aduddell Lincoln Plaza Hotel v Certain Underwriters at Lloyd's of London,* 2015 OK CIV APP 34, ¶¶ 24-26, 348 P.3d 216, 223-224

       As indicated above in my affirmative opinions, it is without question that a processing error occurred in this case where the A71 claim system's balance between efficiency and communication failed. Throughout the deposition testimony, it is apparent that AIL was concerned about reducing the amount of time between report/notice of a claim under an A71 policy and the payout of the A71 claim. The system was set up to achieve a balance between efficiency and communication. One of the most time consuming jobs of a claim adjuster involves communication with claimants and third parties. Every lay person who has worked in an office setting has had days where their phone rings off the hook and they leave the job believing that they got nothing done that day that was productive because of all the time they spent on the phone. AIL created a claim processing system which was designed to allow for reasonable communication while maximizing the efficiency of claim examiners to review the file facts and make claim decisions in an expedited manner. POS employees were charged with the responsibility for communicating with beneficiaries. If a beneficiary wanted to speak with someone other than the POS employee, they could request that opportunity and the request would either be immediately expedited to the POS manager for intervention or routed through the POS manager to the claims manager so that a response could be provided in real time or later in the claim process. Where not urgent or requested, the POS employee would direct beneficiary communications to the claim examiner through D-notes or emails for follow up or response. The goal of this bifurcated process was to eliminate from the claim environment the normal time consuming telephone time that a claim examiner might need to spend with a beneficiary, which took time away from investigative tasking designed to expedite that beneficiary's claim. In concept, there is nothing wrong with the system utilized by AIL other than the poor optics that a beneficiary cannot immediately speak with the claim examiner investigating the claim itself. While a minimization of customer service pleasantries may

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 35

not be a good recipe for repeat business, it is easy to understand the goal of achieving quick turnaround on claims payment, which inures to the benefit of all beneficiaries.

With respect to the Shackelford claim, the POS employees did not properly notify the claim environment that Mrs. Shackelford was having problems getting a copy of the prescription that had been requested or that she had indicated to a POS employee, generally, that she had picked up prescriptions for her husband but did not have a copy of the prescription. Since Mrs. Shackelford was in charge of managing her husband's medication, it would be reasonable to assume she could acquire a copy of the prescription for Diazepam. Because the POS employee did not properly report Mrs. Shackelford's prescription communication to the claim examiner, the claim examiner was operating under the reasonable belief that prescriptions are easy to acquire from several sources, including a pharmacy or the doctor's office, merely through a phone call since Mrs. Shackelford would know the identity of the pharmacy and potential prescribing doctors. When that information was not forthcoming, notwithstanding three requests, it is easy to understand how Ms. Robles came to the conclusion that there was no prescription including how she read Mrs. Shackelford's letter, which did not say there was a prescription, but she did not have a copy of it. Had Ms. Robles received Ms. Shackelford's communication, she testified she would have followed up with Mrs. Shackelford to offer assistance in securing the prescription proof. Although the system failed, that system failure is not tantamount to bad faith.

Mr. Welch believes that the processing of all A71 claims require recorded statements from beneficiaries and other relevant parties, as well as interviewing the investigating police officer and accident witnesses as part of the claim process. While that type of investigative effort may be warranted for first party UM/UIM claims and third party liability claims, it would not be appropriate for the processing of A71 claims which are routinely processed to a decision of payment with relatively little necessary proof. To utilize Mr. Welch's approach would only slow down the payment of A71 claims and increase the cost of the policies. Mr. Welch ignores the fact that there is no one-size-fits-all claim investigation applicable to all types of claims. The extent of claim investigation that is necessary to process a claim depends upon the nature of the claim itself and each claim and claim type is different.

AIL was not required to take a recorded statement from Mrs. Shackelford, nor was AIL required to interview the witnesses identified in the police report or to interview the investigating police officer. The facts of the accident were not complicated, as indicated in my affirmative opinion discussion above. Likewise, obtaining photographs was not required for the processing of the Shackelford A71 claim.

With respect to Mr. Welch's opinion that AIL was required to retain a consultant to "reliably evaluate [ ] whether the amount of Diazepam in Mr. Shackelford's blood just before his vehicle crossed the center line could explain why the vehicle went left of center and off the road," it is important to note that the exclusion in AIL's policy does not require a certain quantification of causation. This is consistent with the Oklahoma narcotic exclusion statute, which also permits application of the exclusion for both direct and indirect causation situations. Here, there was a reasonable basis to believe that the Diazepam contributed to the accident given the unique

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 36

characteristics of the accident, i.e., a single vehicle accident where the vehicle leaves the roadway in plain daylight without any other explanation in terms of road conditions or other external forces, and then crashes, except, perhaps, that the Diazepam was a contributing factor. Based upon my experience as a litigator of accident cases, it is my suspicion that if a toxicologist were retained to review the facts, the toxicologist would have to conclude as one possibility for the cause of the accident that decedent Shackelford was under the influence of Diazepam. No toxicologist could rule out the idiosyncratic variables that any degree of Diazepam in decedent Shackelford's system could have affected his ability to concentrate or stay alert or react.

Finally, I also disagree with Mr. Welch that the claim file does not include sufficient documentation. Claim files should contain documentation that the significant events and dates thereof may be reasonably reconstructed. A claim file is not required to document every single event or action of a claims examiner. During my review of the claim file, I am able to reasonably reconstruct the dates and events that occurred during the handling of the claim and it appears that Mr. Welch was able to do so as well while formulating his opinions in this matter.

**2.      Mr. Welch opines that AIL violated "the knowledge of law standard." No such specific standard exists as Mr. Welch characterizes it.**

Certainly, insurance companies must operate within the purview of the law. Although the American legal system is predicated on the concept of stare decisis, appellate courts and state supreme courts can deviate (and do deviate) from established precedent such that well-established law can instantly be changed in a particular case.

Mr. Welch engaged in a legal analysis of AIL's policy and as such, is rendering legal opinions which are improper and beyond the scope of expert testimony. Having reviewed the policy, it is my opinion, as set forth in my affirmative opinions above, that AIL reasonably applied its policy language to the known facts and concluded that Exclusion 6 was applicable to the facts regarding decedent Shackelford's death.  I disagree with Mr. Mort's interpretation of the "...expenses incurred for loss" language of the policy. Mr. Welch's interpretation is strained, convoluted, and if adopted would undermine the intent of the overall policy.  Moreover, as indicated above, while Mr. Johnson, Ms. Robles, and Ms. Webb correctly applied Exclusion 6 as written to the known facts of the Shackelford accident, in doing so they mistakenly were unaware of AIL's internal historical interpretation of Exclusion 6 which limited application of the exclusion only to direct causation scenarios. There was nothing improper or wrongful about applying the language of the AIL policy, as written, to both direct and indirect causation scenarios. Indeed, Oklahoma's statute, permits narcotic exclusions, to apply to both direct and indirect causation scenarios. *See* .36 O.S. §4405(B)(10).

I agree with Mr. Welch when he concludes that AIL's Exclusion 6 does not conform to Oklahoma statute because it does not contain language limiting the scope of the statutory narcotic exclusion to scenarios where the involved narcotic was not prescribed. Having said that, the parties have agreed that Diazepam is not a narcotic.  The statute is thus irrelevant to the claim determination because the claim was excluded due to the drug use, which is not addressed in the

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 37

statute. In any event, the record is clear in this case that in practice AIL only applied Exclusion 6 to situations where there was no prescription for the involved drug.

**3.      Regarding Mr. Welch's belief that AIL violated "the standard for internal claims handling and training."  I generally disagree.**

In this matter, it appears that a substantial amount of AIL claim training occurred on the job through a mentoring type of process.  A mentoring process approach is fairly common within the insurance industry.  Additionally, the testimony is that there was training given to claim personnel, including training regarding Unfair Claims Settlement Practices, and the obligation of good faith and fair dealing.  There was no specific claim manual, but there were communications that had been authored by various claim personnel that were circulated regarding practices and procedures.

I agree with Mr. Welch only to the extent that as indicated in my affirmative opinions above, AIL acknowledges that there was an internal historical narrow interpretation of Exclusion 6 utilized by AIL that was not followed by Ms. Robles, Ms. Webb, and Mr. Johnson.  The testimony of Ms. Robles, Ms. Webb, and Mr. Johnson was that they did not receive specific training on AIL's historical interpretation of Exclusion No. 6.  The trier of fact will have to ultimately decide that issue given the contrary testimony of Mr. Scarborough and Ms. Troxell. What was significant to me was that situations arising under Exclusion 6 for A71 policies were very rare.  Insurance companies generally do not train their claim personnel on specific exclusions, nor do they train on specific fact patterns that may give rise to those exclusions.  Claim personnel are trained, universally, to review the language of the policy in question in juxtaposition with the facts presented by the claim.  The latter occurred here.  I would not expect a reasonable insurer to provide formal training to its claim personnel on a rarely applicable exclusion.

As indicated in my affirmative opinions above, Ms. Robles, Ms. Webb, and Mr. Johnson all followed industry standard claim practice in reading the exclusion and applying it to the facts in question.  There was a reasonable basis in the factual record to support the application of the exclusion as worded to the known facts.  In the end, the trier of fact would ultimately have to decide the issue if it were contested.

I reserve the right to alter or change any of my opinions based upon new or additional information that may be received since this report was issued.

Very truly yours,

Steven Plitt
For the Firm

SP/mcw

Candace Lisle, Esq.
Re: *Shackelford v. American Income Life*
July 1, 2019
Page 38


Enclosures (CV, Testimony List)

# INSURANCE CONSULTANT ON INSURANCE COVERAGE, CLAIM HANDLING PRACTICES/STANDARDS AND INSURANCE BAD FAITH

## STEVEN PLITT

THE CAVANAGH LAW FIRM
*A Professional Association*
1850 NORTH CENTRAL AVENUE, SUITE 2400
PHOENIX, AZ 85004-4579
TELEPHONE: 602-322-4000
FACSIMILE: 602-322-4100
E-MAIL: **splitt@cavanaghlaw.com**
WEBSITES: **www.cavanaghlaw.com** and
**www.insuranceexpertplitt.com**



During his 34+ year practice career, Mr. Plitt managed a large litigation practice where he represented policyholders and insureds in litigation, as well as acting as coverage counsel for insurance companies. Since 2001, Mr. Plitt's practice has almost exclusively involved the handling of complex insurance coverage and insurance bad faith cases for insurance companies or as an expert consultant for both insurance companies and insureds. He has extensive trial and litigation experience. He is a veteran of numerous cases tried to jury verdict.

Mr. Plitt is the current senior author of the widely recognized and authoritative insurance coverage treatise series titled COUCH ON INSURANCE 3D. Mr. Plitt and his team are rewriting and revising the treatise series. This treatise series comprises 24 volumes of substantive texts covering all aspects of insurance. He is the author of ARIZONA LIABILITY INSURANCE LAW which is a treatise on Arizona insurance coverage. He is also an author of the national treatises THE CLAIM ADJUSTER'S AUTOMOBILE LIABILITY HANDBOOK and PRACTICAL TOOLS FOR HANDLING INSURANCE CASES. He is a Senior Contributing Editor and Editorial Board Member of the nationally recognized INSURANCE LITIGATION REPORTER. He was on the Editorial Board for Claims Journal.

Mr. Plitt has been cited by the Supreme Courts in 33 states, the Intermediate Appellate Courts in 23 states, 11 of the Federal Circuit Courts of Appeal, 59 Federal District Courts, the Federal Court of Claims, and 4 Federal Bankruptcy Courts. Mr. Plitt has also been cited in 95 scholarly articles and the Code of Federal Regulations.

Mr. Plitt is currently teaching insurance law at the University of Arizona's College of Law. He is a former adjunct professor of law at Arizona State University's College of Law where he taught the insurance law curriculum. He has been a licensed insurance broker since 1974. Mr. Plitt is listed as one of THE BEST LAWYERS IN AMERICA® in the field of insurance law. He was identified as one of PHOENIX'S TOP LAWYERS by PHOENIX MAGAZINE®. He was selected as a SOUTHWEST SUPER LAWYER® and chosen by SUPER LAWYERS® and his peers as one of the Top 50 Lawyers in Arizona. In 2012 and 2017 Mr. Plitt was selected as the Insurance Lawyer of the Year – Phoenix by BEST LAWYERS®. He is a Fellow of the American College of Coverage Counsel.

During his practice career, Mr. Plitt estimates that he has reviewed and analyzed thousands of claim files from more than a hundred different insurance companies. This practical knowledge and experience informs him as to industry custom, standard and practice. He has participated in roundtable discussions, claim handling, and bad faith risk avoidance activities as part of his national insurance law practice. During his direct representation, as well as his consulting retentions, Mr. Plitt has been able to review the claim manuals, claim bulletins and general corporate claim documentation (where those materials had been available) for many

insurance companies.  He has also reviewed the depositions of insurance claim adjusters, claim supervisors, other claim management personnel, and insurance company representatives ((30)(b)(6) persons most knowledgeable) regarding the handling of specific claims, claims handling generally and claim operations. Mr. Plitt has participated in many insurance company "roundtable" discussions which are part of the overall claim adjustment and evaluation process.  When he has attended a "roundtable" discussion his role was to provide guidance and advice on claim valuation, claim handling issues and problems, and he provided advice and solutions regarding impediments that may have arisen in the claim environment on specific claims. Additionally, in Mr. Plitt's capacity as an attorney directly representing insurance companies, he had oftentimes been called upon to provide informal advice and guidance regarding claim handling practices and procedures and possible revisions thereto.  These discussions would take place with claim management professionals including in-house counsel.

Mr. Plitt has been invited to conduct in-house training seminars on claim handling, bad faith and insurance regulations (including the NAIC Model Unfair Claims Settlement Practices Act and specific state iterations of the Act) for 22 different insurance companies with adjusting staffs in 13 different states.  As part of those training sessions, he would provide advice for specific claims as well as advice for general claim handling practices.  Mr. Plitt recently developed an on-line course for claim adjusters regarding Unfair Claims Settlement Practices statutes and accompanying state regulations.  Adjusters who take the course will be eligible for continuing education credits.  Through the innumerable dealings Mr. Plitt has had with claim adjusters, supervisors and claim management personnel and through his experience as an attorney directly representing insurance companies as well as a consultant over the last 33 years, he has observed industry standards, customs and practices regarding claim handling and processing issues.

Mr. Plitt has been qualified as a claims handling expert in both state and federal courts.  Over the years Mr. Plitt has analyzed coverage issues in all 50 states and has been an expert witness consultant in matters venued in 32 states.  He has been an expert consultant for policyholders/insureds and insurance companies in hundreds of matters in the following venues:  Arizona, California, Connecticut, Colorado, Florida, Hawaii, Idaho, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington, West Virginia, Wisconsin and Wyoming.

Mr. Plitt has been involved with drafting of insurance policies generally, and endorsements specifically, and has worked closely with insurance company product development committees and/or corporate counsel regarding the evaluation of existing policy language and possible amendments.

Mr. Plitt is available to consult in cases involving insurance coverage, claims handling, underwriting, insurance company practice and procedure, insurance company compliance with principles of good faith and fair dealing.  Additionally, because Mr. Plitt has held his insurance broker's license since 1974, he is available to consult on insurance agent E&O cases.

## TEACHING:

UNIVERSITY OF ARIZONA, JAMES E. ROGERS COLLEGE OF LAW
(Adjunct Assistant Professor of Law, 2010-Present)  (Class taught:  Insurance Law)

ARIZONA SUMMIT LAW SCHOOL
(Adjunct Professor of Insurance Law, 2014, 2015) (Class taught:  Insurance Law)

ARIZONA STATE UNIVERSITY, SANDRA DAY O'CONNOR COLLEGE OF LAW
(former Adjunct Professor of Insurance Law, 2000-2005) (Classes taught:  Insurance Law & Regulation; Liability Insurance; Advanced Coverage Research and Analysis)

INDUSTRY TEACHING
- Direct Instruction to Insurance Companies
  Provided in-house training seminars on claim handling, bad faith, insurance regulations, Unfair Claims Settlement Practices Act, and Advice of Counsel to 22 insurance companies with adjusters attending from 11 different states)

- **CLAIM LITIGATION MANAGEMENT ALLIANCE (CLM)**
  (1)  Developed an online, continuing education compliant course for claim adjusters on the NAIC Model Unfair Claims Settlement Practices Act, state-specific UCSPAs, and accompanying insurance department regulations;
  (2) Faculty Instructor, CLM Claim College, Extra-Contractual School (Subject: Insurance Company Claim Handling Regulations and Practices).

## EDUCATION and SCHOLASTIC ACTIVITIES:

UNIVERSITY OF CONNECTICUT:  LL.M., Insurance Law, 2012
- Graduated "With Honors"
- CALI Award of Excellence – Workers' Compensation
- Recipient 2012 Insurance Law Center LL.M. Award (Awarded to the outstanding LL.M. graduating student)
- Honors Thesis – A Practical Exploration Into The Policy Architecture Of Directors & Officers Insurance Coverage

UNIVERSITY OF ARIZONA:  J.D. With Distinction, 1982
- Recipient, Best Oral Advocate Award, Second Year Moot Court Competition
- Member, U of A National Moot Court Team
- Editor, Second Year Moot Court Board
- National Order of Barristers

ARIZONA STATE UNIVERSITY:  B.S. Political Science, 1978
- Barrett Honors College Graduate
- Graduated *Summa Cum Laude* and "With Honors"
- Honors Thesis – The Panama Canal:  A Question of Sovereignty

## JUDICIAL LAW CLERKSHIPS, INTERNSHIPS, BOARDS and CERTIFICATIONS

- Law Clerk to Judge Robert J. Corcoran, Arizona Court of Appeals, 1982-1983
- Legislative Intern to the Chairman of the Committee on Banking and Insurance, House of Representatives, Arizona State Legislature, 1979
- Senior Contributing Editor and Editorial Board Member– INSURANCE LITIGATION REPORTER (2006-Present)
- CLAIMS JOURNAL, Editorial and Advisory Board Member (2012-2014)
- Certified Litigation Management Professional (CLMP), Claims Litigation Management Alliance (CLM)
- Executive Council CLM Claim College, Extra-Contractual School

## AMERICAN LAW INSTITUTE

Mr. Plitt has been elected to the American Law Institute.  The American Law Institute is the leading independent organization in the United States producing scholarly work to clarify, modernize, and otherwise improve the law.  The Institute is made up of distinguished lawyers, judges and law professors.

The Institute publishes RESTATEMENTS of the law, model statutes, and principals of law that are influential in courts and legislatures, as well as in legal scholarship and education.

- Principles of the Law of Liability Insurance (Members Consultive Group)
- Restatement of the Law of Liability Insurance (Members Consultive Group)

## AMERICAN COLLEGE OF COVERAGE COUNSEL

Mr. Plitt has been elected to the American College of Coverage Counsel (ACCC).  ACCC is comprised of preeminent coverage counsel in the United States and Canada.  ACCC is equally divided between policyholder counsel and insurer counsel.

## ARIZONA INSURANCE INSTITUTE

Mr. Plitt is the Director of the Arizona State Bar sponsored Annual Insurance Institute.

## PROFESSIONAL RECOGNITION:

- Ranked by "*CHAMBERS & PARTNERS (USA)*" as Band 1 for insurance law for 2019* (*inaugural year for insurance law in Arizona)
- Recipient of "*MARQUIS WHO'S WHO*" 2018 *Albert Nelson Marquis Lifetime Achievement Award*
- Profiled as a legal "trendsetter" in "*AZ BUSINESS MAGAZINE*" (January/February 2018)
- Listed in "*THE BEST LAWYERS IN AMERICA®*" (2007*–2019) *First year insurance law was considered for inclusion within Arizona
- Selected 2012* and 2017 Phoenix Insurance Lawyer of the Year by *BEST LAWYERS®* *First year awarded in Arizona
- Listed in "*SOUTHWEST SUPER LAWYERS®*" (2007*–2019) *inaugural year
- Top 50 Lawyers in Arizona, "*SOUTHWEST SUPER LAWYERS®*" (2007*-2019) *inaugural year
- Listed in "*CORPORATE COUNSEL ALMANAC*" as one of the top lawyers in the field of insurance law in the United States
- Top 10 Lawyers in Arizona (Category: Employee Benefits & Insurance), "*AZ BUSINESS MAGAZINE*"
- Top 100 Lawyers in Arizona (for all categories) 2014*-2018 *inaugural year of All Category 100 Top Lawyer List "*AZ BUSINESS MAGAZINE*"
- Listed in "*ARIZONA'S FINEST LAWYERS®*"
- AV Preeminent Rated with Martindale-Hubbell®
- Legal Leaders – Top Rated Lawyers–Insurance Law (Top 5% of AV Preeminent Lawyers)
- American Society Of Legal Advocates (Top 100 Litigation Lawyers in Arizona)
- "*AZ BUSINESS MAGAZINE*" – (Industry Leader edition) Listed as one of Arizona's Industry Leaders (Top 5 Most Influential Leaders in Insurance Law) (2014-2020)
- Listed in "*PHOENIX MAGAZINE®*" as one of Phoenix's Top Lawyers (November 2006)
- Recipient, Outstanding Contribution to Continuing Legal Education Award, Arizona State Bar Association, 1999
- Listed in "*Who's Who* in American Law" (5th Edition)
- Listed in "*Who's Who* Among Students in American Universities and Colleges" (1978-1979).

## LICENSED INSURANCE BROKER

Mr. Plitt has been a licensed insurance broker in Arizona since 1974 to present (Property and Casualty; Accident and Health; Life)

## PUBLICATIONS:

### BOOKS PUBLISHED

1. Senior Author, COUCH ON INSURANCE 3D. (re-writing and revising entire treatise)

2. PRACTICAL TOOLS FOR HANDLING INSURANCE CASES. (1777 pages) (2 Volumes, Thomson Reuters 2011)
   - 2018 Annual Cumulative Supplement (675 pages)

3. THE CLAIM ADJUSTER'S AUTOMOBILE LIABILITY HANDBOOK. (West Publishing 2009)
   - 2016 Annual Cumulative Supplement (267 pages)

4. CATASTROPHE CLAIMS: INSURANCE COVERAGE FOR NATURAL AND MAN-MADE DISASTERS (fka CAT CLAIMS). (Thomson West 2008)

5. ARIZONA LIABILITY INSURANCE LAW (705 pages), the State Bar of Arizona (1998)
   - 2006 Cumulative Supplement (426 pages)

6. Senior Contributing Editor, ARIZONA TORT LAW HANDBOOK, the State Bar of Arizona (2012)

7. *Construction Defects: Claims and Coverage:* "Progressive Losses—Triggers of Coverage, Numbering of Occurrences and Allocation Among Successive Policies" (DRI Defense Library Series) (Ch. 3, Part II)

### ACADEMIC JOURNALS AND LAW REVIEWS

1. *A Jurisprudential Survey of the Tort of Spoliation of Evidence: Resolving Third-Party Insurance Company Automobile Spoliation Claims.* CONN. INS. L.J., Vol. 24.1, p. 63 (2017-2018)

2. *How Far Is Too Far? Exploring The Contoured Nuances of Damron and Morris Agreement And The Emergence of Helme/Peaton Agreements.* 10 Ariz. Summit L. Rev. 1 (Fall 2016)

3. *Federal Reverse Preemption Of Uninsured And Underinsured Motorist Coverage Offering In The Digital Age: E-Sign And UETA Have Not Had A Significant Impact On State Offering Or Rejection Requirements.* KY. L.J., Vol. 104, No. 3 (2015-2016)

4. *Quihuis v. State Farm Mutual Automotive Insurance Company: A Potpourri Of Insurance Issues Resolved?* 9 ARIZ. SUMMIT L. REV., Issue 1 (Spring 2016)

5. *The Battle To Define The Scope Of Attorney-Client Privilege In The Context Of Insurance Company Bad Faith: A Judicial War Zone.* U.N.H. L. REV., Vol. 14, No. 1 (January 2016)

6. *Evaluating The Relationship Between Independent Insurance Adjusters And Insureds: The Case Against Imposing An Independent Duty Of Care.* CREIGHTON L. REV., Vol. 48, No. 2 (March 2015)

7. *Delay, Manipulation, and Controversy: The Impact Of The 2012 Amendments To 28 U.S.C. § 1446 On The Battles For Removal Of Cases To Federal Court.* PHOENIX L. REV., Vol. 6, No. 2 (Spring 2013)

8. *When Constitutional Challenges To State Cancellation Moratoriums Enacted After Catastrophic Hurricanes Fail: A Call For A New Federal Insurance Program.* BYU J. OF PUB. LAW, Vol. 27, No. 1 (Fall 2012)

9. *A Jurisprudential Survey Of Bad Faith Claims In The Workers' Compensation Context And A Call For A Unified Statutory Remedy.* CONN. INS. L.J., Vol. 18.2, p. 451 (2011-2012)

10. *Are State Court Garnishment Actions An Effectual Impediment To Federal Declaratory Judgment Jurisdictions: Is Timing Everything.* CONN. INS. L.J., Vol. 15.1 (2008-2009)

11. *Prohibiting De Facto Insurance Redlining:  Will Hurricane Katrina Draw A Discriminatory Redline In The Gulf Coast Sands Prohibiting Access To Home Ownership?*  14 WASH. & LEE J. CIVIL RTS. & SOC. JUST. 199 (Spring 2008)

12. *The Practical Ramifications of Dual Sovereignty In Prosecuting Declaratory Judgment Actions Against State And Federal Governments.*  CONN. INS. L.J., Vol. 14.2, p. 445 (2007-2008)

13. *Charting A Course For Federal Removal Through The Abstention Doctrine:  A Titanic Experience In The Sargasso Sea Of Jurisdictional Manipulation.*  56 DEPAUL L. REV. 107 (Fall 2006)

14. *The Punitive Damages Lottery Chase Is Over:  Is There A Regulatory Alternative To The Tort Of Common Law Bad Faith And Does It Provide An Alternative Deterrent?*  37 ARIZ. ST. L.J. 1221 (Winter 2005)

15. *Judicial Abstinence: Ninth Circuit Jurisdictional Celibacy For Claims Brought Under The Federal Declaratory Judgment Act.*  27 SEATTLE U. L. REV. 751 (Issue 3, Spring 2004)

16. *The Evolving Boundaries Of Damron/Morris Agreements:  A Search For The Missing Link, A Judicial Determination Of The Length Of A Reasonable Person's Arm, And Other Progressive Issues.*  35 ARIZ. ST. L.J. 1331 (2003)

17. *The Elastic Contours Of Attorney-Client Privilege And Waiver In The Context Of Insurance Company Bad Faith: There's A Chill In The Air.*  34 SETON HALL L. REV. 513 (2003)

18. *Disability Under A Judicial Microscope:  The Struggle To Define The Rights And Remedies For Claims Brought Under The Rehabilitation Act.*  47 N.Y.L. SCH. L. REV. 269 (2003)

19. *Board Of Trustees Of The University Of Alabama vs. Garrett:  Is Constitutional Authority For Sale And Is State Sovereign Immunity The Purchase Price?*  13 GEO. MASON. U. CIV. RTS. L.J. 151 (Spring 2003)

20. *The Changing Face Of Global Terrorism And A New Look Of War:  An Analysis Of The War-Risk* Exclusion *In The Wake Of The Anniversary Of September 11, And Beyond.* 39 WILLAMETTE L. REV. 31 (Winter 2003)

21. *The Changing Landscape Of The Eleventh Amendment Immunity In The Context Of The Americans With Disabilities Act And The Rehabilitation Act After Garrett:  Are Arizona School Districts Beyond Suit?*  34 ARIZ. ST. L.J. 873 (Fall 2002)

## OTHER PROFESSIONAL PUBLICATIONS

1. *One Good Deed Deserves Another: Occupancy Status and the Good Samaritan*, Westlaw Journal Insurance Coverage, Vol. 28, No. 20, February 23, 2018

2. *Washington Court Rules On Discoverability Of Insurer's Claim File By Third Parties*, Claims Journal (February 21, 2018)

3. *Disparagement is not "Patent Pending"*, Claims Journal (February 15, 2018)

4. *"Neither Snow Nor Rain Nor Heat Nor Gloom of Night . . ." : Cancellation by Mail*, Claims Journal (February 13, 2018)

5. *Occupying or not Occupying, That is the Question*, West Journal Insurance Coverage, Vol. 28, No. 18, February 9, 2018

6. *Termite Damage Is Not The Functional Equivalent Of Building Collapse For Purposes Of First-Party Property Coverage*, Claims Journal (January 23, 2018)

7. *Insured Must Obtain Settlement Consent Where Policies Require It*, Claims Journal (January 18, 2018)

8. *Taxable Cost Award Capped by Insurance Policy Limits According to the Minnesota Supreme Court*, Claims Journal (December 27, 2017)

9. *Controlling the Defense in Massachusetts*, Claims Journal (December 20, 2017)

10. *Good Samaritan Who Exits Vehicle To Assist Injured Person Still Occupies The Insured Vehicle For Um Purposes*, Claims Journal (December 13, 2017)

11. *Failure To Keep IME Doctor Updated On Plaintiff's Condition Can Foreclose Application Of Genuine Dispute Doctrine For MSJ Purposes*, Claims Journal (December 11, 2017)

12. *Being Drunk Is No Legal Excuse For Excluded Intentional Misconduct*, Westlaw Journal Insurance Coverage, Vol. 28, No. 8 (December 1, 2017)

13. *Minnesota Supreme Court Rules that Statutory Attorney's Fees are Capped by the Policy Limit*, Claims Journal (November 13, 2017)

14. *Rhode Island Supreme Court Enforces Suit Limitation Provision in Policy*, Claims Journal (November 9, 2017)

15. *Failing to Initiate Settlement Negotiations is Risky Business*, Claims Journal (November 7, 2017)

16. *7th Circuit Addresses Boundaries of Ghandi Agreements in Texas*, Westlaw Journal Insurance Coverage, Vol. 28, No. 4 (November 3, 2017)

17. *Smooth Sailing For A Pollution Exclusion?*, Claims Journal (October 16, 2017)

18. *Colorado Court Of Appeals Analyzes A Spectrum Of Bad Faith Issues*, West Journal Insurance Coverage, Vol. 13, No. 11 (September 27, 2017)

19. *Oregon Supreme Court Decides the Meaning of 'Recovery' for Claims Under ORS §742.061*, Claims Journal (September 20, 2017)

20. *Investigation Of Property Loss Does Not Establish Estoppel In Oregon*, Claims Journal (September 11, 2017)

21. *Stepping Outside the Box of Claims-Handling Can Have Unintended Consequences*, Westlaw Journal Insurance Coverage, Vol. 27, No. 38 (June 30, 2017)

22. *Maine Supreme Court Discusses Allocating Between Covered and Uncovered Claims*, Claims Journal (June 22, 2017)

23. *Massachusetts Bad Faith Statute Does Not Include Pre-Judgment Interest In The Multiplier*, Claims Journal (June 17, 2017)

24. *Use of Employer's Vehicle While Intoxicated Did Not Exceed Scope of Permissive Use*, Claims Journal (June 16, 2017)

25. *Michigan Court Draws a Fine Line of Exclusion Between Professional and Nonprofessional Related Services*, Westlaw Journal Insurance Coverage, Vol. 27, No. 36 (June 16, 2017)

26. *South Dakota High Court Permits Bad Faith Cause of Action Against Workers' Comp Insurer*, Claims Journal (June 12, 2017)

27. *Delineating Regular Use Under California Auto Insurance Law*, Westlaw Journal Insurance Coverage, Vol. 27, No. 35 (June 9, 2017)

28. *Kentucky Supreme Court Finds No Bad Faith as a Matter of Law*, Claims Journal (June 7, 2017)

29. *Reverse Engineering Insurance Bad Faith Set-Ups*, Litigation Management, Vol. 7, Issue 1 (Winter 2017)

30.   *Defense Counsel's Duty of Loyalty To The Insured In An ROR Context*.  The Voice, Vol 16, Issue 5 (February 8, 2017)

31.   *Insurers Cannot Seek Reimbursement Of Fees In ROR Situations In Alaska*.  Claims Journal (January 12, 2017)

32.   *Washington Court Further Clarifies Defense Counsel's Role In ROR Defense.*  Claims Journal (January 10, 2017)

33.   *Montana Courts Finds That Falling Boulders Constitute 'Earth Movement' For Purposes of Policy's 'Earth Movement" Exclusion*.  Claims Journal (December 29, 2016)

34.   *8th Circuit Holds Insured's Voluntary Mold Cleanup Costs Are Not Covered*.  Westlaw Journal Insurance Coverage 2, Vol. 27, No. 11 (December 23, 2016)

35.   *No Exceptions:  Wisconsin Supreme Court Upholds Four Corners Rule.*  Claims Journal (December 22, 2016)

36.   *Liquidated Judgment Not Necessary For Equitable Subrogation*.   Claims Journal (December 20, 2016)

37.   *Washington Court Further Delineates Defense Counsel's Role In ROR Situations*.  Westlaw Journal Insurance Coverage 2, Vol. 27, No. 10 (December 15, 2016)

38.   *Set-Up On Failure To Defend Rejected In Florida*.  Claims Journal (December 12, 2016)

39.   *Failure To Re-Evaluate Is Bad Faith.*  Claims Journal (December 7, 2016)\

40.   *Pro Rata Allocation Comes To Louisiana.*  Claims Journal (November 22, 2016)

41.   *Notice-Prejudice Rule Adopted In Wyoming.*  Claims Journal (November 16, 2016)

42.   *Is Advertising Injury In The Bag?*  Claims Journal (November 10, 2016)

43.   *Alaska Law Bans Insurer Reimbursement For Defense Of Uncovered Claims.*  Westlaw Journal Insurance Coverage 1, Vol. 27, No. 3 (October 28, 2016)

44.   *Florida High Court Clarifies Uninsured Motorist Bad Faith Principles.*  Claims Journal (October 21, 2016)

45.   *Beyond A Reasonable Doubt Is Key For Application To Criminal Acts Exclusion.*  Claims Journal (October 18, 2016)

46.   *Offensive Orders Are Pollution And Excluded Under Homeowners Policy:  No Exception.*  Westlaw Journal Insurance Coverage 1, Vol. 26, No. 50 (September 22, 2016)

47.   *Determining When A Criminal Act Exclusion Applies To The Duty To Defend*.  Westlaw Journal Insurance Coverage 1, Vol. 26, No. 49 (September 16, 2016)

48.   *Offensive Odors Are Pollutants According To South Carolina Court*.  Claims Journal (September 12, 2016)

49.   *Oregon Supreme Court Says Covenants Not To Execute In Insurance Disputes Are Not Releases.*  Westlaw Journal Insurance Coverage 1, Vol. 26, No. 45 (August 19, 2016) and Westlaw Journal Insurance Bad Faith 2, Vol. 12, No. 12 (October12, 2016)

50.   *Stacking UIM Coverages Under Missouri Law.*  Claims Journal (August 9, 2016)

51.   *Kentucky Court Finds Tort Accrual Trigger For UM Claims Reasonable.*  Claims Journal (August 5, 2016)

52.   *The "Inferred Intent" Doctrine And Emotional-Distress Claims Arising From Housing Discrimination.*  Westlaw Journal Insurance Coverage 1, Vol. 26, No. 42 (July 28, 2016)

53.     *Determining Accrual Date For Minnesota UM/UIM Claims: Recent Case Decision.* Claims Journal (July 20, 2016)

54.     *Ohio High Court Rejects Inferred-Intent Doctrine In Fair Housing Discrimination Case.* Claims Journal (July 15, 2016)

55.     *Does Parental Discipline Suspend The Automobile "Regular Use" Exclusion?* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 40 (July 14, 2016)

56.     *Washington Supreme Court Determines Test For Vehicle Use In UIM Context*. Westlaw Journal Insurance Coverage 1, Vol. 26, No. 38 (June 30, 2016) and Westlaw Journal Insurance Bad Faith 2, Vol. 12, No. 6 (July 20, 2016)

57.     Is A Foreign Exchange Student A "Ward" For Purposes Of UM/UIM And Medical Payments Coverage? Claims Journal (June 28, 2016)

58.     *Passing The Duty To Defend To The Excess Carrier.* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 37 (June 24, 2016)

59.     *Plaintiff's Prayer For Coverage Is Answered In Illinois.* Claims Journal (June 1, 2016).

60.     *Primary Insurer Must Exhaust Policy Via Payment To Pass Defense Obligation To Excess Insurer In New Hampshire.* Claims Journal (May 23, 2016)

61.     *New York Case Is Assault And Battery Plain And Simple.* Claims Journal (May 18, 2016)

62.     *Cracking The Known-Loss Doctrine*. Westlaw Journal Insurance Coverage 1, Vol. 26, No. 31 (May 13, 2016) and Westlaw Journal Insurance Bad Faith 2, Vol. 12, No. 3 (June 8, 2016)

63.     *Settling Without Insurer Consent While Being Defended Under A Reservation Of Rights In Pennsylvania.* Westlaw Journal Insurance Bad Faith 2, Vol. 12, No. 1 (May 11, 2016)

64.     *A Practical Approach To Pollution Exclusions.* Claims Journal (May 10, 2016)

65.     *Strict Statutory Compliance Required To Enforce Named Insured Exclusion In Connecticut.* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 30 (May 5, 2015) and Westlaw Journal Insurance Bad Faith 2, Vol. 12, No. 2 (May 25, 2016)

66.     *Publicizing DNA Results Does Not Fall Within TCPA Exclusion.* Claims Journal (May 3, 2016)

67.     *Eleventh Circuit Criticizes District Court For Focusing On Bad Faith Set-Up Conduct.* Claims Journal (April 29, 2016)

68.     *Strict Statutory Compliance Required To Enforce Named Insured Exclusion In Connecticut.* Claims Journal (April 27, 2016)

69.     *Insurer's Controlled Substance Exclusion Didn't Relieve Obligation To Defend Methadone Intoxication Death Case.* Claims Journal (April 18, 2016)

70.     *Intentional And Criminal Acts Or Omissions Bar Coverage.* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 26 (April 7, 2016)

71.     *What's In A Name? Insurance Coverage?* Claims Journal (April 4, 2016)

72.     *Some Knowledge Isn't Enough To Trigger Known-Loss Exclusion*. Claims Journal (March 29, 2015)

73.     *Massachusetts Court Adopts Standard For Business Pursuits Exclusion*. Westlaw Journal Insurance Coverage 1, Vol. 26, No. 24 (March 24, 2016) and Westlaw Journal Insurance Bad Faith 2, Vol. 11, No. 25 (April 13, 2016)

74. *Oregon Supreme Court Finds Covenants Not To Execute Are Not Releases.* Claims Journal (March 23, 2016)

75. *Washington High Court Decides What Constitutes "Use" For UIM Coverage Attachment.* Claims Journal (March 15, 2016)

76. *Getting The Lead Out Of The Pollution Exclusion.* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 16 (January 28, 2016) and Westlaw Journal Insurance Bad Faith 2, Vol. 11, No. 21 (February 17, 2016)

77. *Covering The Disgorgement Of Legal Fees.* Claims Journal (January 27, 2016)

78. *Alternate Intentional Loss Exclusion Defeats Coverage for Wrongful Death From A Single, Criminal Blow.* Claims Journal (January 21, 2016)

79. *Eleventh Circuit Predicts Florida Will Reject Manifestation Trigger.* 2016 Windstorm Conference for Claims Journal (2016)

80. *Assigning Breach Of Contract Claim In Florida Doesn't Violate Policy's Anti-Assignment, Loss Payment Provisions.* Claims Journal (December 16, 2015)

81. *When Is A Claim For Reimbursement Of Defense Costs Ripe?* Claims Journal (December 14, 2015)

82. *Florida High Court:  Citizens Property Insurance Immune From First Party Bad Faith Claims.* Claims Journal (December 8, 2015)

83. *Can An Insurer Seek Reimbursement For Uncovered Defense Costs Directly From Cumis Counsel?* Claims Journal (December 1, 2015)

84. *Punitive Damages In A Bad-Faith, Failure-To-Settle Case:  Are They Recoverable?* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 6 (November 12, 2015)

85. *Hawaii High Court Adopts Equitable Subrogation In The Primary/Excess Insurance Context.* Claims Journal (November 3, 2015)

86. *Louisiana High Court Addresses Insurance Spoliation Issue.* Claims Journal (October 21, 2015)

87. *10th Circuit Finds Oklahoma Law Doesn't Require Excess Insurer To Proactively Seek Settlement.* Claims Journal (October 15, 2015)

88. *Rejection Of Adjuster Negligence Claims Affirmed.* Westlaw Journal Insurance Bad Faith 2, Vol. 11, No. 12 (October 14, 2015)

89. *Texas Supreme Court Upholds Anti-Concurrent-Causation Clauses In Property Policies.* Claims Journal (October 8, 2015)

90. *Louisiana's Anti-Annulment Statute Doesn't Prohibit Agreement Eliminating Insurer's Obligation To Defend.* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 52 (October 1, 2015)

91. *Colorado's Highest Court Says Notice-Prejudice Rule Doesn't Apply To Claims-Made Policies.* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 51 (September 25, 2015) and Westlaw Journal Insurance Bad Faith 3, Vol. 11, No. 14 (November 11, 2015)

92. *Ninth Circuit Finds Anti-Concurrent-Causation Clauses Unenforceable In Arizona.* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 50 (September 17, 2015)

93. *Insurer's Reliance On Unpublished Appellate Decision Constitutes Fair Debatability, New Jersey High Court Rules.* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 48 (September 3, 2015)

94.  *Pleading A Lost-Policy Case:  1st Circuit Ruling Offers Guidance*.  Westlaw Journal Insurance Coverage 1, Vol. 25, No. 47 (August 28, 2015) and Westlaw Insurance Journal Bad Faith 2, Vol. 11, No. 10 (September 16, 2015)

95.  *Oklahoma Determines That Anti-Annulment Statute Applies To Claims-Made Policies.* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 46 (August 20, 2015)

96.  *Fifth Circuit Predicts Texas Law Will Validate Wasting Limit Policies.*  Claims Journal (August 18, 2015)

97.  *Rejection Of Adjuster Negligence Claims Affirmed.*  Westlaw Journal Insurance Coverage 1, Vol. 25, No. 45 (August 14, 2015)

98.  *Sixth Circuit Court Predicts Kentucky Will Reject The Adoption Of Reverse Bad Faith.* Claims Journal (August 12, 2015)

99.  *California Court Finds That Fire Caused By Vagrant On Premises Is Not Excluded.*  Claims Journal (July 30, 2015)

100.  *A Homeowner Policy's Vacancy Exclusion Includes Arson In Florida.*  Claims Journal (July 27, 2015)

101.  *Sexual Assault On The Job:  The Duty Of Insurers To Defend Employees Under California Law.*  Westlaw Journal Insurance Coverage 1, Vol. 25, No. 42 (July 23, 2015) and Westlaw Journal Insurance Bad Faith 2, Vol. 11, No. 8 (August 19, 2015)

102.  *Virginia Attorney Seeks Coverage For Accident Because He Was Thinking About Work.* Claims Journal (July 23, 2015)

103.  *Montana Supreme Court Adopts Notice-Prejudice Rule*.  Claims Journal (July 21, 2015)

104.  *Does Policy Provision Stating The Insurer Will Not Withhold Its Consent To Settle Unreasonably Vitiate The Consent To Settlement Requirement?*  Claims Journal (July 17, 2015)

105.  *An Overview Of What Constitutes Collapse For Purposes Of Property Insurance Coverage Involving Hidden Decay.*  Ins. Lit. Rptr., Vol. 37, No. 10 (July 9, 2015)

106.  *Independent Insurance Adjuster Liability To Insureds:  The Majority And Minority Views.* Ins. Lit. Rptr., Vol. 37, No. 9 (June 26, 2015)

107.  *New Jersey High Court Finds That Res Judicata Barred Plaintiff's UM Bad Faith Claim, Not The Entire Controversy Doctrine.*  Claims Journal (June 25, 2015)

108.  *District Court Finds Policy Required Matching Color For Replacement Panels That Were Damaged.*  Claims Journal (June 23, 2015)

109.  *Right To Intervention Upheld By Montana Supreme Court.*  Claims Journal (June 17, 2015)

110.  *Employee Exclusion Applies To Both Actual And Statutory Employees Under Florida Law.* Claims Journal (June 10, 2015)

111.  *Amplifying Louisiana's Anti-Annulment Statute.*  Claims Journal (June 5, 2015)

112.  *Defaming A Former Law Partner May Not Be Covered.*  Claims Journal (June 1, 2015)

113.  *Named Insured's Decision To Reject Higher UM Limits Was Not Binding On An Additional Insured.*  Claims Journal (May 27, 2015)

114.  *Severance Of Bad-Faith Claims Under Texas Law When Coverage Issues Are Unresolved.* Westlaw Journal Insurance Bad Faith 1, Vol. 11, No. 2 (May 27, 2015) and Westlaw Journal Insurance Bad Faith 1, Vol. 11, No. 2 (May 27, 2015)

115. *Innocent Insured Doctrine Doesn't Preclude Policy Rescission For Misrepresentation In The Application.* Claims Journal (April 15, 2015)

116. *Fair Debatability Defense Can Be Supported By Unpublished Court Decisions.* Claims Journal (April 7, 2015)

117. *Texas Court Draws The Line On Allowing Broad Discovery Of Other Claims In Bad Faith Litigation.* Westlaw Journal Insurance Bad Faith 1, Vol. 10, No. 24 (April 1, 2015)

118. *Workers' Compensation Exclusive Remedy Bars Bad Faith Claim In North Carolina.* Claims Journal (March 24, 2015)

119. *Number of Courts Rejecting Insurance Adjuster Negligence Claims Grows.* Claims Journal (March 20, 2015)

120. *Standard Mortgage Clause Effects on Vacancy Restrictions In Homeowner Policies Under Minnesota Law.* Claims Journal (March 13, 2015)

121. *Supplementing The NAIC's Model Unfair Claims Settlement Practices Act: Accompanying State Regulations.* Ins. Lit. Rptr., Vol. 37, No. 3 (March 11, 2015)

122. *New Hampshire Court Finds Illegal Drug Activity Inherently Dangerous, Harmful Thus Liability Can't Constitute A Covered Occurrence.* Claims Journal (March 5, 2015)

123. *Offsetting Third Party Recoveries Against UIM Benefits.* Claims Journal (February 25, 2015)

124. *Notifying Additional Insureds Of Coverage Denials Under New York Law.* Claims Journal (February 25, 2015)

125. *Texas High Court Finds No Direct Action Rule Can Apply to Declaratory Judgment Actions Brought Against Insurers In Some Cases.* Claims Journal (February 13, 2015)

126. *A Jurisprudential Survey Of UM/UIM Statutes of Limitation.* Ins. Lit. Rptr., Vol. 37, No. 1 (February 5, 2015)

127. *Ohio Supreme Court Ruling: Context Is Everything.* Claims Journal (February 3, 2015)

128. *Reimbursing Defense Costs Under Alaska Law: A Request For Clarity.* Claims Journal (January 29, 2015)

129. *8th Circuit Reaffirms Missouri's Cause Test, Rejects "Time And Space" Test For Determining Number of Occurrences.* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 10 (December 12, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 10, No. 19 (January 22, 2015)

130. *South Carolina Court Rules "Your Work" Exclusion Applies To Costs To Remove And Rebuild Brick Wall To Meet Contract Compliance.* Claims Journal (January 8, 2015)

131. *New Jersey High Court Finds That Res Judicata Barred Plaintiff's UM Bad Faith Claim, Not the Entire Controversy Doctrine.* 2015 Windstorm Conference Claims Journal, Claims Journal (2015)

132. *Arkansas Faulty Workmanship Statute Does Not Have Retroactive Application.* Claims Journal (December 11, 2014)

133. *Florida Appeals Court Provides Guidance On When An Insured's Bad Faith Lawsuit Is Ripe.* Claims Journal (December 5, 2014)

134. *Choosing Your Punishment May Foreclose UM (UIM) Coverage.* Claims Journal (December 1, 2014)

135.  *Defending Against Bad Faith: A Nuts And Bolts Review Of The Fair Debatability Doctrine And California's Genuine Dispute Doctrine.* Ins. Lit. Rptr., Vol. 36, No. 19 (November 13, 2014)

136.  *Towing The Line On "Expected And Intended."* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 4 (October 31, 2014) and Westlaw Journal Insurance Bad Faith 3, Vol. 10, No. 15 (November 26, 2014)

137.  *Public Policy Prevents Family Step-Down Clauses In South Carolina Auto Policies.* Claims Journal (October 28, 2014)

138.  *Louisiana's Direct Action Statute Doesn't Substantively Modify Claims-Made Policy Notice Provisions.* Claims Journal (October 22, 2014)

139.  *Extricating Injured Passenger From A Crashed Auto Constitutes Use Of That Auto.* Claims Journal (October 21, 2014)

140.  *Demanding Arbitration Is No Excuse For Bad Faith Conduct.* Claims Journal (October 17, 2014)

141.  *The Pitfalls Of Rejecting A Defense Under Texas "Same Facts" Test.* Claims Journal (October 14, 2014)

142.  *Arizona Courts Are Grappling With Fixing The Correct Punitive Damages Ratio: A State Specific Measure Of Due Process*. Ins. Lit. Rptr., Vol. 36, No. 17 (October 13, 2014)

143.  *Known Loss Exclusion Trumps Common-Law Known Loss Doctrine.* Claims Journal (October 9, 2014)

144.  *Conspiracy To Abduct Not Covered.* Claims Journal (October 8, 2014)

145.  *A Review Of Insurance Broker Duties Under California Law.* Insurance Journal Magazine, Vol. 92, No. 19 (October 6, 2014)

146.  *Product Disparagement Claims Do Not Include "Close Enough" Or "Better Than" Assertions.* Westlaw Journal Insurance Coverage 1, Vol. 24, No. 52 (October 3, 2014); West Law Journal Insurance Bad Faith 2, Vol. 10, No. 13 (October 29, 2014)

147.  *When Does Directing Traffic Constitute Vehicle Use?* Claims Journal Magazine, Vol. 3, No. 4 (Fall 2014)

148.  *Adjuster Negligence Claim Rejected By Vermont Supreme Court.* Claims Journal (September 29, 2014)

149.  *New York Strict Timelines Standard Doesn't Apply To Environmental Claims.* Claims Journal (September 24, 2014)

150.  *Objecting To The Golden Rule During Trial*. Claims Journal (September 19, 2014)

151.  *Proving The Content Of Lost Insurance Policies*. Ins. Lit. Rptr., Vol. 36, No. 15 (September 10, 2014)

152.  *A Little Knowledge Goes A Long Way Against Defense And Indemnity Reimbursement.* Claims Journal (September 15, 2014)

153.  *When Considering A Prior Publication Exclusion, Does "Close Enough" Count?* Claims Journal (September 12, 2014)

154.  *Insurance Experts: Does It Really Take One To Know One?* Insurance Journal Magazine, Vol. 92, No. 17 (September 8, 2014)

155.  *Indiana Supreme Court Considers Enforceability Of Workers' Compensation Setoff Provisions In UIM Context.* Westlaw Journal Insurance Coverage 1, Vol. 24, No. 48

(September 5, 2014) and Westlaw Journal Insurance Bad Faith 3, Vol. 10, No. 11 (October 1, 2014)

156.  *Indiana Supreme Court Affirms Importance Of Reading Policy.*   Insurance Journal (August 26, 2014)

157.  *The Effect Of No-Contest Pleas On D&O Coverage Exclusions*. Westlaw Journal Insurance Coverage 1, Vol. 24, No. 46 (August 22, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 10, No. 10 (September 17, 2014)

158.  *Court Holds That Companies Do Not Need To Disclose Use Of In-House Counsel To Defend Insureds At The Time Of Insurance Purchase.* The Voice, Vol. 13, No. 33 (August 20, 2014)

159.  *It's A Fine Line:  Interpreting Status-Based Exclusions*. Claims Journal (August 18, 2014)

160.  *Payment of Prior Claims May Not Estop Denial Of Future Claims*. Westlaw Journal Insurance Coverage 1, Vol. 24, No. 44 (August 8, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 10, No. 9 (September 3, 2014)

161.  *New York Court of Appeals' Stunning K2 About Face*. Ins. Lit. Rptr., Vol. 36, No. 13 (August 8, 2014)

162.  *California Court Finds That Bad Cooking Odors Did Not Result In Property Damage.* Claims Journal (July 31, 2014)

163.  *South Dakota High Court Rules That Continuous And Progressive Damage Exclusion Does Not Violate Public Policy*. Claims Journal (July 28, 2014)

164.  *The Meaning Of "Incurred" In The Medical Payments Coverage Context*. Westlaw Journal Insurance Coverage 1, Vol. 24, No. 40 (July 11, 2014)

165.  *When In Doubt – Consider An IME*. Claims Journal (July 1, 2014)

166.  *What Constitutes Collapse For Purposes Of Property Insurance Coverage*. Claims Journal Magazine, Vol. 3, No. 3 (Summer 2014)

167.  *Landlord Beware:   Criminal Acts Causing Property Damage Are Not Covered By Homeowner Policy*. Claims Journal (May 22, 2014)

168.  *Cleveland Indians Baseball vs. New Hampshire Insurance:  An Agent's Duty To Additional Insureds*. Insurance Journal Magazine, Vol. 92, No. 10 (May 19, 2014)

169.  *Theft Alone Is Not A Publication For Personal Injury Coverage*. Westlaw Journal Insurance Coverage 1, Vol. 24, No. 32 (May 16, 2014)

170.  *Seventh Circuit Court:  Alcoholic Energy Drinks Excluded From Coverage.* Claims Journal Magazine (April 28, 2014)

171.  *Historical Tour Of The Contra Preferentem Doctrine.*  Claims Journal Magazine, Vol. 3, No. 1 (Spring 2014)

172.  *The Potential Liability Rule Inapplicable In A Priest Molestation Case*. Claims Journal (April 16, 2014)

173.  *Odor From Hog Farms Is Not A Pollutant*. Claims Journal (April 8, 2014)

174.  *Washington Follows Qualcomm*. Westlaw Journal Insurance Coverage 1, Vol. 24, No. 26 (April 4, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 9, No. 26 (April 30, 2014)

175.  *North Dakota Law Upholds Insureds Step-Down Clauses*. Claims Journal (April 1, 2014)

176.  *Do Insurers Have To Disclose Their Investigative File Before An EUO?*  Claims Journal (March 26, 2014)

177. *Analyzing Concurrent Causation: Independence Is The Key*. Claims Journal (March 24, 2014)

178. *Excluding Stigma Damages In The Underinsured Motorist Context*. Claims Journal (March 19, 2014)

179. *Determining The Number Of Occurrences From Carbon Monoxide Poisoning.* Claims Journal (March 13, 2014)

180. *Ruling In Dog-Bite Case Opens The Door To Expanded Insurance Coverage*. Westlaw Journal Insurance Coverage 1, Vol. 24, No. 22 (March 7, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 9, No. 10 (May 14, 2014)

181. *When Does The Obligation To Pay Cumis Counsel End?* Westlaw Journal Insurance Coverage 1, Vol. 24, No. 20 (February 21, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 9, No. 22 (March 5, 2014)

182. *Wisconsin Supreme Court Redefined The Boundary Lines Of Occurrences.* Claims Journal Magazine, Vol. 3, No. 1 (Winter 2014)

183. *Are UM/UIM Insurers Obligated To Advance To Their Insureds Undisputed Partial Payments Before Total Claim Value Is Determined?* Ins. Lit. Rptr., Vol. 36, No. 2 (February 18, 2014)

184. *Pennsylvania Court Rejects UM Claim Because Of Delay.* Claims Journal (February 13, 2014)

185. *Stipulations And Concessions That Forged The Framework Of Arbitrability Of Class Actions Under The Federal Arbitration Act*. Westlaw Journal Insurance Coverage 1, Vol. 24, No. 18 (February 7, 2014) and Westlaw Journal Insurance Bad Faith 3, Vol. 9, No. 22 (March 5, 2014)

186. *Connecticut Embraces The Make Whole Doctrine.* Claims Journal (January 30, 2014)

187. *Montana Weighs In On The Obligation To Provide Co-Counsel To Assist Another Insurer Defending Mutual Insureds.* Claims Journal (January 27, 2014)

188. *Insureds' Agreement To Read Insurance Policy (What Is An Insurance Agent To Do?).* Insurance Journal (January 23, 2014).

189. *Colorado Court Requires Insurer To Prove Prejudice To Raise Voluntary Payment Defense.* Claims Journal (January 15, 2014)

190. *When Is A Sexually Molested Hotel Guest Within The Care, Custody And Control Of The Hotel*. Claims Journal (December 23, 2013)

191. *Rhode Island High Court Establishes Statue Of Limitations For UM/UIM Claims.* Claims Journal (December 19, 2013)

192. *Methamphetamine Is Not A Narcotic For Purposes Of Accidental Death Coverage (South Carolina—Accidental Death Coverage/Exclusion For Narcotics)*. DRI, Covered Events Newsletter, 2013, Issue 11 (December 5, 2013)

193. *Excess Insurance And Equitable Subrogation: Oklahoma Clarifies Its Equitable Subrogation Rule.* Claims Journal (December 3, 2013)

194. *The Mutual Mistake Doctrine And The Purchase Of Insurance*. Insurance Journal Magazine, Vol. 91, No. 23 (December 2, 2013)

195. *Paying For Rescission.* The Voice, Vol. 12, No. 46 (November 20, 2013)

196. *Is Negligent Misrepresentation A Covered "Occurrence"?* Claims Journal (November 13, 2013)

197. *Is A Coinsurance Penalty Based Upon ACV Or RCV?* Claims Journal (November 4, 2013)

198. *Florida Supreme Court Says That Replacement Cost Includes Profit And Overhead.* Claims Journal (October 30, 2013)

199. *Florida Court Reaffirms Extrinsic Evidence Is Not Permitted To Resolve Ambiguity In An Insurance Contract.* Claims Journal (October 24, 2013)

200. *Negligent Infliction Of Emotional Distress Claims And Uninsured Motorists/Under Insured Motorists Coverage.* Claims Journal Magazine, Vol. 2, No. 4 (Fall 2013)

201. *Seeking Reimbursement Of Defense Costs In The Context Of Reservation Of Rights: The Washington Supreme Court Weighs In.* Ins. Lit. Rptr., Vol. 35, No. 17 (October 1, 2013)

202. *Is The Risk Of Relapse Into Substance Abuse Enough To Constitute A Current Disability For Doctors?* The Voice, Vol. 12, No. 36 (September 11, 2013); DRI Today (September 17, 2013)

203. *State And Federal Courts Continue To Fill The Gap On The Question Of Whether The Lack Of Exhaustion Of Primary Insurance Can Trigger Excess Coverage.* Ins. Lit. Rptr., Vol. 35, No. 15 (September 9, 2013)

204. *Insurance Coverage for Discounting the Price of Goods for Sale?* Insurance Journal Magazine, Vol. 91, No. 17 (September 9, 2013)

205. *In Alaska, A Claim Of Self-Defense Was Unavailing Where Insured Entered Inconsistent 'No Contest' Plea.* Westlaw Journal Insurance Coverage 2, Vol. 23, No. 48 (September 6, 2013) and Westlaw Journal Insurance Bad Faith 3, Vol. 9, No. 14 (November 7, 2013)

206. *5th Circuit Affirms Matador Decision.* Westlaw Journal Insurance Coverage 1, Vol. 23, No. 46 (August 23, 2013) and Westlaw Journal Insurance Bad Faith 3, Vol. 9, No. 15 (November 21, 2013)

207. *Two Essential Discussions That Should Be Used In All Reservation Of Rights Letters.* In-House Defense Quarterly (Summer 2013)

208. *The Kentucky Supreme Court Utilizes The Integral Parts Test In Hit-And-Run UM Cases.* Claims Journal (August 13, 2013)

209. *High-Stakes Poker In New York Over Insurer's Decision Not To Defend Its Insured.* Westlaw Journal Insurance Coverage 1, Vol. 23, No. 44 (August 9, 2013) and Westlaw Journal Insurance Bad Faith 2, Vol. 9, No. 9 (August 29, 2013)

210. *Notifying Excess Insurers For Additional Insureds.* Insurance Journal (August 9, 2013)

211. *Does Uninsured Motorist Coverage Apply To Negligent Infliction Of Emotional Distress Claims?* Ins. Lit. Rptr., Vol. 35, No. 12 (July 23, 2013)

212. *The Selective Tender Rule Rejected In The Workers' Compensation Context*. Claims Journal Magazine, Vol. 2, No. 3 (Summer 2013)

213. *Rhode Island Court's Ruling On Self-Insured Retentions In Med-Mal Policies*. Insurance Journal (July 23, 2013)

214. *Intervention Nuances Under California Law*. Claims Journal (July 22, 2013)

215. *No Bad Faith In The Workers' Compensation Context: Texas Supreme Court Puts An Exclamation Point On Its Prior Case*. Claims Journal (July 15, 2013)

216. *Washington Law Reverse-Preempts The Federal Arbitration Act In The Insurance Context.* Westlaw Journal Insurance Coverage 2, Vol. 23, No. 40 (July 12, 2013)

217. *Enforcement Of UIM Exhaustion Clauses: The Utah Supreme Court Weighs In.* Ins. Lit. Rptr., Vol. 35, No. 10 (June 26, 2013)

218. *Voluntary Payment Clauses.* Claims Journal (June 26, 2013)

219. *Denying Coverage And Reserving Rights Simultaneously: Georgia Supreme Court Says Insurer Can't Have Its Cake And Eat It Too.* Claims Journal (June 24, 2013)

220. *Insurers Aren't Required To Tell Insureds That They Filed A Claim Under The Wrong Policy.* Claims Journal (June 20, 2013)

221. *Utilizing The "Place Of Injury" Test Regarding Territorial Limitation Clauses In Insurance Policies.* Claims Journal (June 17, 2013)

222. *Washington Supreme Court Limits Insurers' Right To Jury Trial In Bad-Faith and Coverage Cases.* Westlaw Journal Insurance Bad Faith 1, Vol. 9, No. 3 (June 11, 2013)

223. *Reasonable Expectation Doctrine Trumps Insured's Duty To Read Insurance Policy.* Claims Journal (June 10, 2013)

224. *All-Risk Coverage For Stigma Claims Involving Real Property.* Ins. Lit. Rptr., Vol. 35, No. 9 (June 5, 2013)

225. *Direct Physical Loss In All-Risk Policies: The Modern Trend Does Not Require Specific Physical Damage, Alteration.* Claims Journal Magazine, Vol. 2, No. 2 (Spring 2013)

226. *Providing Notification To Insureds Of The Opportunity To Purchase UM/UIM Insurance: Is "English Only" Enough?* Ins. Lit. Rptr., Vol. 35, No. 7 (May 1, 2013)

227. *Application Of The Equality Of Consideration Test In Coverage Disputes.* Common Defense (Spring 2013)

228. *The Ongoing Debate Over Bad Faith And Workers' Compensation.* Westlaw Journal Insurance Bad Faith, Vol. 8, No. 25 (April 16, 2013)

229. *Taking Level 3 Communications To The Next Level: Polishing The 'Insured Vs. Insured' Exclusion.* Westlaw Journal Insurance Coverage 1, Vol. 23, No. 26 (April 5, 2013) and Westlaw Journal Insurance Bad Faith 3, Vol. 9, No. 16 (December 5, 2013)

230. *The Inherent Tension Between Professional Ethics Regarding Mistakes And Insurance Policy Liability Admission Clauses.* The Voice, Vol. 12, No. 13 (April 3, 2013)

231. *Legislation Regulating Coverage For Faulty Workmanship Cannot Be Applied Retroactively.* Claims Journal (April 1, 2013)

232. *Insurer's Obligation To Notify The Insured Of The Need For Allocated Verdicts And Settlements.* Claims Journal (March 28, 2013)

233. *Pollution Exclusions In Indiana Require List Of Specific Substances, State Supreme Court Says.* Westlaw Journal Insurance Coverage 1, Vol. 23, No. 22 (March 8, 2013) and Westlaw Journal Insurance Bad Faith 2, Vol. 8, No. 24 (April 2, 2013)

234. *Analyzing Recent Cases Involving Bad Faith Set-Ups.* Ins. Lit. Rptr., Vol. 35, No. 3 (March 4, 2013)

235. *When Using Colossus Independent Judgment Is A Must.* Claims Journal Magazine, Vol. 2, No. 1 (Winter 2013); Claims Journal (May 9, 2013)

236. *Can An Excess Insurer Sue A Primary Insurer's Defense Counsel For Malpractice?* Claims Journal (February 26, 2013)

237. *Is There A Right To Pre-Litigation Independent Counsel?* Westlaw Journal Insurance Coverage 1, Vol. 23, No. 20 (February 22, 2013)

238. *Excess Insurers Prejudiced When There is No Notice of Underlying Suit.* Claims Journal (February 21, 2013)

239. *Insuring Contractual Liability.* Ins. Lit. Rptr., Vol. 35, No. 2 (February 19, 2013)

240. *New York Court's Latest Take On Insured's Duty To Read Policy.* Insurance Journal (February 19, 2013)

241. *New Twist On The Question Of An Insurer's Duty To Defend Criminal Proceedings.* Claims Journal (February 11, 2013)

242. *Can An Unborn Fetus Qualify As A "Resident of Household" For Coverage Determinations*? Claims Journal (January 23, 2013)

243. *Can An Insured Restrict The Insurer's Right To Use Pre-Litigation IMEs?* Claims Journal (January 15, 2013)

244. *Sexual Assaults In Taxicabs And Application Of The Automobile Exclusion In CGL Policies.* Ins. Lit. Rptr., Vol. 34, No. 20 (December 7, 2012)

245. *Application Of The 'Insured vs. Insured' Exclusion To Federal Takeovers Of Financial Institutions.* Westlaw Journal Insurance Coverage 1, Vol. 23, No. 7 (November 21, 2012)

246. *Determining Insured Status On Auto Liability Coverage.* Claims Journal Magazine, Vol. 1, No. 4 (Fall 2012)

247. *The Risk Landscape of Cyberspace.* Insurance Journal Magazine, Vol. 90, No. 21 (November 2012)

248. *Insurers Finally Get Right To Jury Trial In New Jersey.* Westlaw Journal Insurance Coverage 1, Vol. 23, No. 4 (November 2, 2012) and Westlaw Journal Insurance Bad Faith 3, Vol. 8, No. 16 (December 11, 2012)

249. *When Does the Filing of a Declaratory Judgment Action Constitute Bad Faith*? Ins. Lit. Rptr., Vol. 34, No. 17 (October 8, 2012)

250. *Is Texas Turning The Corner By Allowing Exceptions To The Strict '8-Corners' Rule?* Westlaw Journal Insurance Coverage 1, Vol. 22, No. 51 (September 28, 2012) and Westlaw Journal Insurance Bad Faith 2, Vol. 8, No. 21 (February 19, 2013)

251. *Florida Public Adjuster Waiting Period Deemed Unconstitutional.* Claims Journal (October 1, 2012)

252. *The Arizona Court of Appeal Moves Close To A One-To One Ratio in Punitive Damage Bad Faith Cases.* Common Defense (Fall 2012)

253. *Determining Insurance Coverage For Sexual Misconduct Under Arizona Law: A Microcosm Of The National Debate.* Ins. Lit. Rptr., Vol. 34, No. 15 (September 13, 2012)

254. *Challenging Fraudulent Joinder, The Clock Is Ticking.* The Voice, Vol. 11, No. 36 (September 12, 2012)

255. *Coverage For Diminished Value Following Post-Crash Repairs Debate.* Claims Journal (August 28, 2012)

256. *Stepping Outside Of UM Coverage: Assaults By An Insured Outside A Vehicle.* Claims Journal (August 22, 2012)

257. *Do Insurance Brokers Have An Obligation To Offer The Cheapest Coverage Available?* Insurance Journal Magazine, Vol. 90, No. 15 (August 2012)

258. *Ninth Circuit Court Of Appeals Expands Insurer's Duty To Settle Under California Law.* Claims Journal (July 31, 2012)

259. *Minnesota High Court Blurs Line Between Coverage Determination And Amount Of Loss In Appraisal.* Claims Journal (July 17, 2012)

260. *Telephone Consumer Protection Act And Violations of Seclusion.* Claims Journal Magazine, Vol. 1, No. 3 (Summer 2012)

261. *Evaluating Medical Payment Coverage Questions.* Claims Journal (May 7, 2012)

262. *Understanding the Right of Reimbursement For Defense Costs When Reserving Rights.* Claims Journal (May 1, 2012)

263. *Policy Buyback Limitations.* Claims Journal (April 23, 2012)

264. *Examinations Under Oath.* Claims Journal Magazine, Vol. 1, No. 2 (Spring 2012)

265. *Incomplete Claim Investigations May Create Coverage Where No Coverage Exists.* Claims Journal (March 12, 2012)

266. *To Sue Or Not To Sue:  Allowing Private Litigation Over Insurer Bad Faith In The Workers' Compensation Context.* Claims Journal Magazine, Vol. 1, No. 1 (Winter 2012)

267. *Vandalism, Vacancy And The Absence Of Property Coverage.* Ins. Lit. Rptr., Vol. 33, No. 18 (November 4, 2011)

268. *A Framework Of Adjusting Medical Claims Involving Possible Experimental Treatment.* Claims Journal (October 27, 2011)

269. *Interpreting Immunity:  Why It's Wise To Use Caution With Insurance Fraud Cases.* SIU Today, Vol. 25, No. 3 (Fall 2011)

270. *The Extension Of Insurance To Cover The Plaintiff's Financial Risk Of Litigation:  "Bodily Injury" "Property Damage" And "Attorney's Fees" Caused By An Occurrence?* Common Defense (Fall 2011)

271. *Be Careful What You Say When Issuing A Binder.* Insurance Journal Magazine, Vol. 89, No. 17 (September 2011)

272. *Read The Policy.* Insurance Journal Magazine, Vol. 89, No. 15 (August 2011)

273. *Exploring Experimental Treatment Exclusions.* Ins. Lit. Rptr., Vol. 33, No. 10 (July 8, 2011)

274. *A Review Of ISO's Fungi And Bacteria Exclusion.* Ins. Lit. Rptr., Vol. 33, No. 8 (May 23, 2011)

275. *Bad-Faith Cases:  Preserving Affirmative Defenses.* DRI For the Defense, Vol. 53, No. 5 (May 2011)

276. *Communicable And Transmission Of Disease Exclusions.* Ins. Lit. Rptr., Vol. 33, No. 7 (May 6, 2011)

277. *Why Bragging May Create A Greater Legal Duty Of Care.* Insurance Journal Magazine, Vol. 89, No. 9 (May 2011)

278. *Implied Consent To Representation Is Not Enough.* Common Defense (Spring 2011)

279. *The Perils Of Testing The Contours And Boundaries Of Morris Agreements.* Common Defense (Spring 2011)

280. *Vigilance Guards Against Short Fuse, Third-Party, Bad Faith Set-Ups.* Claims Journal (April 7, 2011)

281.  *Agency E&O Liability For Failing To Procure Coverage*.  Insurance Journal Magazine, Vol. 89, No. 6 (March 2011)

282.  *Voluntary Intoxication And The Application Of Intentional Act Exclusions.*  Ins. Lit. Rptr., Vol. 33, No. 3 (March 7, 2011)

283.  *A Roadmap For NAIC's Unfair Claims Settlement Practices Act*.  Claims Journal (March 3, 2011)

284.  *What Every Claim Adjuster Should Know About Bad Faith*.  Claims Journal (February 3, 2011)

285.  *Do Standard Automobile Liability Insurance Policies Cover Drive-By Shootings?*  Ins. Lit. Rptr., Vol. 31, No. 21 (December 17, 2010)

286.  *Are You Crazy?: Determining Mental Capacity As A Pre-Requisite To The Attachment of an Intentional Act Exclusion*.  Ins. Lit. Rptr., Vol. 32, No. 20 (December 3, 2010)

287.  *Annulment Of Liability Policies Post-loss (Policy Buy-Back/Release)*.  Ins. Lit. Rptr., Vol. 32, No. 19 (November 15, 2010)

288.  *A Requiem For Ingenix.*  Ins. Lit. Rptr., Vol. 32, No. 15 (September 15, 2010)

289.  *A Critical Review Of The Practice Of Setting Up Insurance Companies For Bad Faith.*  Ins. Lit. Rptr., Vol. 32, No. 10 (July 1, 2010)

290.  *A Recent Challenge To UM/UIM Offering Requirements For Excess And Umbrella Coverage Has Revived An Old Debate*.  Ins. Lit. Rptr., Vol. 32, No. 7 (May 10, 2010)

291.  *Splitting Claim Files:  Managing The Concern For Conflicts Of Interest Through Use Of Insurance Company Conflict Screens.*  Ins. Lit. Rptr., Vol. 32, No. 6 (April 26, 2010)

292.  *Mortgage Demands For Homeowner Coverage:  When The Insured Property Has Been Stripped During Foreclosure*.  In-House Defense Quarterly (Winter 2010)

293.  *Wrap-Ups And Agent E&O Exposures*.  Claims Journal (December 22, 2009)

294.  *Shifting Attorneys' Fees To The Losing Party:  Is It Covered Under The Policy?*  Ins. Lit. Rptr., Vol. 31, No. 20 (November 2009)

295.  *Determining Permissive User Status In Automobile Liability.*  Claims Journal (November 16, 2009)

296.  *A Basic Understanding Of Lloyd's Of London Which Every Insurance Lawyer Should Have.*  Common Defense (Fall 2009)

297.  *A Timely Reminder On Managing Agency E&O Risk.*  Claims Journal (November 10, 2009) and Insurance Journal (November 11, 2009)

298.  *It's Time To Review Essential Procedures For Managing E&O:  Systems, Checklists, Guidelines, Manuals Among Tools Useful In Reducing Agency Errors*.  Insurance Journal Magazine, Vol. 87, No. 21 (November 2, 2009)

299.  *Insuring The Emerging Markets In Bio And Nanotechnology.*  Ins. Lit. Rptr., Vol. 31, No. 17 (October 13, 2009)

300.  *Timely Claims Reporting:  A Serious Obligation For Agencies.*  Insurance Journal Magazine, Vol. 87, No. 18 (September 21, 2009)

301.  *Understanding Basic Principles Of Biomechanical Engineering In Low Speed Rear-End Collision Scenarios.*  Claims Journal (September 10, 2009)

302.  *Coverage Issues Associated With Federal Clean Water Act Violations For Discharging Land Fill Into Waterways.*  Ins. Lit. Rptr., Vol. 31, No. 13 (August 12, 2009)

303.  *A Proportional Methodology For Determining Covered Damages Where Continuous And Progressive Injury Is Involved.*  Ins. Lit. Rptr., Vol. 31, No. 11 (July 13, 2009)

304.  *Compendium Of References To Insurance Company Bad Faith Set Up Situations*.  Ins. Lit. Rptr., Vol. 31, No. 11 (July 13, 2009)

305.  *The Fifth Amendment To The U.S. Constitution Is No Bully To A Carriers' Right To An Examination Under Oath.*  IASIU, SIU Today, Vol. 23, No. 2 (Summer 2009)

306.  *Counting The Number Of "Occurrences" Where The Predicate Tort Involves A Pattern Of Conduct Or Interrelated Process.*  Ins. Lit. Rptr., Vol. 31, No. 7 (May 4, 2009)

307.  *The Discoverability Of Reserve Information In Bad Faith Cases*.  Ins. Lit. Rptr., Vol. 31, No. 3 (March 1, 2009)

308.  *How to Avoid Agency Errors And Omission Claims:  Advising Clients On Specific Dollar Values Of Coverages They Need To Consider May Create Unnecessary Exposures*.  Insurance Journal Magazine, Vol. 87, No. 3 (February 2009)

309.  *A Jurisprudential Survey Regarding Submission Of Coverage Questions To Appraisal In The Homeowner Policy Context.*  Ins. Lit. Rptr., Vol. 30, No. 21 (December 15, 2008)

310.  *The Pedigree of USAA v. Morris:  How To Answer Clients When They Call To See If The Morris Decision Can Be Challenged.*  e-Common Defense (November 2008)

311.  *Triggering Coverage in Construction Defect Cases.*  e-Common Defense (November 2008)

312.  *Strategic Planning For An Increasing Direct Writer Marketplace.*  Insurance Journal Magazine, Vol. 86, No. 22 (November 2008)

313.  *Claim Investigation When The Insured Raises The Fifth Amendment Privilege.*  Claims Journal (November 3, 2008)

314.  *The Inherent Tension Between The Fifth Amendment Right Against Self-Incrimination And The Insurance Company's Contractual Right To Cooperation:  Can A Jurisprudential Balance Be Achieved?*  Ins. Lit. Rptr., Vol. 30, No. 18 (October 10, 2008)

315.  *A Survey Of Ingenix As An Evaluative Tool In Assessing Usual, Customary And Reasonable Medical Charges For Insurance Companies.*  Ins. Lit. Rptr., Vol. 30, No. 17 (October 1, 2008)

316.  *The Modernization Of Arizona's UM/UIM Written Offer Requirement.*  e-Common Defense (September 2008)

317.  *Lennar Corp. v. Auto-Owners Insurance Co., Expanding Coverage For Faulty Workmanship Claims.*  e-Common Defense (September 2008)

318.  *The Impact Of Certificates Of Insurance in Determining The Availability Of Coverage For Additional Insureds.*  Ins. Lit. Rptr., Vol. 30, No. 14 (August 5, 2008)

319.  *Advertising Injury Coverage For Fax Blasting And Lantham Act Claims.*  Ins. Lit. Rptr., Vol. 30, No. 13 (July 20, 2008)

320.  *Effectively Using E-Sign To Underwrite UM/UIM Coverage.*  Claims Journal (July 1, 2008)

321.  *Analyzing The Innocent Co-Insured Exception To Intentional Acts In Community Property States.*  Claims Journal (June 10, 2008)

322.  *Limiting Bad-Faith Exposure:  Blindly Accept Colossus Recommendations At Your Own Risk.*  Claims Magazine, Vol. 56, No. 6 (June 2008)

323.  *Is The Race Really On?  Application Of Racing Exclusions Within Standard Automobile Liability Policies*.  Ins. Lit. Rptr., Vol. 30, No. 9 (May 30, 2008)

324. *A Different Perspective On Payment Of Profit And Overhead When Insureds Do Repairs.* Claims Journal (May 5, 2008)

325. *Federal Preemption Of State Statutory Requirements: Written Offers/Rejections Of UM/UIM Coverage In The Modern Age.* DRI For The Defense, Vol. 50, No. 5 (May 2008)

326. *Reasonable Expectations For Agents' E&O.* Insurance Journal-National, West Region, Vol. 86, No. 6 (March 2008)

327. *Use Of Independent Medical Examinations: Analyzing Bad Faith Exposures Arising In First-Party Coverage Determinations.* In-House Defense Quarterly, Vol. 3, No. 2 (Spring 2008)

328. *The Justicability Of Increased Insurance Premium Claims: A Uniformity Of Dismissal?* Ins. Lit. Rptr., Vol. 30, No. 2 (January 31, 2008)

329. *Understanding Federal Bankruptcy Court Stays And How To Procedurally Reach Available Insurance Coverage Of The Bankruptcy Debtor.* Ins. Lit. Rptr., Vol. 29, No. 21 (December 15, 2007)

330. *Directors And Officers Entitlement To D&O Policy Benefits When The Corporation They Served Files Bankruptcy.* Ins. Lit. Rptr., Vol. 29, No. 20 (December 1, 2007)

331. *Attorney's Fees And Declaratory Judgment Actions In Arizona.* DRI National State-by-State Compendium Regarding the Awardability of Attorney's Fees in Declaratory Judgment Actions (December 2007)

332. *A Survey Of Professional Liability Coverage For Claims Brought Under The Federal False Claims Act.* Ins. Lit. Rptr., Vol. 29, No. 17 (October 5, 2007)

333. *A Developing Body Of Law: Daubert And The Insurance Bad Faith Expert.* In-House Defense Quarterly, Vol. 2, No. 3 (Summer 2007)

334. *Colossus Under Attack: The Legal Efficacy Of Computerized Evaluation Of Bodily Injury Claims.* Ins. Lit. Rptr., Vol. 29, No. 8 (May 22, 2007)

335. *Bad Faith Cases: A General Overview Of The Advice Of Counsel Defense.* In-House Defense Quarterly, Vol. 2, No. 2 (Spring 2007)

336. *Claims For Embezzlement Of Client Funds.* DRI For The Defense, Vol. 49, No. 3 (March 2007)

337. *Regulating Insurance Company Claim Handling Practices: Rethinking The Unthinkable (Abandonment of the Common Law Tort of Bad Faith).* Ins. Lit. Rptr., Vol. 29, No. 1 (January 25, 2007)

338. *Discipline Without Assumptions? A Systematic Approach To Coverage Analysis.* In-House Defense Quarterly, Vol. 2, No.1 (Winter 2006)

339. *A Methodical Approach To Analyzing The Application Of The Absolute Pollution Exclusion.* Ins. Lit. Rptr., Vol. 28, No. 19 (November 1, 2006)

340. *Medical Payments Coverage: A Policy Inside A Policy.* Ins. Lit. Rptr., Vol. 28, No. 14 (August 23, 2006)

341. *Building A General Understanding Of Directors & Officers Insurance Policy Architecture.* DRI For the Defense, Vol. 48, No. 5 (May 2006)

342. *All Things Being Considered Equal: Third Party Bad Faith In Arizona.* Arizona Attorney, Vol. 27, No. 6 (1991)

343. *Darner's Neglected Tenant: Abandonment Of Ambiguity Doctrine.* Arizona Attorney, Vol. 27, No. 4 (1990)

344.  *Does* Your *Insurance Stack Up? Multiple Coverage Problems And The Standard Automobile Liability Insurance Policy.*  Arizona Attorney, Vol. 26, No. 5 (1990)

345.  *Guaranteeing Personal Injury Recoveries:  A Practical Guide To Arizona's Property And* Casualty *Insurance Guaranty Fund.*  Arizona Attorney, Vol. 26, No. 2 (1989)

346.  *Insuring Against An Evil Mind:  Punitive Damages Awards And The Uninsured And Underinsured Motorist.*  Arizona Attorney, Vol. 25, No. 9 (1989)

347.  *Let's Make A Deal:  A Requiem for Reservation Of Rights Defenses In Arizona.*  Arizona Bar Journal, Vol. 23, No. 6 (1988)

348.  *When Is A Standardized Insurance Contract Binding:  The Development Of The Reasonable Expectation Doctrine In Arizona.*  Arizona Bar Journal, Vol. 23, No. 5 (1988)

349.  *The Mode Of Operation Rule:  A Slippery Issue For The Arizona Trial Bar.*  Arizona Bar Journal, Vol. 21, No. 4 (1986) (republished by West Publishing Company, Westlaw National Text and Periodicals —Torts Database, 1986)

## PUBLISHED CASE REVIEWS

1.  *Somnus Mattress Corp. v. Hilson,* (Ala.) (Agents & Brokers), Ins. Lit. Rptr., Vol. 41, No. 3, March 1, 2019

2.  *American Family Mutual Insurance Co. v. Vein Centers for Excellence, Inc.,* (8th Cir.) (Notice/Renewals), Ins. Lit. Rptr., Vol. 41, No. 3, March 1, 2019.

3.  *Farmers Texas County Mutual Insurance Co. v. Zuniga,* (Texas) (Liability Insurance/Punitive Damages), Ins. Lit. Rptr., Vol. 40, No. 2, February 15, 2018.

4.  *Travelers Indemnity Co. v. Rogers Cartage Co.*, (Illinois) (Lost Policies) Ins. Lit. Rptr., Vol. 40, No. 2, February 15, 2018

5.  *Venture v. Preferred Mutual Insurance Co.*, (New York) (Bad Faith/Discovery) Ins. Lit. Rptr., Vol. 39, No. 21, December 15, 2017

6.  *Hughes v. First Acceptance Insurance Co. of Georgia, Inc.*, (Georgia) (Bad Faith/Duty to Settle) Ins. Lit. Rptr., Vol. 39, No. 21, December 15, 2017

7.  *Hendricks v. Novae Corporate Underwriting Ltd.*, (7th Cir., Ill.) (Duty to Settle/Assignments) Ins. Lit. Rptr., Vol. 39, No. 17 (October 5, 2017)

8.  *Mount Vernon Fire Ins. Co. v. Visionaid, Inc*., (Massachusetts) (Duty to Defend) Ins. Lit. Rptr., Vol. 39, No. 15 (September 1, 2017)

9.  *State ex rel Universal Underwriters Ins. Co. v. Wilson,* (West Virginia) (Bad Faith/Duty to Defend) Ins. Lit. Rptr., Vol. 39, No. 14 (August 21, 2017)

10.  *State Farm Fire & Casualty Co. v. Justus,* (Washington) (Discovery) Ins. Lit. Rptr., Vol. 39, No. 12 (July 24, 2017).

11.  *Spearman v. Progressive Classic Ins. Co.*, (Oregon) (Bad Faith/Attorney Fees) Ins. Lit. Rptr., Vol. 39, No. 12 (July 24, 2017).

12.  *Caira v. Zurich American Ins. Co.* (Massachusetts) (Bad Faith/Duty to Settle) Ins. Lit. Rptr., Vol. 39, No. 9 (June 22, 2017).

13.  *Pella Corp. v. Liberty Mutual Insurance Co.* (Iowa) (Policy Limits/Occurrence) Ins. Lit. Rptr., Vol. 39, No. 9 (June 22, 2017).

14.  *Walsh Construction Company v. Zurich*, (Indiana) (Self-Insured Retention) Ins. Lit. Rptr., Vol. 39, No. 7 (May 8, 2017).

15.   *Meeks v. Guaranty Insurance Company*, (Oklahoma) (Workers Compensation Bad Faith) Ins. Lit. Rptr., Vol. 39, No. 7 (May 8, 2017).

16.   *Century Surety Co. v. Jim Hipner, LLC* (Wyoming) (Liability Insurance/Notice-Prejudice Rule)  Ins. Lit. Rptr., Vol. 38, No. 16 (October 4, 2016)

17.   *Arceneaux, et al. v. Amstar Corp.* (Louisiana) (Allocation/Defense Costs)  Ins. Lit. Rptr., Vol. 38, No. 16 (October 4, 2016)

18.   *American Family Mutual Ins. Co. v. Hansen* (Colorado) (Policy Interpretation)  Ins. Lit. Rptr., Vol. 38, No. 12 (July 26, 2016)

19.   *Bamford v. Regent Insurance Co.* (8th Cir., Nebraska) (Bad Faith/Duty to Settle)  Ins. Lit. Rptr., Vol. 38, No. 12 (July 26, 2016)

20.   *Country Mutual Ins. Co. v. Dahms* (Illinois) (Criminal Acts Exclusion)  Ins. Lit. Rptr., Vol. 38, No. 10 (July 1, 2016)

21.   *Arden v. Forsberg & Umlauf* (Washington) (Insurance Counsel/Conflict Of Interest)  Ins. Lit. Rptr., Vol. 38, No. 10 (July 1, 2016)

22.   *Hegseth v. American Family Mutual Ins. Group* (Minnesota) (UM/UIM Time Limits)  Ins. Lit. Rptr., Vol. 38, No. 6 (April 20, 2016)

23.   *State Farm Mutual Auto. Ins. Co. v. Riggs* (Kentucky) (UM/UIM Time Limits)  Ins. Lit. Rptr., Vol. 38, No. 6 (April 20, 2016)

24.   *Moore v. GEICO General Ins. Co.* (11th Cir., Florida)  (Bad Faith/Duty to Settle)  Ins. Lit. Rptr., Vol. 38, No. 4 (March 20, 2016)

25.   *Dairyland Ins. Co. v. Mitchell* (Connecticut) (Auto Insurance/Exclusions)  Ins. Lit. Rptr., Vol. 38, No. 4 (March 20, 2016)

26.   *Christy v. Travelers Indemnity Co. of America* (10th Cir., New Mexico) (Reformation/Rescission)  Ins. Lit. Rptr., Vol. 38, No. 2 (February 17, 2016)

27.   *Martin v. Auto Owners Ins. Co.,* (Missouri) (Automobile Insurance/Stacking)  Ins. Lit. Rptr., Vol. 38, No. 2 (February 17, 2016)

28.   *Rent-A-Roofer, Inc. v. Farm Bureau Property & Casualty Ins. Co.* (Nebraska) (Notice-Prejudice/Voluntary Payments)  Ins. Lit. Rptr., Vol. 37, No. 16 (October 6, 2015)

29.   *Mesa v. Clarendon National Ins. Co.* (11th Cir., Florida) (Duty to Settle/Multiple Claims)  Ins. Lit. Rptr., Vol. 37, No. 16 (October 6, 2015)

30.   *Fidelity National Title Ins. Co. v. Centerpoint Mechanic Liens Claims, LLC* (Arizona) (Duty to Settle/Control of Settlement)  Ins. Lit. Rptr., Vol. 37, No. 16 (October 6, 2015)

31.   *SRM, Inc. v. Great American Ins. Co.* (10th Cir., Oklahoma) (Bad Faith/Duty to Settle)  Ins. Lit. Rptr., Vol. 37, No. 14 (September 11, 2015)

32.   *Garcia v. GEICO General Ins. Co.* (11th Cir., Florida) (Bad Faith)  Ins. Lit. Rptr., Vol. 37, No. 14 (September 11, 2015)

33.   *One Call Property Services, Inc. v. Security First Ins. Co.* (Florida) (Property Insurance/ Post-Loss Assignments)  Ins. Lit. Rptr., Vol. 37, No. 13 (August 24, 2015)

34.   *Purscell v. TICO Ins. Co.* (8th Cir., Missouri) (Bad Faith/Duty to Settle)  Ins. Lit. Rptr., Vol. 37, No. 13 (August 24, 2015)

35.   *Atlantic Casualty Ins. Co. v. Greytak* (Montana) (Liability Insurance/Notice)  Ins. Lit. Rptr., Vol. 37, No. 12 (August 14, 2015)

36.  *C. Brewer and Co., Ltd. v. Marine Indemnity Ins. Co. of America* (Hawaii) (Liability Insurance/Designated Premises Endorsement)  Ins. Lit. Rptr., Vol. 37, No. 7 (May 8, 2015)

37.  *BankInsure, Inc. v. Highland Bank* (8th Cir., Minnesota) (Fidelity Insurance/Causation)  Ins. Lit. Rptr., Vol. 37, No. 7 (May 8, 2015)

38.  *Lodholtz v. York Risk Services Group, Inc.* (Indiana) (Adjuster Liability)  Ins. Lit. Rptr., Vol. 37, No. 4 (March 11, 2015)

39.  *Badiali v. New Jersey Mfrs. Ins. Group* (New Jersey) (Bad Faith/Fairly Debatable Claims)  Ins. Lit. Rptr., Vol. 37, No. 4 (March 11, 2015)

40.  *Illinois Tool Works, Inc., et al. v. Travelers Cas. and Sur. Co.* (Illinois) (Duty to Defend)  Ins. Lit. Rptr., Vol. 37, No. 2 (February 19, 2015)

41.  *Everest Indemnity Ins. Co. v. Rea* (Arizona) (Bad Faith/Advice of Counsel Defense)  Ins. Lit. Rptr., Vol. 37, No. 2 (February 19, 2015)

42.  *Quihuis v. State Farm Mutual Auto. Ins. Co.* (Arizona) (Bad Faith/Duty to Settle)  Ins. Lit. Rptr., Vol. 37, No. 1 (February 5, 2015)

43.  *In re Allstate County Mutual Ins. Co.* (Texas) (Bad Faith)  Ins. Lit. Rptr., Vol. 36, No. 19 (November 13, 2014)

44.  *RSUI Indemnity Co. v. American States Ins. Co.* (Louisiana) (Bad Faith/Excess Insurance)  Ins. Lit. Rptr., Vol. 36, No. 19 (November 13, 2014)

45.  *Williams v. Government Employees Ins. Co.* (South Carolina) (Auto Insurance/Policy Limits)  Ins. Lit. Rptr., Vol. 36, No. 17 (October 13, 2014)

46.  *Cammarata v. State Farm Florida Ins. Co.* (Florida) (Bad Faith)  Ins. Lit. Rptr., Vol. 36, No. 17 (October 13, 2014)

47.  *Indiana Ins. Co. v. Kopetsky* (Indiana) (Liability Insurance/Known Loss-Claim)  Ins. Lit. Rptr., Vol. 36, No. 15 (September 10, 2014)

48.  *Murphy v. Patriot Ins. Co.* (Vermont) (Adjusters)  Ins. Lit. Rptr., Vol. 36, No. 15 (September 10, 2014)

49.  *Fellowship of Christian Athletes v. AXIS Ins. Co.* (Missouri) (Liability Insurance/Policy Limits)  Ins. Lit. Rptr., Vol. 36, No. 14 (August 20, 2014)

50.  *Howe v. MMG Ins. Co.* (Maine) (Duty to Defend/Dog Bites)  Ins. Lit. Rptr., Vol. 36, No. 14 (August 20, 2014)

51.  *Springer v. Erie Ins. Exchange* (Maryland) (Liability Insurance/Business Pursuits Exclusion)  Ins. Lit. Rptr., Vol. 36, No. 13 (August 8, 2014)

52.  *Expedia, Inc. v. Steadfast Ins. Co.* (Washington) (Duty to Defend/Extrinsic Evidence)  Ins. Lit. Rptr., Vol. 36, No. 13 (August 8, 2014)

53.  *KeySpan Gas East Corp. v. Munich Reinsurance America, Inc.* (New York) (Denial of Coverage/Time Limits)  Ins. Lit. Rptr., Vol. 36, No. 11 (July 9, 2014)

54.  *Cich v. National Life Ins. Co.* (Minnesota) (Disability Insurance) Ins. Lit. Rptr., Vol. 36, No. 11 (July 9, 2014)

55.  *Metropolitan Property & Cas.* Ins. Co. v. McCarthy (Maine) (Liability Insurance/Sexual Misconduct Exclusion)  Ins. Lit. Rptr., Vol. 36, No. 11 (July 9, 2014)

56.  *Groce v. American Family Mut. Ins. Co.* (Indiana) (Agent & Brokers/Statute of Limitations)  Ins. Lit. Rptr., Vol. 36, No. 8 (May 21, 2014)

57.   *Neighborhood Investments, LLC v. Kentucky Farm Bureau Mut. Ins. Co.* (Kentucky) (Property Insurance/Criminal Acts Exclusion)  Ins. Lit. Rptr., Vol. 36, No. 8 (May 21, 2014)

58.   *Nodak Mutual Ins. Co. v. Bahr-Renner* (North Dakota) (Auto Insurance/"Step Down" Endorsement)  Ins. Lit. Rptr., Vol. 36, No. 4 (March 21, 2014)

59.   *Wright v. Turner* (Oregon) (UIM/Policy Limits/Number of Accidents)  Ins. Lit. Rptr., Vol. 36, No. 4 (March 21, 2014)

60.   *AAA Mid-Atlantic Ins. Co. v. Ryan* (Pennsylvania) (Underinsured Motorist Coverage)  Ins. Lit. Rptr., Vol. 36, No. 3 (March 4, 2014)

61.   *City Center West, LP v. American Modern Home Ins. Co.* (Colorado) (Property Insurance/Assignments)  Ins. Lit. Rptr., Vol. 36, No. 3 (March 4, 2014)

62.   *Maddox v. Florida Farm Bureau General Ins. Co.* (Florida) (Policy Limits/Per Occurrence)  Ins. Lit. Rptr., Vol. 36, No. 3 (March 4, 2014)

63.   *Country-Wide Ins. Co. v. Preferred Trucking Services Corp.* (New York) (Liability Insurance/Duty to Cooperate)  Ins. Lit. Rptr., Vol. 36, No. 3 (March 4, 2014)

64.   *United Services Automobile Ass'n v. Speed* (Washington) (Liability Insurance/Accident)  Ins. Lit. Rptr., Vol. 36, No. 3 (March 4, 2014)

65.   *Deeter v. Indiana Farmers Mut. Ins. Co.* (Indiana) (Property Insurance/Intentional Acts)  Ins. Lit. Rptr., Vol. 36, No. 1 (February 3, 2014)

66.   *Corn v. Farmers Ins. Co.* (Arkansas) (UIM/Trigger of Coverage).  Ins. Lit. Rptr., Vol. 36, No. 1 (February 3, 2014)

67.   *State Farm Fire and Casualty Co. v. Brechbill* (Alabama) (Bad Faith).  Ins. Lit. Rptr., Vol. 35, No. 18 (October 18, 2013)

68.   *Bardsley v. Government Employees Ins. Co.* (South Carolina) (Policy Interpretation/Other Insurance).  Ins. Lit. Rptr., Vol. 35, No. 18 (October 18, 2013)

69.   *State Farm Fire and Casualty Co. v. Schwan* (Montana) (Duty to Defend).  Ins. Lit. Rptr., Vol. 35, No. 17 (October 1, 2013)

70.   *Caron v. Horace Mann Ins. Co.* (Massachusetts) (Policy Interpretation/Reformation).  Ins. Lit. Rptr., Vol. 35, No. 17 (October 1, 2013)

71.   *Tweton v. Country Preferred Ins. Co.* (North Dakota) (UIM/Stacking).  Ins. Lit. Rptr., Vol. 35, No. 14 (August 20, 2013)

72.   *American States Ins. Co. v. LaFlam* (Rhode Island) (UM/UIM/Contractual Time Limits).  Ins. Lit. Rptr., Vol. 35, No. 14 (August 20, 2013)

73.   *De Smet Farm Mutual Ins. Co. of South Dakota v. Busskohl* (South Dakota) (Rescission).  Ins. Lit. Rptr., Vol. 35, No. 14 (August 20, 2013)

74.   *Starr Indemnity & Liability Co. v. SGS Petroleum Service Corp.* (Texas) (Excess Insurance/Notice-Prejudice).  Ins. Lit. Rptr., Vol. 35, No. 14 (August 20, 2013)

75.   *Colony Ins. Co. v. Human Ensemble, LLC* (Utah) (Bad Faith/Duty to Advise).  Ins. Lit. Rptr., Vol. 35, No. 9 (June 5, 2013)

76.   *O&G Industries, Inc. v. Aon Risk Services Northeast, Inc.* (Connecticut) (Agents & Brokers).  Ins. Lit. Rptr., Vol. 35, No. 4 (March 18, 2013)

77.   *Fedderson v. Columbia Ins. Group* (South Dakota) (Property Insurance/Innocent Co-Insureds).  Ins. Lit Rptr., Vol. 35, No. 1 (February 4, 2013)

78.   *Pistalo v. Progressive Casualty Ins. Co.* (Indiana) (Bad Faith/Duty to Settle).  Ins. Lit. Rptr., Vol. 35, No. 1 (February 4, 2013)

79.   *American Building Supply Corp. v. Petrocelli Group, Inc.* (New York) (Agents & Brokers). Ins. Lit. Rptr., Vol. 34, No. 21 (December 23, 2012)

80.   *Prest v. Louisiana Citizens Property Ins. Corp.* (Louisiana) (Agents & Brokers).  Ins. Lit. Rptr., Vol. 34, No. 21 (December 23, 2012)

81.   *Jones v. Farmers Ins. Exchange* (Utah) (Bad Faith).   Ins. Lit. Rptr.,  Vol. 34,  No. 18 (October 26, 2012)

82.   *Bannister v. State Farm Mut. Auto. Ins. Co.*, (10th Cir. [Oklahoma]) (Bad Faith/Failure to Investigate/Causation).  Ins. Lit. Rptr., Vol. 34, No. 18 (October 26, 2012)

83.   *Stancil v. ACE USA* (New Jersey) (Bad Faith/Workers' Compensation).  Ins. Lit. Rptr., Vol. 34, No. 18 (October 26, 2012)

84.   *Continental Cas. Co. v. North American Capacity Ins. Co.* (5th Cir. 2012 [Texas]) (Contribution/Defense Costs).  Ins. Lit. Rptr., Vol. 34, No. 13 (August 13, 2012)

85.   *Pedicini v. Life Ins. Co. of Alabama* (6th Cir. 2012 [Kentucky]) (Bad Faith/Narrow Policy Interpretation).  Ins. Lit. Rptr., Vol. 34, No. 13 (August 13, 2012)

86.   *Hoover v. Maxum Indemnity Co.*, (Georgia) (Estoppel/Duty to Defend).  Ins. Lit. Rptr., Vol. 34, No. 13 (August 13, 2012)

87.   *In re XL Specialty Ins. Co.* (Texas) (Bad Faith/Discovery).  Ins. Lit. Rptr., Vol. 34, No. 12 (July 30, 2012)

88.   *Goheagan v. American Vehicle Ins. Co.* (Florida) (Bad Faith/Duty to Settle).  Ins. Lit. Rptr., Vol. 34, No. 10 (July 9, 2012)

89.   *Yan Fang Du v. Allstate Ins. Co.* (California) (Bad Faith/Duty to Settle).  Ins. Lit. Rptr., Vol. 34, No. 10 (July 9, 2012)

90.   *Amerex Group, Inc. v. Lexington Ins. Co.* (New York) (Appraisal).  Ins. Lit. Rptr., Vol. 34, No. 10 (July 9, 2012)

91.   *Quade v. Secura Insurance* (Minnesota) (Appraisal).  Ins. Lit. Rptr., Vol. 34, No. 10 (July 9, 2012)

92.   *Illinois Union Ins. Co. v. NRI Construction, Inc*. (Georgia) (Liability Insurance/ Reimbursement).  Ins. Lit. Rptr., Vol. 34, No. 8 (June 11, 2012)

93.   *Vision One LLC v. Philadelphia Indem. Ins. Co.* (Washington) (Property Insurance/Ensuing Loss).  Ins. Lit. Rptr., Vol. 34, No. 8 (June 11, 2012)

94.   *Sprague v. Safeco Ins. Co. of America* (Washington) (Property Insurance/Ensuing Loss).  Ins. Lit. Rptr., Vol. 34, No. 8 (June 11, 2012)

95.   *Ennen v. Integon Indemnity Corp., GMAC*, (Alaska) (Bad Faith/Standing).  Ins. Lit. Rptr., Vol. 34, No. 6 (April 16, 2012)

96.   *Universal Underwriters Inc. Co. v. LKQ Smart Parts, Inc.,* (Illinois) (Liability Insurance/Spoliation of Evidence).  Ins. Lit. Rptr., Vol. 34, No. 2 (February 17, 2012)

97.   *Rogue v. Allstate Ins. Co.*, (Colorado) (Automobile Insurance/Road Rage).  Ins. Lit. Rptr., Vol. 34, No. 2 (February 17, 2012)

98.   *Employers Mutual Cas. Co. v. Holman Building Co., LLC*, (Alabama) (Procedure/Intervention).  Ins. Lit. Rptr., Vol. 34, No. 1 (February 3, 2012)

99.   *Emerson Electric Co. v. Marsh & McLennan Companies,* (Missouri) (Agents & Brokers/Fiduciary Duty).  Ins. Lit. Rptr., Vol. 33, No. 18 (November 4, 2011)

100.  *Remodeling Dimensions, Inc. v. Integrity Mutual Ins. Co.,* (Minnesota) (Insurance Defense Counsel).  Ins. Lit. Rptr., Vol. 33, No. 14 (September 9, 2011)

101.  *Weingarten Realty Management Co. v. Liberty Mutual Fire Ins. Co.,* (Texas) (Duty to Defend). Ins. Lit. Rptr., Vol. 33, No. 12 (August 12, 2011)

102.  *Stuart v. Pittman* (Oregon) (Agents and Brokers).  Ins. Lit. Rptr., Vol. 33, No. 10 (July 8, 2011)

103.  *Wood v. New Jersey Manufacturers Ins. Co.,* (New Jersey) (Bad Faith/Procedure).  Ins. Lit. Rptr., Vol. 33, No. 10 (July 8, 2011)

104.  *Lennar Corp. v. Transamerica Insurance Co.* (Arizona) (Bad Faith/Defenses).  Ins. Lit. Rptr., Vol. 33, No. 8 (May 23, 2011)

105.  *Allstate Ins. Co. v. Herron* (Alaska) (Bad Faith/Duty to Settle).  Ins. Lit. Rptr., Vol. 33, No. 6 (April 22, 2011)

106.  *Langwith v. American National General Ins. Co.* (Iowa) (Agents and Brokers).  Ins. Lit. Rptr., Vol. 33, No. 4 (March 25, 2011)

107.  *Westport Ins. Corp. v. VN Hotel Group, LLC* (Florida) (Liability Insurance/Legionnaires Disease).  Ins. Lit. Rptr., Vol. 33, No. 4 (March 25, 2011)

108.  *Ballesteros v. American Standard Ins. Co. of Washington* (Arizona) (UIM/UIM).  Ins. Lit. Rptr., Vol. 33, No. 3 (March 7, 2011)

## SPEAKER/PRESENTATIONS:

1.   "2018 Insurance Law Institute" (February 1-2, 2018, Phoenix, AZ) (Topic: Coverage Analysis) Sponsored by the State Bar of Arizona

2.   "Reverse Engineering Short-Fuse Bad Faith Set-Ups" (December 13, 2017, Phoenix, AZ) Sponsored by the Arizona Association of Defense Counsel

3.   Fourth Annual "Insurance Law Institute" (June 7-8, 2017) (Panelist/Moderator for Mediation of Coverage and Bad Faith Claims) Sponsored by the State Bar of Arizona

4.   "Working Effectively With Your Insurance Bad Faith Expert" (June 2, 2017, Scottsdale, AZ) (Panel Member) Arizona Association of Defense Counsel Annual Meeting

5.   "2016 Claims College: School of Extra-Contractual Claims" (September 7-9, 2016, Baltimore, MD) (Teaching Topic:  Insurance Claim Handling Regulations, Statutes and Unfair Claims Settlement Practices Acts)  Sponsored by CLM/Claims & Litigation Management Alliance

6.   "Extra-Contractual & Bad Faith Liability" (June 2-3, 2016, New York, NY) (Topic: Creative Bad Faith Set Ups: Preventative Strategies and Techniques with Regard to Open Limits, Policy Limit Demands and Time Limit Demand Letters)  Sponsored by American Conference Institute

7.   Third Annual "Insurance Law Institute" (February 4-5, 2016) (Panelist/*Damron* and *Morris* Agreements)  Sponsored by the State Bar of Arizona.

8.   "ACI's 32nd National Forum on Bad Faith Claims & Litigation" (November 19-20, 2015, Miami, FL) (Topic:  Bad Faith Set-Ups)  Sponsored by American Conference Institute.

9.   "Complex Insurance Coverage Analysis & Interpretation, A Systematic Approach" (March 24, 2015)  Sponsored by Thomson Reuters.

10.  "ACI's 30th National Forum on Bad Faith Claims & Litigation" (March 16-17, 2015, Philadelphia, PA) (Topic: Claims Management Best Practices and Bad Faith Avoidance) Sponsored by American Conference Institute.

11.  Second Annual "Insurance Law Institute" (January 29-30, 2015) (Panelist/Moderator for Bad Faith Panel Discussion) Sponsored by the State Bar of Arizona.

12.  "28th National Advanced Forum On Bad Faith Claims & Litigation" (July 29, 2014, San Francisco, CA) (Topics: Removal Issue in Bad Faith Cases; Adjuster Negligence; Aiding & Abetting Claims) Sponsored by American Conference Institute.

13.  "Annual CLE Meeting" (May 8, 2014, Salt Lake City, UT) (Topic: Discipline Without Assumptions: A Systematic Approach To Insurance Coverage Analysis) Sponsored by the Utah Defense Lawyers Association.

14.  "27th National Advanced Forum On Bad Faith Litigation" (March 31, 2014, Philadelphia, PA) (Topics: Federal Removal Challenges In Bad Faith Litigation; Claim Adjuster Negligence) Sponsored by American Conference Institute.

15.  First Annual "Insurance Law Institute" (January 30-31, 2014) (Topics: Building a General Understanding of Directors & Officers Insurance Policy Architecture and *Damron/Morris* Agreements; Panelist/Moderator for Judges Panel, *Damron/Morris* Panel, and Mediators Panel) Sponsored by the State Bar of Arizona.

16.  "Arizona Tort Law Handbook Seminar" (August 27, 2013) (Topic: Product Liability/Product Liability Exclusions in CGL Policy) Sponsored by the State Bar of Arizona.

17.  "25th National Advanced Forum On Bad Faith Litigation" (July 30-31, 2013, San Francisco, CA) (Topic: Bad Faith Set Ups) Sponsored by American Conference Institute.

18.  "Effective Strategies For Avoiding Federal Court Removal In Insurance Cases" (May 21, 2013) Sponsored by Thomson Reuters.

19.  "Discipline Without Assumptions: An Essential Exploration Into Coverage Analysis" (April 23, 2013) (Topic: Systematic Insurance Coverage Analysis) Sponsored by Thomson Reuters.

20.  "Texas 20th Annual Insurance Symposium," (April 5, 2013, Dallas, TX) (Topic: Problems with Complex Coverage Analysis) Sponsored by Cooper & Scully as approved by Texas State Bar and Texas Department of Insurance.

21.  "Arizona Tort Law Handbook Seminar," (February 1, 2013) (Topic: Dram Shop/Assault & Battery Exclusion/Intoxication Exclusion) Sponsored by the State Bar of Arizona.

22.  "2013 Arizona Insurance Law," Chairperson/Speaker (January 31, 2013) (Topic: 2012 Amendments to 28 USCA § 1446) Sponsored by the State Bar of Arizona.

23.  "Bad Faith Insurance Law," Chairperson (August 30, 2012) (Topic: Panel Member) Sponsored by the State Bar of Arizona.

24.  "2012 Annual Convention," Speaker for Bad Faith Insurance Litigation Group/Insurance Law Section (July 28-August 1, 2012, Chicago, IL) (Topic: Effective Strategies for Avoiding Federal Court Removal in Insurance Cases) Sponsored by the American Association for Justice.

25.  "22nd Annual CLE by the Sea," (July 18, 2012, San Diego, CA) (Topic: Witness Issues Arising in Civil Cases—Experts) Sponsored by the State Bar of Arizona.

26.  "Litigation Basics II CLE" (April 26, 2012)  (Topic:  A Young Associate's Guide to Preparing for Bad Faith Litigation)   Sponsored by Arizona Association of Defense Counsel, Young Lawyers Division.

27.  "Arizona Insurance Law" (January 27, 2012) (Topic: Directors & Officers Coverage) Sponsored by the State Bar of Arizona.

28.  The Medical Protective Company, National Claim Department Annual Conference (July 21, 2011, Fort Wayne, IN)  (Topics:  Bad Faith; Claim Handling).

29.  "21st Annual CLE by the Sea," Chairperson/Speaker (July 14-16, 2011, San Diego, CA) (Topic: Settlement Agreements)  Sponsored by the State Bar Arizona.

30.  "Arizona Insurance Law" (January 27, 2011) (Topic: Insurance Coverage – Analysis & Interpretation)  Sponsored by the State Bar of Arizona.

31.  "Insurance Coverage Litigation" (October 11, 2010)  (Topics: Interpreting Coverage Under the Insurance Contract and Bad Faith Litigation)  Sponsored by the National Business Institute.

32.  "Arizona Insurance Law" (January 22, 2010)   (Topic: Automobile Liability Coverage) Sponsored by the State Bar of Arizona.

33.  "Insurance Coverage Litigation" (October 12, 2009)  (Topic: Common Types of Insurance Coverage Disputes)  Sponsored by the National Business Institute.

34.  "American Conference Institute's 19th National Advanced Forum on Bad Faith Litigation," Compendium Of References To Insurance Company Bad Faith Set Up Situations (April 29-30, 2009, San Francisco, CA)  (Topic: Manufactured Claims: Strategically Avoiding and Properly Defending Against "Bad Faith Set-Ups")  Sponsored by American Conference Institute.

35.  "Arizona Insurance Law" (January 23, 2009)  (Topic: Third-Party Bad Faith in Arizona) Sponsored by the State Bar of Arizona.

36.  "Litigation Basics for the Civil Defense Associate" (December 2, 2008) (Topic: Fundamentals of Insurance Coverage Analysis)  Sponsored by Arizona Association of Defense Counsel, Young Lawyers Division.

37.  Guest Lecturer (March 6, 2008)  (Topic: Discovery Issues in Bad Faith Litigation)  Arizona State University College of Law (LAW 691).

38.  "Arizona Insurance Coverage" (January 25, 2008)   (Topic: Complex Coverage Analysis) Sponsored by the State Bar of Arizona.

39.  "Insurance Coverage and Claims Institute" (April 11-13, 2007, Chicago, Illinois)   (Topic: Expert witnesses and Insurance coverage litigation)  Sponsored by DRI.

40.  "*Daubert* and Use of Expert Witnesses in the Insurance Bad Faith Content" (April 4, 2007) Sponsored by Arizona Association of Defense Counsel.

41.  "Arizona Insurance Coverage" (January 25, 2007)  (Topics:  Complex Insurance Coverage Analysis and Directors & Officers Coverage)  Sponsored by the State Bar of Arizona.

42.  "Insurance Coverage and Practice Symposium" (December 7-8, 2006, New York, NY) (Topic: Dirty Sox and Clean Directors:  The Impact of Enron on D&O Issues)  Sponsored by DRI.

43.  "Western Regional Claims Counsel Conference" (October 25, 2006, San Diego, CA)  (Topic: Effective Use of "Colossus" Injury Analysis and Advice of Counsel to Avoid Bad Faith Liability Exposures)  Sponsored by Progressive Insurance Group.

44.  "Complex Insurance Coverage Analysis" (September 20, 2006, Hartford, CT)  Sponsored by Thomson/West Publishing.

45. "Federalizing Catastrophic Insurance Losses" and "The Evolution of Disclosure Obligations Regarding Disseminating Health Information to Applicants by Life, Health & Disability Insurance Companies" (September 20, 2006, Hartford, CT)  Sponsored by Thomson/West Publishing.

46. "2005 NDDLA/SBAND Seminar" (September 23, 2005, Fargo, ND)  (Topic: Discipline Without Assumptions, A Systematic Approach To Coverage Analysis)  Sponsored by State Bar Association of North Dakota.

47. "Insurance Coverage Topics" (February 9, 2005)  (Topic: Use of Demonstrative Exhibits for Bad Faith Trials)  Sponsored by Arizona Association of Defense Counsel.

48. "Arizona Liability Insurance Coverage" (May 14, 2004)  (Topic: Analyzing and Litigating Insurance Coverage Cases)  Sponsored by the State Bar of Arizona.

49. "Learn at Lunch" (January 14, 2004)  (Topic: Waiver of Attorney Client Privilege and Advice of Counsel in the Context of Insurance Bad Faith)  Sponsored by Arizona Association of Defense Counsel.

50. "Tort Law" (December 5, 2003)  (Topic: Insurance Bad Faith Analysis and Litigation) Sponsored by State Bar of Arizona.

51. "The Nuts and Bolts of Litigating Insurance Coverage Questions" (January 8, 2003) (Topic: Discipline Without Assumptions, A Systemic Approach to Coverage Analysis)  Sponsored by Arizona Association of Defense Counsel.

52. "Arizona Liability Insurance Coverage" (September 20, 2001)  (Topics:  *Damron/Morris* Agreements and Third-Party Bad Faith)  Sponsored by the State Bar of Arizona.

53. "Insurance Litigation in Arizona" (October 20, 2000) (Topic: *Morris* Agreements and Third-Party Bad Faith)  Sponsored by Lorman Education Services.

54. "Advanced Litigation Techniques Seminar" (December 10, 1999)  (Topic: Bad Faith and Coverage Issues)  Sponsored by the Arizona Association of Defense Counsel.

55. "The Most Advanced Insurance Seminar of the Year" (October 1, 1999)  (Topic: *Morris/Damron* Agreements – How to Avoid the Often Subtle and Serious Pitfalls)  Sponsored by the Arizona Trial Lawyers Association.

56. "Arizona Liability Insurance Coverage" (April 30, 1999) (Topic: Insurance:  Developments in Judicial Rulings on Reservation of Rights Defenses and *Morris* Agreements)  Sponsored by the State Bar of Arizona.

57. "The Phoenix Mini-Bar" (June 19, 1998)  (Topic: How to Understand and Litigate Insurance Coverage in Arizona)  Sponsored by Continuing Legal Education Options (CLE-Ops).

58. "The Law of Insurance Bad Faith:  A Balanced Perspective" (April 24, 1998-Tucson; May 1, 1998-Phoenix)  (Topic: Third-Party Bad Faith)  Sponsored by the State Bar of Arizona.

59. "Sing a Song of Six Torts" (April 18, 1997)  (Topic: First Party Bad Faith)  Sponsored by the State Bar of Arizona.

60. "Recent Developments in Insurance Coverage Litigation:  Environmental Coverage, Common Negligence and Bad Faith" (June 13, 1996)  (Topic: Bad Faith)  Sponsored by the Arizona Association of Defense Counsel.

61. "Essentials in Insurance and Bad Faith" (March 31, 1995)  (Topic: Insurance Bad Faith from the Defense Perspective)  Presented at the Arizona Statewide Minority Lawyers Bar Convention.

62.   "Law of Insurance Bad Faith: A Beginning, but Not the End" (March 10, 1995)  (Topic: Third Party Bad Faith)  Sponsored by the State Bar of Arizona.

63.   "Tort Reform:  The November 8 Vote, What's Law? What's Not" (November 10, 1994)  (Topic: Insurance Bad Faith, the Defense Perspective)  Sponsored by the Arizona Association of Defense Counsel.

64.   "Insurance Coverage Issues" (March 1, 1994)  (Topic: Reservation of Rights Defenses and *Morris* Agreements)  Sponsored by the Arizona Association of Defense Counsel.

65.   "Insurance Coverage Litigation:  An Overview of Key Areas of Concern to Lawyers" (November 18, 1993)   (Topic: The Concurrent Causation Doctrine and the Standard Automobile Liability Policy)  Sponsored by the State Bar of Arizona.

66.   "Auto Insurance" (November 15, 1991)  (Topic: Arizona's Property and Casualty Insurance Guaranty Fund)  Sponsored by Arizona Trial Lawyers Association.

67.   "Insurance Coverage Litigation:  An Overview of Key Areas of Concern to Lawyers" (March 9, 1990—Phoenix; April 20, 1990—Tucson) (Topic: Multiple Coverage Problems and the Standard Automobile Liability Insurance Policy; Arizona's Property and Casualty Insurance Guaranty Fund)  Sponsored by the State Bar of Arizona.

68.   "Arizona Bad Faith Insurance Law:  What Every Practitioner Should Know" (December 14, 1990)  (Topic: Third-Party Bad Faith)  Sponsored by the State Bar of Arizona.

69.   "Contemporary Problems in Insurance Related Litigation" (May 5, 1989)   (Topic: Developments in the Law Regarding Uninsured and Underinsured Automobile Liability Insurance Policies)  Sponsored by the State Bar of Arizona.

## PROFESSIONAL ACTIVITIES:

- Admitted to the State Bar of Arizona, 1982; U.S. District Court (Arizona), 1982; Ninth Circuit Court of Appeals, 1983; U.S. Court of Appeals (D.C. Circuit), 1989; U.S. Supreme Court, 2002; Tenth Circuit Court of Appeals, 2004.
- Licensed Insurance Broker, Arizona, 1974 to present (Property and Casualty; Accident and Health; Life).
- Chairman, CLE Committee, Young Lawyers Division, Arizona State Bar Association, 1990-1992.
- Member, Arizona State Bar Association, CLE Committee, 1990-1993; 2001-2004.

**Rule 26 LIST OF STEVEN PLITT  (Last 4 years)**

| | CASE NAME | COURT INFORMATION | FORM OF TESTIMONY | DATE OF TESTIMONY |
|---|---|---|---|---|
| 1. | Calaway v. Ace American Ins. Co. | Maricopa County Superior Ct., Arizona, CV2013-015803 | Trial x2 | 07/07/15, 07/08/15 |
| 2. | Century Surety Company v. William R. Smith, et al. | USDC, Colorado, 1:14-cv-00947-RM-MJW | Depo | 08/03/15 |
| 3. | Tellez v. Southern Insurance Co. | Third Judicial District, Salt Lake County, Utah, 130901142 | Depo #1 | 08/06/15 |
| 4. | Tellez v. Southern Insurance Co. | Third Judicial District, Salt Lake County, Utah, 130901142 | Depo #2 | 10/07/15 |
| 5. | Amburgey v. Chubb Custom Ins. Co. | Knott Circuit Court, Kentucky, 07-CI-00056 | Depo | 01/06/16 |
| 6. | Calaway v. Ace American Ins. Co. | Maricopa County Superior Ct., Arizona, CV2013-015803 | Trial x2 | 01/14/16, 01/15/16 |
| 7. | Citizens of Humanity, LLC v. Westchester Surplus Lines Ins. Co. | USDC, Central District, California, 2:15-cv-02278-ODW-AJW | Depo | 03/31/16 |
| 8. | Redstone Hawaii, Inc., et al. v. David Akui, et al. | Circuit Court of the First Circuit, Hawaii, 14-1-0661-03 | Depo | 04/22/16 |
| 9. | Hale v. Farm Bureau Property & Casualty Ins. Co., et al. | 1st Judicial District Court, Santa Fe County, New Mexico, D-101-CV-2014-01829 | Depo | 06/15/16 |
| 10. | Cosgrove v. National Fire & Marine Ins. Co. | USDC, Arizona, 2:14-cv-02229-PHX-HRH | Depo | 08/18/16 |
| 11. | The Charter Oak Fire Ins. Co. v. American Capital, Ltd., et al. | USDC, Maryland, 8:09-CV-00100-DKC | Depo | 10/18/16 |
| 12. | Apollo Education Group, Inc. fka Apollo Group, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa. | USDC, Arizona, 2:15-cv-01948-PHX-SPL | Depo | 11/15/16 |
| 13. | Roberts v. State Farm Fire & Cas. Ins. Co., et al. | 1st Judicial District Court, Santa Fe County, New Mexico, D-101-CV-2010-03310 | Depo | 01/19/17 |
| 14. | Chomko v. Nevada Capital Ins. Co., et al. | Clark County District Ct., Nevada, A-719297-C | Depo | 02/03/17 |
| 15. | Walker, et al. v. State Farm Mutual Auto. Ins. Co., et al. | USDC, Nevada, 2:16-cv-00986-RFB-GWF | Depo | 02/22/17 |
| 16. | Gonzakowski v. Allstate Indemnity Company, et al. | 2nd Judicial District Court, Bernalillo County, New Mexico, D-202-CV-2015-06572 | Depo | 03/03/17 |
| 17. | New Jersey Transit Corporation v. Certain Underwriters at Lloyd's London, et al. | Superior Court of New Jersey, Law Div., Essex County Docket No. L-6977-14 | Depo | 03/31/17 |
| 18. | Savage v. State Farm | Superior Court of the State of Arizona, Maricopa County Superior Court; CV2015-054801 | Depo | 04/13/17 |
| 19. | Rankin v. USAA | USDC, Colorado 1:16-CV-00373-WJM-STV | Depo | 04/25/17 |
| 20. | Principal Life Insurance Company v. Emad Zaki | USDC, Arizona, 2:15-cv-01337-PHX-SMM | Depo | 04/28/17 |
| 21. | Gonzakowski v. Allstate Indemnity Company, et al. | 2nd Judicial District Court, Bernalillo County, New Mexico, D-202-CV-2015-06572 | Trial | 07/19/17 |
| 22. | Central Freight Xpress, Inc. v. Travelers Property and Casualty Company of America, et al. | Maricopa County Superior Court, Arizona, CV2016-050950 | Depo | 08/08/17 |
| 23. | The Cedars Townhomes Owners Association, et al. v. Auto-Owners Insurance Company, et al. | USDC, District of Utah, Central Division, 2:14-cv-00608-TC | Depo | 08/11/17 |

**Rule 26 LIST OF STEVEN PLITT  (Last 4 years)**

| | CASE NAME | COURT INFORMATION | FORM OF TESTIMONY | DATE OF TESTIMONY |
|---|---|---|---|---|
| 24. | Nast v. Certain Underwriters at Lloyd's of London | Circuit Court of City of St. Louis, 1522-CC09864 | Depo | 09/07/17 |
| 25. | Sunflower Condominium Association, Inc. v. Owners Insurance Company | USDC, District of Colorado, 16:CV-02946-WJM-NYW | Depo | 10/05/17 |
| 26. | Wortham v. Western Mutual Insurance Company | USDC, District of Nevada 2:16-cv-02988-JCM-CWH | Depo | 10/24/17 |
| 27. | Buccheri v. GEICO Insurance Company | USDC, District of New Mexico 1:17-CV-00490-LF-KK | Depo | 11/09/17 |
| 28. | Tyler v. American General | USDC, District of Arizona 2:16-cv-00939-GMS | Depo | 12/20/17 |
| 29. | Endurance American Specialty Insurance Company v. Admiral Insurance Company | Superior Court, California, San Diego County, Central Division 37-2015-00028446-CU-IC-CTL | Depo | 04/11/18 |
| 30. | Hogg v. Automobile Club Inter-Insurance Exchange | Circuit Court, Jackson County, Missouri 1616-CV28347 | Depo | 04/26/18 |
| 31. | Wunderlich v. National General Insurance Online, Inc. | Circuit Court, Jackson County, Missouri 1716-CV12514 | Depo | 05/01/18 |
| 32. | Masciotra v. American Family Mutual Insurance Company, et al. | District Court, Clark County, Nevada A-14-695837-C | Depo | 05/15/18 |
| 33. | Whitlock v. Nevada Capital | District Court, Clark County, Nevada A-13-681608-C | Depo | 06/13/18 |
| 34. | Rossman v. Farmers Insurance Exchange | Fourth Judicial District, Ada County, Idaho CV01-17-11405 | Depo | 06/15/18 |
| 35. | Wei v. Warrick | Circuit Court, St. Louis County, Missouri 17SL-CC00724 | Trial | 06/27/18 |
| 36. | Labertew, et al. v. Chartis Property Casualty Company, et al. | USDC, District of Arizona CV-13-01785-PHX-DGC | Depo | 09/04/18 |
| 37. | Cheney v. American General Life Insurance Company, et al. | USDC, District of Arizona 2:17-CV-00004-PHX-DGC | Depo | 09/13/18 |
| 38. | OR&L Construction, L.P. v. Mountain States Mutual Casualty Company, et al. | Third Judicial District, Dona Ana County, New Mexico D-307-CV-2016-01075 | Depo | 09/25/18 |
| 39. | Lobato v. Travelers | USDC, District of Colorado 1:18-cv-00504 REB-MEH | Depo | 01/04/19 |
| 40. | Fremont v. Rocky Mountain Hospital | JAMS Arbitration No. 1260004507 | Depo | 01/29/19 |
| 41. | Raygarr v. EMC Insurance Companies | USDC, District of Arizona 4:18-cv-00246-RM | Depo | 05/14/19 |